STATE OF CONNECTICUT *v.* MICHAEL B. ROSS
(13224)
(13225)
(13226)

PETERS, C. J., CALLAHAN, BERDON, DUPONT and E. O'CONNELL, Js.

Argued February 15—decision released July 26, 1994

*Kent Drager,* assistant public defender, and *Michael A. Fitzpatrick,* with whom were *G. Douglas Nash* and *M. Fred DeCaprio,* public defenders, and *Peter Scillieri* and *Elizabeth Inkster,* assistant public defenders, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom were *C. Robert Satti, Sr.,* state's attorney, *Jack W. Fischer, Judith Rossi* and *Susan C. Marks,* assistant state's attorneys, and *Mary Thurston,* law student intern, for the appellee (state).

*James W. Bergenn, Gregory T. D'Auria* and *David N. Rosen* filed a brief for the Connectieut Citizens for Humanizing Criminal Justice et al. as amici curiae.

*Helena M. Cook, Christopher Keith Hall, Alice M. Miller, Jane Rocamora, David Weissbrodt, William M. Bloss, Julius Oosthuizen* and *Catherine A. DeFlorio* filed a brief for Amnesty International et al. as amici curiae.

*David M. Cohen* and *Martha Stone* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Kathryn Emmett* and *Deborah Fins* filed a brief for the American Friends Service Committee et al. as amici curiae.

*Jacob D. Zeldes, Jennifer L. Forrence, Tanina Rostain, Jonathan M. Levine* and *Loftus E. Becker, Jr.,* filed a brief for Ezra E. H. Griffith et al. as amici curiae.

PETERS, C. J. These consolidated criminal appeals from the imposition of the death penalty upon the defendant, Michael B. Ross, raise numerous issues concerning the validity of his capital felony convictions and the validity of the procedures that resulted in death sentences for each of these convictions.[1] After a trial to

---

[1] We reject the dissenting justice's suggestion that plenary consideration of the defendant's appeals should have been postponed to some indefinite

determine guilt, a jury convicted the defendant of six counts of capital felony[2] in violation of General Statutes § 53a-54b.[3] At a separate sentencing hearing pur-

time in the future. No other death penalty case is presently ready to be heard, without disqualifications, en banc or even by five justices of this court. There is no prospect that any such appeal will be ready in this calendar year. It is entirely unclear when any such appeal will be ready. Concern for fairness in the administration of justice requires the prompt reversal of a trial court judgment that improperly imposes the death penalty. It is anomalous for the dissenting justice to take the position that the death penalty is unconstitutionally cruel on its face, in part because of the inevitable delay in its implementation, and simultaneously to urge indefinite extension of the uncertainty and anxiety of a criminal defendant who is presently improperly being held on death row.

Furthermore, we disagree with the dissenting justice's contention that the members of the Appellate Court who sit with this court in this case by designation, pursuant to General Statutes § 51-207 (b), lack the institutional competence to decide this case. Although General Statutes § 51-199 (b) directs that appeals in death penalty cases, as in other serious criminal cases, are to be filed in this court, § 51-199 (c) permits all such appeals to be transferred to the Appellate Court. While General Statutes § 53a-46b confers jurisdiction on the Supreme Court to review the validity of a death sentence, that statute does not, either expressly or by implication, determine who shall sit as the Supreme Court in order to hear the appeal. In short, the legislature has not appointed the individual members of this court as a special constitutional court. Indeed, members of the Appellate Court, like members of this court, frequently decide appeals raising grave questions of constitutional law. The Supreme Court is the final arbiter of state constitutional law only because a court system is necessarily hierarchical. It demeans the importance of serious jurisprudential differences to devalue the contribution of any properly selected member of the court.

[2] The state originally charged the defendant with having committed eight counts of capital felony. After a finding of probable cause on all counts, the trial court, *Hendel, J.*, dismissed the count charging the defendant with capital felony in the rape and murder of April B. and dismissed the count charging the defendant with capital felony based on a double homicide committed in one transaction, for lack of territorial jurisdiction.

[3] General Statutes § 53a-54b provides in relevant part: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction."

suant to General Statutes § 53a-46a,[4] the same jury considered further evidence and found an aggravating

[4] General Statutes § 53a-46a provides in relevant part: "HEARING ON IMPOSITION OF DEATH PENALTY. AGGRAVATING AND MITIGATING FACTORS. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not con-

factor and no mitigating factor with respect to each count. As a result, the trial court rendered a judgment imposing the death sentence on the defendant on each count. The defendant has appealed to this court in accordance with General Statutes §§ 51-199 and

stitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

We recognize that, for the purposes of this appeal, the statute applicable to the defendant's trial was General Statutes (Rev. to 1983) § 56a-46a. For the sake of uniformity and clarity, however, our references are to the statute as it is currently codified. Except where otherwise noted, there have been no substantive changes in the applicable text of the statute since its 1983 codification.

53a-46b.[5] We affirm the defendant's conviction of all counts of capital felony. Because of improprieties in the conduct of the sentencing hearing, however, we reverse the judgments with respect to the imposition of the death penalty and remand for new sentencing hearings on all counts.

The jury could reasonably have found the following facts. On June 13, 1984, the defendant accosted seventeen year old Wendy B. as she was walking along Route 12 in Lisbon. After a short conversation, he pulled Wendy B. over a stone wall, forcing her to go with him into a wooded area that led to an open field. There he sexually assaulted her, forced her to turn over on her stomach, and then strangled her.

On Thanksgiving Day, 1983, the defendant accosted nineteen year old Robyn S. on the grounds of Uncas on Thames State Hospital in Norwich. He forcefully pulled Robyn S. into a wooded area and ordered her to remove her clothing. He then sexually assaulted her

---

[5] General Statutes § 51-199 provides in relevant part: "JURISDICTION. . . . (b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

General Statutes § 53a-46b provides: "REVIEW OF DEATH SENTENCE. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

and, after ordering her to turn over on her stomach, strangled her. Before leaving, he covered her body with leaves.

On Easter Sunday, 1984, the defendant picked up fourteen year old April B. and fourteen year old Leslie S., who were hitchhiking to Jewett City on Route 138. Once the girls had entered his car, he drove them easterly on Route 165 and, over their protests, past their intended destination. When April B. tried to force the defendant to stop the car by threatening him with a knife, he disarmed her and continued to transport the girls against their will, through eastern Connecticut, to Beach Pond in Rhode Island. At Beach Pond, he parked his car and bound both girls hand and foot. He then untied April B.'s feet and forced her to walk a short distance from his car, where he assaulted her sexually, turned her over on her stomach and strangled her. Returning to the car, the defendant killed Leslie S. without sexually assaulting her. He then placed the bodies of both girls in his car and drove back to Preston, Connecticut, where he deposited their bodies in a culvert.

At his trial, the defendant did not deny having committed the sexual assaults, the kidnappings and the murders described above. His defense was insanity, a defense that the jury rejected by finding him guilty as charged. Additional facts will be discussed as they become relevant to the issues before us.

The defendant's appeal raises a multitude of issues, which we will address in three main parts. First, we will consider the validity of the defendant's conviction of six counts of capital felony. Second, we will consider the facial constitutionality, under the federal and state constitutions, of imposing the death penalty upon a person who has been found to have committed, in an especially heinous, cruel or depraved

manner; General Statutes § 53a-46a (h) (4); a capital felony under subsection (5) or subsection (7) of § 53a-54b. Third, we will consider the validity, pursuant to § 53a-46a, of the defendant's sentencing hearing. In light of our remand for a new sentencing hearing because of substantial noncompliance with the statutory requirements of § 53a-46a, we need not review the defendant's death sentences pursuant to § 53a-46b.

## I

### VALIDITY OF THE CONVICTIONS

The defendant has raised numerous challenges to the validity of his conviction of six counts of capital felony. On jurisdictional grounds, he maintains that the trial court lacked the authority to try him for the two counts of capital felony involving the two murders committed in Rhode Island. On evidentiary grounds, he maintains that the trial court improperly: (1) denied his motions to suppress his incriminatory statements to the police; and (2) restricted his cross-examination of a police officer. On instructional grounds, he maintains that the trial court improperly charged the jury concerning: (1) the inferences that could be drawn from missing witnesses; (2) the special evidentiary requirements for proof of a capital crime; (3) reasonable doubt; (4) the burden of proving insanity; and (5) the unavailability of a defense of extreme emotional disturbance. In addition, he maintains that the trial court improperly: (1) denied his motion for severance; (2) permitted prejudicial commentary by the prosecuting attorney; and (3) rejected claims of juror prejudice. We agree with the state that none of the defendant's claims of error warrant reversal of his convictions.

Before addressing the multiple claims raised by the defendant, we should take notice of two claims that he does not make. He does not challenge the sufficiency of the evidence to support the jury's verdicts that he

was guilty, beyond a reasonable doubt, of each of the counts of capital felony with which he was charged under § 53a-54b (5) and (7). He similarly does not challenge the jury's determination that he failed to establish his defense of insanity by a preponderance of the evidence.

## A

### JURISDICTIONAL ISSUES

The defendant maintains that the trial court lacked territorial jurisdiction to try him for the capital felonies relating to the deaths of April B. and Leslie S. because these two victims were not killed in Connecticut. The state argues that Connecticut's continuing jurisdiction over the defendant's kidnapping of these victims provides authority for Connecticut to prosecute him for the capital felonies arising out of the murders committed in Rhode Island.

When the issue of territorial jurisdiction was initially raised in the trial court by the defendant's motion to dismiss, the trial court, *Hendel, J.,* after a hearing, made the following findings of fact. The victims were kidnapped in Connecticut and killed in Rhode Island. At the time of their abduction, the defendant had the intention to assault the victims sexually and to kill them. The victims had the ability to observe the defendant throughout their abduction and thus would have been able to identify him.

From these facts, the trial court concluded that it lacked jurisdiction over the capital felony counts charging the defendant with double murder; § 53a-54b (8); and with the sexual assault and murder of April B.; § 53a-54b (7); because the alleged murders and sexual assault had been committed entirely in Rhode Island.[6] The trial court concluded, however, that it had jur-

---

[6] The state has not appealed this ruling. See footnote 2.

isdiction over the capital felony counts charging murder in the course of a kidnapping. General Statutes § 53a-54b (5). Without challenging the trial court's underlying findings of fact, the defendant argues that its ruling of law was incorrect. We disagree.

Our starting point is the observation that, as a general matter, the Superior Court has no territorial jurisdiction to adjudicate a charge of murder unless the state proves, beyond a reasonable doubt, that the victim was murdered in Connecticut. General Statutes § 51-1a (b); *State v. Beverly,* 224 Conn. 372, 375–76, 618 A.2d 1335 (1993); *State v. Volpe,* 113 Conn. 288, 294, 155 A. 223 (1931); A. Spinella, Connecticut Criminal Procedure (1985) § 3A, pp. 18–19. This point of departure is consistent with the common law principle that limits the state's interest in vindicating its criminal laws to the reach of its territory. *State v. Volpe,* supra, 294; *State v. Grady,* 34 Conn. 118, 129–30 (1867); *Gilbert v. Steadman,* 1 Root 403 (1792). This principle of limited territorial jurisdiction presumably underlay the trial court's dismissal of the capital felony count charging the defendant with having violated § 53a-54b (8).

The issue before us is whether a different rule should apply to a capital felony that is defined by statute as a "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety." General Statutes § 53a-54b (5). The defendant emphasizes that the statute punishes an aggravated form of murder, so that the gravamen of the offense charged is the homicide that occurred in Rhode Island. The state argues, to the contrary, that the statute prescribes a linkage between kidnapping and murder that allows the exercise of territorial jurisdiction over the consequences of a kidnapping that began in Connecticut. The state emphasizes the trial court's finding of fact that, at the

time of their abduction, the defendant had the intention to assault the victims sexually and to kill them.

This specific issue is a matter of first impression for this court. To resolve it, we must examine our common law with respect to territorial jurisdiction, as well as changes brought about by the enactment of the penal code.

Prior to the enactment of the penal code, our common law cases reviewed this state's exercise of jurisdiction over a number of continuous crimes that had a significant nexus with another state. In those cases, we held that our courts had jurisdiction to consider charges of larceny brought against criminal defendants who are discovered in this state with property stolen in another state. *State* v. *Keeby,* 159 Conn. 201, 206, 268 A.2d 652 (1970), cert. denied, 400 U.S. 1010, 91 S. Ct. 569, 27 L. Ed. 2d 623 (1971); *State* v. *Palkimas,* 153 Conn. 555, 561–62, 219 A.2d 220 (1966); *State* v. *Pambianchi,* 139 Conn. 543, 547, 95 A.2d 695 (1953); *State* v. *Cummings,* 33 Conn. 260, 264–65 (1866). Similarly, we held that a defendant had committed the crime of embezzlement in this state when he received bonds in Connecticut, with the present intent to sell them and to appropriate their proceeds, even though the embezzled bonds were actually sold in another state and the proceeds realized there. *State* v. *Serkau,* 128 Conn. 153, 156–57, 20 A.2d 725 (1941).

In each of these cases at common law, we construed our statutes to impose criminal liability on the defendants for their conduct in Connecticut. In the larceny cases, we held that our larceny statute imposed criminal liability on the continued retention in Connecticut of stolen property regardless of its provenance. In the embezzlement case, we held that our statute imposed liability on the felonious appropriation of property in Connecticut regardless of the locale of the completion

of the defendant's felonious plan. The defendants in those cases were therefore properly convicted in Connecticut, not because Connecticut was exercising extraterritorial jurisdiction, but because the state had established that each element of the crimes charged had been proven to have occurred in this state. See A. Spinella, supra, pp. 18–21. As the defendant correctly points out, the cited precedents would permit a Connecticut prosecution of a capital felony if a murder occurred in this state following a kidnapping that had begun in another state. They would likewise permit a Connecticut prosecution for a kidnapping that began in Connecticut but continued until the victims were released in another state. Presumably they would also encompass a Connecticut prosecution for a murder commenced by a physical attack on a victim in this state, with the intent to kill, even though the victim actually died in a hospital in Rhode Island. See *Pollard* v. *State,* 270 Ind. 599, 388 N.E.2d 496 (1979). Those are not, however, the facts of this case.

Adoption of the penal code abrogated our common law of crimes. *Valeriano* v. *Bronson,* 209 Conn. 75, 92, 546 A.2d 1380 (1988). Nothing in the text of the penal code indicates that the legislature addressed questions of extraterritorial jurisdiction. The state urges us to adopt the expanded view of extraterritorial jurisdiction advocated by the Model Penal Code, pursuant to which a state has jurisdiction over any crime whenever at least one element of the crime occurred within the state. See 1 A.L.I., Model Penal Code and Commentaries (1985) § 1.03. Although our penal code commission apparently noted and discussed an earlier version of the Model Penal Code incorporating the same expanded view of jurisdiction; see 1967 Report of the Commission to Revise the Criminal Statutes p. 42; that discussion did not result in any textual articulation of legislative intent. See A. Spinella, supra, § 3A. The

defendant urges us to conclude that enactment of our penal code, without a specific adoption of the Model Penal Code as to jurisdiction, limits the jurisdiction of our courts to crimes committed within this state.

The closest that we have come to judicial adoption of the Model Penal Code's view of jurisdiction is *State* v. *Stevens,* 224 Conn. 730, 620 A.2d 789 (1993). In that case, we held that a police officer, after a lawful arrest in Connecticut for a crime committed in this state, did not exceed permissible territorial limitations on his jurisdiction by having blood tests performed on an allegedly intoxicated driver at the nearest emergency medical facility in Rhode Island. Id., 742–43. Citing the Model Penal Code, we began our discussion by stating that there are situations in which "even a criminal statute may have extraterritorial effect. See, e.g., *Strassheim* v. *Daily,* 221 U.S. 280, 284, 31 S. Ct. 558, 55 L. Ed. 735 (1910) (upholding prosecution in Michigan for acts of bribery and obtaining public money under false pretenses by defendant in Illinois, offenses by their nature peculiarly injurious to the state of Michigan); see also *People* v. *Tyler,* 7 Mich. 161, 221 (1859) ('every sovereignty has the right, subject to certain restrictions, to protect itself from, and to punish as crimes, certain acts which are peculiarly injurious to its rights or interests, or those of its citizens, *wherever committed'* [emphasis in original])." Id., 738.

In *State* v. *Stevens,* supra, 224 Conn. 739, we nonetheless resolved the issue in favor of jurisdiction on a narrower ground than that advocated by the Model Penal Code when we invoked a test that "balance[d] the legitimate interests of the adjoining sovereignties." See also *State* v. *Mueller,* 44 Wis. 2d 387, 392–93, 171 N.W.2d 414 (1969). We noted that the courts of Rhode Island would have had no jurisdiction over the defendant's offenses; *State* v. *Stevens,* supra, 737; and that the statutes of Rhode Island permit " 'any one' to arrest or

to seize evidence after the commission of 'any offense.' "
Id., 739. On the Connecticut side of the ledger, we
emphasized our state's "unambiguous policy aimed at
ensuring that our highways are safe from the carnage
associated with drunken drivers." Id. Finally, we looked
to the language of the governing Connecticut statute,
General Statutes § 14-227b. We thought it highly sig-
nificant that "nothing in the language or legislative his-
tory of § 14-227b [suggests] that the legislature
intended that a police officer should endanger the life
of an arrestee by contravening the judgment of emer-
gency medical personnel and requiring them to trans-
port the arrestee to a more distant hospital so that the
officer may gather evanescent evidence on Connecti-
cut soil." Id., 742.

*Stevens* is not a controlling precedent because, in that
case, we addressed the extraterritorial authority of a
Connecticut police officer, rather than the extrater-
ritorial authority of a Connecticut court. *Stevens* is,
nonetheless, significant because, rather than adopting
the provisions of the Model Penal Code wholesale, we
undertook an examination of the underlying public
policy and a close reading of the relevant statutes.

Applying the methodology of *Stevens,* we note that
*Stevens* assumed that, as a matter of public policy in
the realm of criminal law, the General Assembly has
the constitutional authority to enact a statute that has
an extraterritorial effect. We agree with that assump-
tion. As the Supreme Court of Florida has held, if the
legislature so directs, "[a] person who commits a crime
partly in one state and partly in another state may be
tried in either state under the sixth amendment of the
United States Constitution." *Lane* v. *State,* 388 So. 2d
1022, 1028 (Fla. 1980);[7] see also *Conrad* v. *State,* 262

___

[7] The statutes at issue in *Lane* v. *State,* supra, 388 So. 2d 1022, were
§§ 910.005 and 910.01, Florida Statutes Annotated (1977). Section 910.005

Ind. 446, 450, 317 N.E.2d 789 (1974); *State* v. *Harrington,* 128 Vt. 242, 250, 260 A.2d 692 (1969). Connecticut does not lack the authority to make it a capital crime in Connecticut to form the intent here to cause the death of a victim elsewhere and to act in furtherance thereof or to commit an underlying felony in this state that results in a murder elsewhere. *Lane* v. *State,* supra, 1028; see also *Heath* v. *Jones,* 941 F.2d 1126, 1138 (11th Cir. 1991).

The ultimate question is, therefore, as *Stevens* suggests, a matter of statutory construction. We must decide whether, in enacting § 53a-54b (5), the legislature manifested its intention to give extraterritorial effect to the capital felony it therein defined as a "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety." We recognize that, unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state. *State* v. *Russell,* 218 Conn. 273, 278, 588 A.2d 1376 (1991); *State* v. *Torres,* 206 Conn. 346, 355, 538 A.2d 185 (1988). We are, however, persuaded that the statute, as drafted, unambiguously manifests the legislature's intent to allow a capital felony prosecution of the defendant in the circumstances of this case.

On its face, the statute requires the state to prove a murder by a kidnapper without requiring that the

provided in relevant part: "(1) A person is subject to prosecution in this state for an offense that he commits, while either within or outside the state, by his own conduct or that of another for which he is legally accountable, if: (a) The offense is committed wholly or partly within the state . . . .

"(2) An offense is committed partly within this state if either the conduct that is an element of the offense or the result that is an element, occurs within the state. In homicide, the 'result' is either the physical contact that causes death, or the death itself; and if the body of a homicide victim is found within the state, the death is presumed to have occurred within the state."

murder have been committed in Connecticut. The strongest argument against such a literal construction of § 53a-54b (5) is that its language does not parallel the language of the felony murder statute, General Statutes § 53a-54c. The latter statute provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits . . . kidnapping . . . and, in the course of and in furtherance of such crime or of flight therefrom, he . . . causes the death of a person other than one of the participants . . . ." When the predicate crime is a kidnapping, the felony murder statute encompasses any killing of the victim that occurs during the victim's unlawful detention. See *State* v. *Gomez*, 225 Conn. 347, 350–51, 622 A.2d 1014 (1993). Presumably, the felony murder statute would encompass such a murder if it occurred in another state. Although the language of the capital felony statute is slightly different, because it penalizes a "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety"; General Statutes § 53a-54b (5); we are not persuaded that these differences in statutory formulation are sufficient to ascribe an extraterritorial effect to the one statute and not to the other.

An alternate argument contrary to a literal construction of § 53a-54b (5) is premised on the proposition that, because commission of a murder is the major premise for any capital felony under § 53a-54b, the legislature cannot have intended to have Connecticut assume jurisdiction over a murder committed in another state under any circumstances. This argument is unpersuasive for two reasons. Structurally, although most subsections of § 53a-54b require the state to prove the commission of a murder, subsection (6) has no such requirement. See footnote 3. Linguistically, § 53a-54b (5), the subsection presently at issue, speaks of "murder by a kidnapper" and does not prioritize between the commission of the two predicate felonies, kidnapping and murder.

To reach the conclusion that § 53a-54b (5) applies to the Rhode Island murders in the circumstances of this case, we need not embrace the policy of the Model Penal Code in its entirety for all criminal prosecutions. It bears emphasis that in this case we have a defendant who, in this state, intentionally committed two kidnappings with the contemporaneous intent to cause the death of his victims. With that intent, and during the uninterrupted course of the kidnappings, he killed the victims. Although the murders occurred in Rhode Island, the defendant returned the victims' bodies to Connecticut. This case, therefore, demonstrates an overwhelming factual nexus between the crimes and Connecticut. We are persuaded that the legislature intended the literal language of the statute to apply to a case so closely tied to the public welfare of this state.

In summary, we conclude that the defendant's jurisdictional defense cannot be sustained in the circumstances of this case. The defendant was properly convicted of the two counts of capital felony arising out of his kidnapping of April B. and Leslie S., even though he murdered them in Rhode Island.

## B

### EVIDENTIARY ISSUES

The defendant next maintains that several allegedly improper evidentiary rulings entitle him to a new trial. He urges us to conclude that the trial court improperly: (1) denied his motions to suppress his incriminatory statements to the police; and (2) restricted his cross-examination of a police officer. We disagree.

### 1

On June 28, 1984, while at the Lisbon town hall, the defendant made numerous inculpatory statements to the state police. He admitted, orally and in writing, that he had killed Wendy B. and Robyn S., murders that

were committed in New London county. He also confessed to killing April B. and Leslie S. in Rhode Island and to other murders in Windham county.

After an evidentiary hearing, the trial court, *Hendel, J.,* denied the defendant's motion to suppress his inculpatory statements. In support of its ruling, the trial court made the following findings of fact. The defendant came to the Lisbon town hall voluntarily. He made his first incriminatory statement to detective Michael Malchik before having received *Miranda* warnings. This statement resulted from an extended conversation in a town hall conference room. During this conversation, the defendant was not physically restrained and twice had been advised that he was free to leave. It was the defendant who initiated an inquiry into the type of person who might have killed Wendy B. and whether such person might receive psychotherapy. The defendant then asked Malchik whether Malchik thought the defendant had killed Wendy B. Malchik replied in the affirmative and told the defendant that he felt that "he [the defendant] would do it again and I thought that was the most important thing, that he didn't do it again." Immediately thereafter, without any questioning by Malchik, the defendant admitted to having killed Wendy B. Upon hearing this incriminatory statement, Malchik terminated any further conversation with the defendant and treated him as a custodial suspect. Before asking any further questions, Malchik gave the defendant the required *Miranda* warnings; *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and asked the defendant to sign a *Miranda* waiver, which he did. All the defendant's subsequent incriminatory statements followed repeated *Miranda* warnings and waivers.

The trial court concluded that: (1) the police had not illegally detained or arrested the defendant; (2) the defendant had made his statements to the police volun-

tarily; and (3) there was no *Miranda* violation in the manner in which the police obtained statements from the defendant. Accordingly, the trial court denied the defendant's motion to suppress.

On appeal, the defendant does not challenge the trial court's determination that he came to the Lisbon town hall voluntarily and, while there, made his incriminatory statements voluntarily. His principal claim, rather, is that his noncustodial interview with Malchik was transformed into a custodial detention once Malchik told the defendant that he, Malchik, thought that the defendant had killed Wendy B. Immediately thereafter, according to the defendant, *Miranda* warnings were required. Because no such warnings were given until after he made his first incriminatory statement, he claims that all his subsequent statements should have been suppressed. We disagree.

To sustain the defendant's argument, we would have to conclude that the trial court made a clearly erroneous finding of fact when it determined that the defendant was not in custody at the time that he told Malchik that he had killed Wendy B. *State* v. *Northrop,* 213 Conn. 405, 414, 568 A.2d 439 (1990); *State* v. *Pittman,* 209 Conn. 596, 606, 553 A.2d 155 (1989). "A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. . . . 'Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. . . .' " (Citations omitted.) *State* v. *Pittman,* supra, 608. "[A]n officer's [articulated] views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many

factors that bear upon the assessment whether that individual was in custody," but such statements are not, of themselves, "dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury* v. *California,* U.S. , 114 S. Ct. 1526, 1530, 128 L. Ed. 2d 293 (1994).

Malchik testified that, just prior to the defendant's first incriminatory statement, Malchik would have allowed the defendant to leave the conference room had he elected to do so, even though Malchik had felt that the defendant had killed Wendy B. The objective circumstances are in accord with this intent. Malchik came and went from the conference room, leaving the defendant alone on several occasions. Immediately before the interchange between the defendant and Malchik, the defendant had been told that he could leave at any time, and he had responded that he understood he was there voluntarily. Also, when concern was expressed that the defendant would be late for work, the defendant had responded that he did not need to leave for work but was willing to stay and talk. We find it especially probative that, contrary to the facts of the cases on which the defendant relies, it was the defendant, not Malchik, who initiated the discussion of the murder of Wendy B. The defendant deliberately solicited Malchik's belief that the defendant had killed Wendy B. Immediately thereafter, although no question had been posed by Malchik, the defendant spontaneously offered that he had killed Wendy B. Considering the record of the meeting in its entirety, we are persuaded that the trial court was not clearly erroneous in its determination that a reasonable person in the defendant's position would have felt free to leave even after Malchik had voiced his belief that the defendant had killed Wendy B.

The defendant also challenges the validity of the *Miranda* waivers that he executed prior to giving fur-

ther incriminatory statements. In large part, this argument is predicated upon his contention, which we have rejected, that his first incriminatory statement was inadmissible. The defendant also argues, however, that even if that statement was properly admitted, he was given contradictory directions that undermined his ability to exercise the independent judgment implied in the execution of *Miranda* waivers. We are convinced, however, that the trial court properly found, in light of all the circumstances, that the defendant had knowingly, intelligently and voluntarily waived his rights. The defendant was both a college graduate and a person with prior experience with the criminal justice system. He adduced no persuasive evidence of police overreaching or coercion.

2

Alternatively, the defendant claims that the trial court's findings at the suppression hearing should be set aside because the trial court improperly: (1) restricted his opportunity to cross-examine Malchik during the suppression hearing; and (2) denied his subsequent motion to open the suppression hearing. Both claims relate to the defendant's efforts to link the reliability of Malchik's testimony concerning the admissibility of the defendant's incriminatory statements to the reliability of Malchik's testimony concerning his investigatory efforts to ascertain the geographical location of the murders that were committed in Rhode Island. We reject both claims.

During the suppression hearing, the defendant attempted to challenge the credibility of Malchik's testimony that the defendant had not been in police custody prior to his first incriminatory statement. The defendant sought, in this regard, to question Malchik about his failure immediately to investigate and locate the scene of the murders that had occurred in Rhode

Island. Although the trial court originally sustained an objection by the state on the ground of immateriality, it thereafter reversed its ruling and permitted the defendant to pursue his inquiry. The only question ultimately excluded related to Malchik's failure to ask the defendant to take the police to the place where the crimes had been committed. Because that question did not impugn Malchik's motive, interest, bias or prejudice, the trial court's ruling did not deprive the defendant of his constitutional rights under the sixth amendment to the United States constitution. *State* v. *Vitale,* 197 Conn. 396, 402–403, 497 A.2d 956 (1985); *State* v. *Talton,* 197 Conn. 280, 284, 497 A.2d 35 (1985). Having afforded the defendant his constitutional rights, the trial court did not abuse its discretion by excluding this one question on the ground that it related to matters immaterial to the suppression hearing. See *State* v. *Dobson,* 221 Conn. 128, 137, 602 A.2d 977 (1992).

At a hearing held, a year later, on the defendant's motion to dismiss the counts relating to the Rhode Island murders for lack of territorial jurisdiction, Malchik was again questioned about his failure immediately to ascertain the geographical location of these murders. During the hearing, the trial court expressed its concern that Malchik had not offered a credible explanation for this investigatory delay. As a result of the questions raised at the dismissal hearing, the defendant moved to open the suppression hearing.

In a posttrial articulation, after having reviewed the relevant transcripts, the trial court withdrew its criticism of Malchik's investigation and stated that, in its view, Malchik had testified truthfully during the suppression hearing. In light of the articulation, we conclude that the trial court's denial of the motion to open the suppression hearing was not an abuse of its discretion. The court could reasonably have concluded that

Malchik's credibility concerning his investigatory activities subsequent to the defendant's confessions was collateral to his credibility about the events leading up to the confessions. The defendant's offer of proof, in support of his motion to open, consisted solely of the representations of counsel and centered on the defendant's contention that Malchik had taken him into custody as soon as Malchik invited him to drive with Malchik to the town hall, a claim that has now been abandoned.

We have examined the defendant's challenges to the admissibility of his incriminatory statements under the principles established by the United States constitution and Connecticut common law. Although the defendant's brief adverts to independent rights under the Connecticut constitution, no such arguments have been briefed and they are therefore deemed to have been waived. See *State* v. *Hamilton,* 228 Conn. 234, 246 n.10, 636 A.2d 760 (1994). We conclude, therefore, that the trial court properly admitted the defendant's incriminatory statements into evidence.

### 3

During the trial to adjudicate the defendant's guilt of the crimes with which he had been charged, the defendant renewed his effort to cross-examine Malchik about his investigatory efforts with respect to the Rhode Island murders. Although the defendant characterized this inquiry as relevant to Malchik's credibility, the trial court, *Ford, J.,* could reasonably have concluded, as did the trial court, *Hendel, J.,* at the suppression hearing, that the motive for Malchik's delay in going to the scene of these crimes was collateral and immaterial. Considering the breadth of the defendant's cross-examination of Malchik, we are persuaded that the defendant's constitutional rights were not impaired, and that the trial court's ruling was not an abuse of its discretion.

## C

### INSTRUCTIONAL ISSUES

The defendant also maintains that he is entitled to a new trial to determine his guilt because the trial court, *Ford, J.,* misinstructed the jury. He claims that the trial court improperly: (1) charged the jury on inferences that might be drawn from his failure to call two witnesses concerning his mental status; (2) failed to charge the jury with respect to the special evidentiary requirements for proof of a capital crime; (3) diluted the charge to the jury on what constitutes proof beyond a reasonable doubt; (4) imposed on the defendant the burden of proving insanity by a preponderance of the evidence and did not fully inform the jury about the consequences of a verdict of not guilty by reason of insanity; and (5) refused to charge the jury on the availability of the defense of extreme emotional disturbance. Because we are unpersuaded that the instructions given by the trial court deprived the defendant of a fair trial, we conclude that reversal of his convictions is not required.

### 1

The defendant asserts that the trial court improperly gave a *Secondino* charge instructing the jury that it might draw inferences unfavorable to the defendant because two psychiatric experts whom he had consulted were not called to testify as witnesses on his behalf. In *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960), this court held that "[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." (Internal quotation marks omitted.) The *Secondino* rule applies to criminal prosecutions. *State* v. *Grant,* 221 Conn. 93, 105, 602 A.2d 581 (1992); *State*

v. *Watley,* 195 Conn. 485, 488, 488 A.2d 1245 (1985). Although the defendant does not deny that the state has established the procedural prerequisites for a *Secondino* charge,[8] he maintains that a *Secondino* charge is fundamentally inconsistent with his privilege to consult psychiatric experts in furtherance of his insanity defense. In the circumstances of this case, he maintains, therefore, that the *Secondino* charge was both improper and harmful.[9] Although we recognize the seriousness of the defendant's claim of privilege, we are persuaded that the *Secondino* charge was not sufficiently prejudicial to warrant reversal of the defendant's convictions.

[8] *Secondino* v. *New Haven Gas Co.,* supra, 147 Conn. 675, set forth two prerequisites that must be established before an adverse inference can be drawn from the failure of a party to produce a witness: "The witness must be available, and he must be a witness whom the party would naturally produce." In *Secondino,* this court defined a witness who would naturally be produced by a party as a person who "by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." Id.

[9] The defendant also makes two further *Secondino* claims. The first charges prosecutorial misconduct by the state in its closing argument to the jury about *Secondino* inferences with respect to the psychiatric experts. Our resolution of the issue on the instructions to the jury applies equally to the prosecutor's argument.

The defendant also argues that it was improper for the state to suggest *Secondino* inferences to the jury with regard to the defendant's failure to call his parents to testify on his behalf during the guilt phase. We decline to consider this issue because it was not properly preserved at trial. Rather than object at trial, the defendant chose to make his own *Secondino* argument against the state for its failure to call his parents. Despite this tactical choice, the defendant now seeks review under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), the plain error rule and a "special capital rule," contending that the obvious error of allowing a *Secondino* charge with regard to his parents during the penalty phase reflects similar error in the guilt phase. It is well established that "[a] party who fails to make a timely objection to the giving of a *Secondino* charge will be deemed to have waived the issue for appeal. The giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimensions." *State* v. *Anderson,* 212 Conn. 31, 41–42, 561 A.2d 897 (1989).

In *State* v. *Toste,* 178 Conn. 626, 628, 424 A.2d 293 (1979), we joined the majority of jurisdictions in holding that "[w]here a psychiatric expert, whether psychiatrist or psychologist, is retained by a criminal defendant or by his counsel for the sole purpose of aiding the accused and his counsel in the preparation of his defense, the attorney-client privilege bars the state from calling the expert as a witness." The defendant urges us to extend this holding to preclude a jury instruction permitting an adverse inference to be drawn from the defendant's failure to call such a psychiatric expert as a witness at trial.[10] The state urges us to hold, to the contrary, that when the other prerequisites for a *Secondino* charge have been satisfied,[11] the existence of an attorney-client privilege does not bar an instruction permitting the jury to draw whatever inference it deems proper from the absence of an expert psychiatric witness.

Although we have never squarely addressed the overall relationship between a missing witness instruction

---

[10] *State* v. *Toste,* supra, 178 Conn. 626, did not reach, nor has this defendant raised, the question of whether a violation of a defendant's attorney-client privilege in this context also violates his right to counsel under the sixth amendment to the federal constitution. See *United States* v. *Talley,* 790 F.2d 1468 (9th Cir.), cert. denied, 479 U.S. 866, 107 S. Ct. 224, 93 L. Ed. 2d 152 (1986); *United States ex. rel. Edney* v. *Smith,* 425 F. Sup. 1038, 1053 (E.D.N.Y. 1976), aff'd, 556 F.2d 556 (2d Cir.), cert. denied, 431 U.S. 958, 97 S. Ct. 2683, 53 L. Ed. 2d 276 (1977) (admission of doctor's testimony in these circumstances not "so detrimental to the attorney's effective representation of this client as to be prohibited by the Sixth Amendment"); but cf. *State* v. *Pratt,* 284 Md. 516, 520, 398 A.2d 421 (1979) (recognizing close tie between attorney-client privilege and constitutional guarantee of effective assistance of counsel); see also *State* v. *Cascone,* 195 Conn. 183, 188, 487 A.2d 186 (1985) (adopting balancing test to accommodate conflict between attorney-client privilege and right of confrontation); *Rienzo* v. *Santangelo,* 160 Conn. 391, 395, 279 A.2d 565 (1971) (attorney-client privilege encourages candor necessary for effective legal advice); *Turner's Appeal,* 72 Conn. 305, 318, 44 A. 310 (1899) (exercise of privilege prevents full disclosure of truth and so will be strictly construed).

[11] See footnote 8.

and an evidentiary privilege, we have in fact applied the *Secondino* rule in a number of contexts despite the possible existence of a privilege restricting the applicability of the rule. In the very case in which we articulated the missing witness rule, *Secondino* v. *New Haven Gas Co.,* supra, 147 Conn. 676, we held that the trial court had improperly refused to give a missing witness instruction when the plaintiff, in a personal injury action, had failed to call her treating physician as a witness. In *State* v. *McLaughlin,* 126 Conn. 257, 261, 10 A.2d 758 (1939), we held that it was proper for the prosecutor to comment on the failure of the defendant's spouse to testify. More recently, in *D'Amico* v. *Manson,* 193 Conn. 144, 153, 476 A.2d 543 (1984), we indicated that the *Secondino* rule in a habeas corpus proceeding might, in the proper circumstances, permit an adverse inference to be drawn from the defendant's failure to call his trial attorney.

These holdings are not dispositive, however, because they contain no explicit consideration of the relationship between a missing witness instruction and the attorney-client privilege. This question is therefore an issue of first impression for this court. Courts in other jurisdictions are divided. Compare *State* v. *Holsinger,* 124 Ariz. 18, 601 P.2d 1054 (1979) (privilege bars adverse inference), *O'Connor* v. *Detroit,* 160 Mich. 193, 125 N.W. 277 (1910) (adverse inference permitted), *Daniels* v. *Beeson,* 312 So. 2d 441 (Miss. 1975) (spousal privilege bars adverse inference), and *George* v. *State,* 98 Nev. 196, 644 P.2d 510 (1982) (adverse comment on any claim of privilege barred per statute), with *Epperson* v. *State,* 650 S.W.2d 110 (Tex. App. 1983) (adverse inference permitted); see also annot., 26 A.L.R.4th 9 (1983); annot., 34 A.L.R.3d 775 (1970); annot., 32 A.L.R.3d 906 (1970); annot., 116 A.L.R. 1170 (1938), for extensive documentation of conflicting authorities.

The proper resolution of the defendant's claim of privilege requires a balancing of significant competing

interests. These interests include the defendant's need for access to expert psychiatric advice to enable him to establish his insanity defense, the state's need for information to enable it to respond to an insanity defense, and the jury's need to consider all relevant, probative and reliable evidence to enable it to exercise its truth finding function.

It cannot be gainsaid that expert psychiatric advice is critical to a lawyer planning an insanity defense. "[T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshall his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers." *Ake* v. *Oklahoma,* 470 U.S. 68, 80, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

We have, however, repeatedly recognized that the state must be afforded a fair opportunity "to acquire information that will enable it to respond intelligently to defenses that concern a defendant's mental status." (Internal quotation marks omitted.) *State* v. *Manfredi,* 213 Conn. 500, 515, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990). A defendant waives many significant rights when he chooses to assert a defense of insanity. See, e.g., *State* v. *Jarrett,* 218 Conn. 766, 776–78, 591 A.2d 1225 (1991); *State* v. *Steiger,* 218 Conn. 349, 362–66, 590 A.2d 408 (1991); *State* v. *Manfredi,* supra, 513; *State* v. *Fair,* 197 Conn. 106, 109, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d

895 (1986); see also *Buchanan* v. *Kentucky,* 483 U.S. 402, 421–24, 107 S. Ct. 2906, 97 L. Ed. 2d 336, reh. denied, 483 U.S. 1044, 108 S. Ct. 19, 97 L. Ed. 2d 807 (1987). Specifically, a defendant's assertion of an insanity defense requires at least a partial waiver of his attorney-client privilege because, under Practice Book §§ 759 and 760,[12] he must disclose defense psychiatric reports and submit to a court-ordered psychiatric examination on behalf of the state.

Furthermore, the *Secondino* charge serves important evidentiary interests. In contradistinction to an invocation of privilege, "the *Secondino* inference derives from the maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted." (Internal quotation marks omitted.) *State* v. *Shashaty,* 205 Conn. 39, 44, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988). Permitting consideration of all relevant evidence that bears a reasonable assurance of reliability advances the truth finding function of the

---

[12] Practice Book § 759 provides in relevant part: "—— ——MENTAL DISEASE OR DEFECT INCONSISTENT WITH THE MENTAL ELEMENT REQUIRED FOR THE OFFENSE CHARGED

"If a defendant intends to introduce expert testimony relating to a mental disease or defect, or another condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall . . . furnish the prosecuting authority with copies of reports of physical or mental examinations of the defendant made in connection with the offense charged, within five days after receipt thereof. . . ."

Practice Book § 760 provides: "—— ——PSYCHIATRIC EXAMINATION

"In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

jury. See *State* v. *Borrelli,* 227 Conn. 153, 159, 629 A.2d 1105 (1993).

The particular facts of this case make it unnecessary for us to strike the definitive balance between these interests today, for even if the missing witness instruction was improper, it was, at best, harmless. Because the instruction relates to a claim arising under state law and does not involve any constitutional right, the defendant bears the burden of proving harmful error if the instruction were deemed to be improper. See *State* v. *Silva,* 201 Conn. 244, 250, 513 A.2d 1202 (1986); *State* v. *Conroy,* 194 Conn. 623, 627, 484 A.2d 448 (1984). "In order to meet his burden of proving that [an] unwarranted *Secondino* charge constituted harmful error, the defendant must show that the charge was likely to have affected the verdict. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976)." *State* v. *Shashaty,* supra, 205 Conn. 44. We evaluate the harmfulness of a nonconstitutional error on the record as a whole. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147 (1969), cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1970). An improper instruction is not automatically harmful merely because it adversely affects a defense. *State* v. *Cooper,* 182 Conn. 207, 212–14, 438 A.2d 418 (1980); *State* v. *Ruth,* 181 Conn. 187, 196–200, 435 A.2d 3 (1980). We are persuaded that the defendant has not met his burden.

Direct and substantive evidence concerning the missing witnesses was presented to the jury during the course of the defendant's trial. The state's cross-examination of the defense psychiatric experts elicited from them the information that the defendant had also consulted with Bruce Freedman, a clinical psychologist, and Howard Zonana, a psychiatrist. With regard to Freedman, Walter Borden, a psychiatrist who testified

on the defendant's behalf, told the jury that he had referred the defendant to Freedman for a quick screening involving numerous psychological tests. Borden acknowledged that Freedman's diagnosis was that the defendant suffered from "intermittent explosive disorder," and that this diagnosis did not comport with his own diagnosis or that of John Cegalis, a clinical psychologist, who also testified on behalf of the defendant. As Borden told the jury, Freedman did not find that the defendant suffered from psychotic thinking or a loss of contact with reality, and further found that the defendant knew what he was doing when he killed the women. With regard to Zonana, Borden testified that he knew the defendant had seen Zonana, that those interviews had been taped, and that they had taken place after Borden had first seen the defendant. Cegalis testified that he knew Zonana and that, although he had not reviewed Zonana's taped interviews of the defendant, he had talked briefly with Zonana subsequent to Cegalis' first interview with the defendant.[13] The involvement of Freedman and Zonana in the defendant's diagnosis, and their absence from the witness stand, was therefore evident to the jury.

The testimony concerning Freedman and Zonana is significant in two respects. First, it reveals that the

[13] We note that the defendant repeatedly objected to the admission of the testimony regarding Freedman and Zonana on the grounds of hearsay and relevance, which objections were overruled by the trial court. Because the defendant has failed to raise these evidentiary issues on appeal, he is deemed to have waived them. *State* v. *Evans,* 165 Conn. 61, 63–64, 327 A.2d 576 (1973).

We note in this regard that the defendant relies on *People* v. *Pate,* 108 Mich. App. 802, 310 N.W.2d 883 (1981), to support his public policy argument that the missing witness rule is inappropriate in cases involving a statutory or common law privilege. That is not, however, the precise ruling in *Pate. Although the court in *Pate* found reversible error in a prosecutor's adverse comments on a defendant's insanity defense by virtue of his failure to call certain psychiatric experts, it made its ruling on the ground that such evidence was irrelevant and unduly prejudicial, rather than on the ground of privilege. Id., 808.

adverse inference instruction did not weave evidence favorable to the state out of whole cloth, but instead merely highlighted information that had previously been brought out directly, particularly with regard to Freedman. Second, the testimony reveals that the missing witnesses were not insignificant. See *Dent* v. *United States,* 404 A.2d 165, 172 (D.C. App. 1979) (repeated references to persons whose absence was not significant more likely to cumulate prejudice to point of distortion).

Furthermore, the psychiatric testimony presented by the defendant's experts cut two ways. While Borden testified that he believed the defendant to have been legally insane at the moment that he killed, and Cegalis testified that he was mentally ill and out of control at that time, both also gave testimony that supported a contrary conclusion. In essence, their testimony was that the defendant's kidnap/rape/murders were ritualistic in nature, and that once the ritual of killing had begun, the defendant could not control himself. Borden initially testified that the killing ritual began when the defendant saw his victim, and later testified that it began when the defendant removed his glasses. When pressed on cross-examination, however, Borden testified that the defendant's urge to kill became uncontrollable only after the defendant had completed the rape, but he could not pinpoint whether it occurred before or after the defendant actually began to strangle his victim. Borden also testified that the defendant was fully aware of all his actions and that he was not psychotic, while Cegalis testified that he could not conclude that the defendant was psychotic.

Although Borden and Cegalis relied on the similarity among all the murders to support their conclusions that the killings were "ritualistic," the evidence presented was inconsistent. Borden testified to at least four incidents when the defendant did not complete the

kidnap/rape/murder ritual after his assault had begun, and testified also that the defendant commonly stalked women without ever initiating an assault. Borden also agreed, on cross-examination, that his theory of sexual sadism was inconsistent with the defendant's killing to avoid detection. The jury had substantial evidence before it, including the defendant's confession, that would support a conclusion that the defendant had killed to avoid detection.

Finally, we note that the defendant bore the burden of proof on the issue of insanity. *State* v. *Joyner,* 225 Conn. 450, 464–65, 472, 625 A.2d 791 (1993). Consequently, there was no risk that the missing witness inference might have led the jury to distort the proper allocation of the burden of proof, as might have been the case had the state borne the burden. See *State* v. *Brewer,* 505 A.2d 774, 777 (Me. 1985); *State* v. *Schneider,* 402 N.W.2d 779, 788 (Minn. 1987); *State* v. *Peterson,* 266 Minn. 77, 84, 123 N.W.2d 177 (1963).

We reiterate that we do not dismiss lightly the defendant's claim that a *Secondino* charge was inconsistent with his statutory psychiatric privilege and consequently with that part of his attorney-client privilege relating to his unfettered ability to present an insanity defense. Considering all the evidence that was presented to the jury, we nonetheless conclude that, even if the missing witness instruction should not have been given, it was harmless.

2

The defendant requested the trial court to instruct the jury, in accordance with the terms of General Statutes § 54-83, that "[n]o person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." The trial court instead instructed the jury that, in order to convict the defendant, it would have

to find that there was "material and substantial evidence apart from the statement of the accused that the particular crimes charged were committed by the accused." The jury was told that it had to determine that such evidence "substantially corroborate[d] the admissions or the confessions of the accused." The defendant maintains that these instructions so deviated from the requirements of § 54-83 that he is entitled to a new trial. We disagree.

First enacted in 1672, § 54-83 has been construed, in this century, to have a dual function. The statute not only imposes an additional evidentiary burden on the state but requires the finder of fact, upon proper instructions, to determine whether the state has met its burden. The defendant therefore has a statutory entitlement to an instruction informing the jury that, in capital cases, the state has an additional evidentiary burden above and beyond its obligation to prove its case beyond a reasonable doubt. See *State* v. *Cots,* 126 Conn. 48, 58, 9 A.2d 138 (1939); *State* v. *Williams,* 90 Conn. 126, 129, 96 A. 370 (1916); *State* v. *Marx,* 78 Conn. 18, 22, 60 A. 690 (1905).

The evidentiary burden imposed on the state by § 54-83 does not, however, preclude a finding of guilt in capital cases in which the state cannot produce two eyewitnesses to the crime. Because the statute allows the state to have recourse to "equivalent" evidence, the state can satisfy its statutory burden by producing more than one witness to provide circumstantial evidence from which the jury may infer the defendant's guilt. *State* v. *Malm,* 142 Conn. 113, 118–19, 111 A.2d 685 (1955); *State* v. *Taborsky,* 139 Conn. 475, 483–85, 95 A.2d 59 (1953); *State* v. *Cots,* supra, 126 Conn. 57; *State* v. *Chin Lung,* 106 Conn. 701, 705, 139 A. 91 (1927); *State* v. *Schutte,* 97 Conn. 462, 468–69, 117 A. 508 (1922).

The defendant in this case accordingly does not claim that the state adduced insufficient evidence to prove his guilt beyond a reasonable doubt. With respect to all his victims, the defendant's confessions were corroborated by the presence of the girls' bodies and clothing at the locations to which the defendant led the police. In addition, medical testimony confirmed that all but one of the victims had been sexually assaulted and that all had been strangled.

The defendant maintains, nonetheless, that, in light of his request for an instruction pursuant to § 54-83, the trial court improperly failed to inform the jury of the state's additional evidentiary burden under the statute. We agree that the trial court should have instructed the jury expressly in accordance with the language of the statute. In explaining the applicability of the statute to the circumstances of this trial, the trial court would, appropriately, however, have gone beyond the statutory language. *State* v. *Gabriel,* 192 Conn. 405, 419, 473 A.2d 300 (1984). An appropriate explanation of the statute would have presented to the jury substantially those instructions that the trial court actually gave. The trial court's description of the evidentiary burden imposed by the statute closely paralleled the instructions concerning § 54-83 that we approved in *State* v. *Taborsky,* supra, 139 Conn. 484–85.

Even when a defendant requests an instruction that is legally correct, "a court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . Whether a charge is possibly misleading depends on the substance rather than the form of what is said." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz,* 217 Conn. 648, 662, 588

A.2d 127 (1991). Deviation from a requested instruction is, at most, harmless error so long as the trial court's instructions include the material portions of the defendant's request and provide the jury with "a clear understanding of the issues presented for [its] consideration, under the offenses charged and upon the evidence . . . ." *State* v. *Harden,* 175 Conn. 315, 322–23, 398 A.2d 1169 (1978); *State* v. *Harrell,* 199 Conn. 255, 269–71, 506 A.2d 1041 (1986).[14] We are persuaded that, in the circumstances of this case, the defendant was not harmed by the form in which the trial court responded to his request for an instruction pursuant to § 54-83.

3

During its instructions on reasonable doubt, the trial court told the jury that "[p]roof beyond a reasonable doubt can probably best be described as that proof which leaves you with a strong and abiding conviction that the accused is guilty of the crimes with which he has been charged." Although no exception was taken to this charge at trial, the defendant urges us to conclude that the language employed by the court so diluted the standard of proof beyond a reasonable doubt that the defendant was deprived of his fundamental constitutional right to due process. We disagree. "This court has previously reviewed similar language in jury charges on reasonable doubt and has consistently rejected the proposition that such language amounts to a constitutional error." *State* v. *Adams,* 225 Conn.

---

[14] The defendant contends that the trial court further diluted its instructions with regard to the requirements of General Statutes § 54-83 by its cautionary instructions warning the jury not to "weigh cases by the number of witnesses" but rather to look at the quality rather than the quantity of the relevant evidence. These instructions were given, however, in an earlier portion of the charge relating to the credibility of witnesses. We are, therefore, unpersuaded that they had any relationship to the requirements of § 54-83.

270, 291, 623 A.2d 42 (1993); see also *State* v. *Kelley,* 229 Conn. 557, 567–68, 643 A.2d 854 (1994).

4

The trial court instructed the jury, in accordance with the provisions of General Statutes §§ 53a-12 and 53a-13, that the defendant bore the burden of proving his affirmative defense of mental disease or defect by a preponderance of the evidence. The defendant argues that the statutes imposing this burden of proof upon him violate the due process clause contained in article first, §§ 8 and 9, of the Connecticut constitution. We disagree. The defendant's argument principally relies on contentions that we have expressly considered and rejected in *State* v. *Joyner,* supra, 225 Conn. 465, 472. We are unpersuaded by his further suggestion that a capital felony prosecution inherently requires a higher standard of due process than would be appropriate for any other serious criminal prosecution.

Also in connection with the defense of mental disease or defect, the trial court instructed the jury, in accordance with the provisions of General Statutes § 54-89a,[15] concerning the consequences of a verdict of not guilty by reason of insanity. The defendant had expressly exercised his right to refuse to waive the requirement that the jury be told the consequences of such a verdict. The court, however, denied the defendant's request to inform the jury, in its instructions, that he previously had been convicted of capital felonies in

---

[15] General Statutes § 54-89a provides: "COURT TO INFORM JURY ON CONSEQUENCES OF A FINDING OF NOT GUILTY BY REASON OF MENTAL DISEASE OR DEFECT. If the court instructs the jury on a defense of mental disease or defect raised pursuant to section 53a-13, it shall, unless the defendant affirmatively objects, inform the jury of the consequences for the defendant if he is found not guilty by reason of mental disease or defect and of the confinement and release provisions of sections 17a-580 to 17a-602, inclusive, applicable to a person found not guilty by reason of mental disease or defect."

Windham and, in those cases, had already been sentenced to two life terms of imprisonment totaling 120 years. The court's refusal of the defendant's request to charge was justified by our holding in *State* v. *Wood,* 208 Conn. 125, 144, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988), that § 54-89a should be strictly construed. The statute mandates only that the jury learn the consequences of the matters directly before it, to enable it "to reach a determination based on the evidence . . . unaffected by sympathy, fear or other inappropriate and irrelevant concerns." Id. The trial court was, therefore, not required to inform the jury concerning the consequences of the defendant's prior convictions.

5

The trial court further instructed the jury, in accordance with the defendant's request, that it could consider whether the defendant's culpability for capital felony should be reduced because of evidence that he suffered from an extreme emotional disturbance. See General Statutes §§ 53a-54a (a) and 53a-55 (a) (2). In its original instructions, the court informed the jury that it was to consider this defense only if it had rejected guilt on the capital felony offenses and was considering the defendant's culpability of murder as a lesser included offense. In response to exceptions to this charge, the trial court reinstructed the jury that, if it found that "an extreme emotional disturbance had been established, that may be taken into consideration by you in determining whether or not capital felony murder has been established. You may determine it has not because of an extreme emotional disturbance . . . ." The defendant again excepted, claiming that the curative instruction was confusing.

On appeal, the defendant continues to maintain that the jury was inadequately instructed on the defense of

extreme emotional disturbance, while the state maintains that extreme emotional disturbance is not a defense to a capital felony. The state relies on *State v. Chicano,* 216 Conn. 699, 716–17, 584 A.2d 425, cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), in which we held that extreme emotional disturbance is not an affirmative defense to felony murder as that crime is defined by General Statutes § 53a-54c. We need not, however, resolve the applicability of the defense in this case. If the defense applies, the defendant received its benefit, because the trial court's supplemental instructions adequately informed the jury of its relationship to the capital felonies with which he was charged. The defendant cannot complain of alleged instructional misstatements that are corrected by a timely supplemental instruction. *State v. Dolphin,* 195 Conn. 444, 450–51, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985); *State v. Spates,* 176 Conn. 227, 237, 405 A.2d 656, cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979). Indeed, a supplemental charge is likely to enjoy special prominence in the minds of the jurors because it is fresher in their minds when they deliberate. *State v. Williams,* 199 Conn. 30, 41, 505 A.2d 699 (1986).

## D

### OTHER CLAIMS OF UNDUE PREJUDICE

In addition to the foregoing claims of impropriety at his trial, the defendant claims that he is entitled to a new trial because the trial court: (1) denied his motion for severance; (2) permitted prejudicial commentary by the prosecuting attorney; and (3) refused to overturn the verdicts against him on the ground of juror prejudice. We are not persuaded.

1

The defendant maintains that the trial court improperly denied his motion to sever the three cases that were consolidated for trial. He maintains that the state's joint presentation of the three cases so intermingled the evidence that the jury was encouraged to rely on a cumulation or aggregation of the evidence in arriving at its verdict. Because each of the cases charged the defendant with crimes that were factually similar and of a violent nature, he contends that the joint trial caused him irreparable prejudice and that the prejudice was not cured by the trial court's instruction to the jury to treat the three informations as three separate offenses.

The defendant's claim arose in the following procedural context. The trial court's initial ruling to consolidate the three cases against the defendant resulted from the defendant's express representation that he had no preference about whether the cases should be consolidated for trial. Approximately nine months later, the defendant stated on the record that he wanted to try the cases together. Subsequently, however, the defendant made a motion to sever the Rhode Island murders from the other two cases. That motion was premised on the defendant's expressed desire to testify concerning the jurisdictional facts relating to the Rhode Island murders. In fact, the defendant did not testify at trial.

Even though this procedural history does not definitively establish that the defendant has waived his claim for severance; *State* v. *Herring,* 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); he cannot succeed on its merits. On appeal, our review of a trial court's order of consolidation is limited to determining whether the

trial court has manifestly abused its discretion. *State v. Jennings,* 216 Conn. 647, 657, 583 A.2d 915 (1990); *State v. Herring,* supra, 94–95. In this case, the trial court could reasonably have concluded that the three cases involved charges that were factually discrete and easily distinguishable, that the violence involved in each of them would not have led to juror confusion or undue prejudice, and that the joint trial would not have substantially exacerbated the duration and the complexity of the trial. See *State v. Boscarino,* 204 Conn. 714, 722–23, 529 A.2d 1260 (1987). The defendant did not contest that he was the person who had killed each of the victims. His defense of insanity included references to all the killings, including those that had occurred in Windham county, with respect to which his guilt had already been established. In light of the insanity defense, of which the court had notice when it denied the motion to sever, the jury might well have received evidence about the Rhode Island killings even if those cases had been severed. See *State v. Pollitt,* 205 Conn. 61, 72, 530 A.2d 155 (1987). The defendant has, therefore, failed to meet his heavy burden of proving an abuse of discretion.

2

The defendant next claims that his constitutional rights were violated by a single statement during the prosecutor's closing argument. The prosecutor told the jury: "You have a defendant sitting in front of you— and just incidentally, you may take into account whatever you observe in this courtroom about the defendant Michael Ross in your deciding whether or not he was mentally ill at the time that he committed the offenses. You may take that into account." Although the defendant did not object to the prosecutor's argument at trial, he now maintains that we should review his claim under *State v. Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and find a violation of his

due process rights and his rights to representation by counsel under the fifth and sixth amendments to the United States constitution.

While we have recognized the possibility that prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, we have never held that a single questionable prosecutorial statement is sufficient to implicate the fairness of the trial itself. See *State* v. *Joyner,* supra, 225 Conn. 473; *State* v. *Somerville,* 214 Conn. 378, 393, 572 A.2d 944 (1990). Even if it were appropriate to grant broader review to some unpreserved claims in a death penalty case, this claim would not warrant such special consideration in the absence of a showing of significant prejudice. The defendant cannot prevail on this *Golding* claim.

3

The defendant's final contention with respect to his guilt of the crimes charged is that he presented sufficient evidence of juror prejudice to require the trial court to grant his motion to set aside the verdicts and for a new trial. The motion was grounded principally on two allegations: (1) the jury's very brief period of deliberation; and (2) the conduct of one juror, who "smiled broadly" at the father of one of the victims at the time of the verdicts. The defendant also informed the court that, following the verdicts, the mother of one of the victims had verbally thanked the jury. The trial court denied the defendant's request for an evidentiary hearing into these allegations of prejudice and denied his motion on its merits.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e have . . . accordingly confined

our role to a determination of whether there has been an abuse of discretion." *State* v. *Hammond,* 221 Conn. 264, 269–70, 604 A.2d 793 (1992). Claims of juror misconduct fall within this rule of limited review. *State* v. *Asherman,* 193 Conn. 695, 735–36, 478 A.2d 227, cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The fact that jury deliberations took only a little more than one hour does not establish the defendant's claim of juror prejudice. In the absence of a claim of external influence or juror misconduct, "[t]he length of time that a jury deliberates has no bearing on nor does it directly correlate to the strength or correctness of its conclusions or the validity of its verdict." *State* v. *Hernandez,* 28 Conn. App. 126, 136, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992); *State* v. *Dubina,* 164 Conn. 95, 101, 318 A.2d 95 (1972).

The limited postverdict contacts between the jurors and the victims' parents similarly do not establish that there were any impermissible communications to or by the jurors during the course of the trial or during their deliberations. In response to the trial court's inquiry, the defendant acknowledged that he had no other information relevant to his allegations of juror prejudice. On this record, the defendant has offered insufficient allegations of actual bias to require the trial court either to hold an evidentiary hearing or to set aside the jury's verdicts. *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983).[16]

In summary, we have examined each of the defendant's claims relating to his guilt, under § 53a-54b (5)

---

[16] In light of the fact that a new penalty phase hearing will be required, we need not consider the defendant's claim that the jurors' postverdict contacts required the trial court to grant his motion to discharge the jury and to impanel a different jury for the sentencing phase of the proceedings against him.

and (7), of the six capital felony counts relating to his murder of Wendy B., Robyn S., April B. and Leslie S. We find no reason for reversing the verdicts of the jury on any of these counts.

## II

## FACIAL VALIDITY OF THE DEATH PENALTY STATUTE

The defendant next challenges the facial validity of the provisions of the death penalty statute both under the federal constitution and under the state constitution. Although the defendant also raises constitutional issues with respect to the application of § 53a-46a in his particular circumstances, we will consider those issues, to the extent required, in part III of this opinion.

With respect to the federal constitution, the defendant maintains that § 53a-46a impermissibly: (1) fails to provide for an individual decision by a capital sentencer; (2) fails to provide an opportunity for a full individualized consideration of himself as defendant; (3) requires the defendant to prove the existence of a mitigating factor by a preponderance of the evidence; (4) embodies a presumption that death is the appropriate penalty; (5) authorizes an aggravating factor that is unconstitutionally vague; and (6) requires juror unanimity before a mitigating factor can be given effect. In light of the governing federal precedents, we find none of these claims persuasive.

With respect to the state constitution, the defendant maintains that: (1) any imposition of the death penalty constitutes cruel and unusual punishment, and such a penalty is barred as a matter of substantive due process; and (2) the statutory procedures contained in § 53a-46a violate procedural due process. We are not persuaded that state constitutional analyses or precedents support either of these claims.

## A

### FEDERAL CONSTITUTIONAL ISSUES

### 1

Analysis of the defendant's specific claims that our death penalty statute fails to conform to federal constitutional mandates must begin with an overview of the applicable law under the eighth and fourteenth amendments to the federal constitution.[17] Since *Gregg v. Georgia,* 428 U.S. 153, 186–87, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), the death penalty is not per se unconstitutional as a matter of federal law. As the United States Supreme Court stated in *California v. Ramos,* 463 U.S. 992, 999, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983), "[i]n ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty." (Emphasis in original.)

Recognizing the unique nature of the death penalty and the need for heightened reliability in death penalty deliberations; *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987); *California v. Brown,* 479 U.S. 538, 543, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987); *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); *California v. Ramos,* supra, 463 U.S. 998–99; *Roberts v. Louisiana,* 428 U.S. 325, 333–36, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1976); *Woodson v. North Carolina,* 428 U.S.

---

[17] The eighth amendment to the United States constitution has been made applicable to the states through the fourteenth amendment. See *Robinson v. California,* 370 U.S. 660, 666, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

280, 303–306, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); *Jurek* v. *Texas,* 428 U.S. 262, 271–72, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Proffitt* v. *Florida,* 428 U.S. 242, 252–53, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Gregg* v. *Georgia,* supra, 428 U.S. 188–95; the United States Supreme Court has derived from the eighth amendment's proscription of cruel and unusual punishment two principal prerequisites to assure the propriety of the imposition of the death penalty in any particular case. "First, sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. . . . Second, even though the sentencer's discretion must be restricted, the capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense. . . . Consideration of such evidence is a constitutionally indispensable part of the process of inflicting the penalty of death." (Citations omitted; internal quotation marks omitted.) *California* v. *Brown,* supra, 541. "[A] system of capital punishment [must be] at once consistent and principled but also humane and sensible to the uniqueness of the individual. . . . [It must] serve both goals of measured, consistent application and fairness to the accused." *Eddings* v. *Oklahoma,* 455 U.S. 104, 110–11, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); see also *Spaziano* v. *Florida,* 468 U.S. 447, 459–60, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

The first prerequisite prohibiting unbridled discretion requires death penalty statutes to be structured so that the death penalty is imposed in a consistent and reliable manner. In deciding to authorize capital punishment, a state "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbi-

trary and capricious infliction of the death penalty [including] defin[ing] the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion." (Internal quotation marks omitted.) *Godfrey* v. *Georgia,* 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). A statutory requirement that, before death may be imposed, the sentencer must find at least one statutorily mandated aggravating circumstance is a constitutionally permissible response to the need to avoid standardless sentencing discretion and to narrow the class of persons eligible for the death penalty. *Blystone* v. *Pennsylvania,* 494 U.S. 299, 302, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990); *Lowenfield* v. *Phelps,* 484 U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988); *Jurek* v. *Texas,* supra, 428 U.S. 270–71, 276; *Proffitt* v. *Florida,* supra, 428 U.S. 251–53; *Gregg* v. *Georgia,* supra, 428 U.S. 198.

The eighth amendment's mandate that the death penalty may only be imposed in a manner that is consistent and reliable also imposes other conditions on the validity of a death penalty statute. A constitutional concern for accurate sentencing information requires that the defendant be afforded access to and an opportunity to rebut all relevant sentencing information. *Gardner* v. *Florida,* 430 U.S. 349, 357–58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (plurality opinion); *Gregg* v. *Georgia,* supra, 428 U.S. 190. To focus attention on the importance of sentencing decisions, a death penalty may not constitutionally be imposed without a bifurcated hearing that addresses the appropriate sentence separately from the determination of guilt. *Gregg* v. *Georgia,* supra, 190–92, 195. Finally, to provide a check against having a death sentence imposed under the influence of passion or prejudice, or in a random and arbitrary manner, there must be an opportunity for meaningful appellate review. *Jurek* v. *Texas,* supra, 428 U.S. 276; *Proffitt* v. *Florida,* supra, 428 U.S. 258–60;

*Gregg* v. *Georgia,* supra, 198, 207; see also *Pulley* v. *Harris,* 465 U.S. 37, 44–45, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984) (proportionality review not constitutionally required).

The second prerequisite for a valid death penalty statute is that, in addition to achieving consistency and reliability, it must also focus the sentencer's attention on "the character and record of the individual offender and the circumstances of the particular offense . . . ." *Woodson* v. *North Carolina,* supra, 428 U.S. 304. " '[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (Emphasis in original.) *Eddings* v. *Oklahoma,* supra, 455 U.S. 110, quoting *Lockett* v. *Ohio,* 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (Burger, C. J., for plurality); see also *Payne* v. *Tennessee,* 501 U.S. 808, 822, 111 S. Ct. 2597, 115 L. Ed. 2d 720, reh. denied, 501 U.S. 1277, 112 S. Ct. 28, 115 L. Ed. 2d 1110 (1991); *Sumner* v. *Shuman,* supra, 483 U.S. 75–76; *Hitchcock* v. *Dugger,* 481 U.S. 393, 394, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987); *Skipper* v. *South Carolina,* 476 U.S. 1, 4, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986); *Zant* v. *Stephens,* 462 U.S. 862, 879, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Jurek* v. *Texas,* supra, 428 U.S. 271–72; *Gregg* v. *Georgia,* supra, 428 U.S. 189. The sentence imposed at the penalty stage "should reflect a reasoned *moral* response to the defendant's background, character, and crime." (Emphasis in original; internal quotation marks omitted.) *Penry* v. *Lynaugh,* 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). "In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's dis-

cretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." (Emphasis in original.) *McCleskey* v. *Kemp,* 481 U.S. 279, 304, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).

Although this second prerequisite demands that the sentencer " 'must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime' "; *Blystone* v. *Pennsylvania,* supra, 494 U.S. 304–305, quoting *Penry* v. *Lynaugh,* supra, 492 U.S. 328; the federal constitution does not require "unfettered sentencing discretion . . . . States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." (Internal quotation marks omitted.) *Boyde* v. *California,* 494 U.S. 370, 377, 110 S. Ct. 1190, 108 L. Ed. 2d 316, reh. denied, 495 U.S. 924, 110 S. Ct. 1961, 109 L. Ed. 2d 322 (1990); *Saffle* v. *Parks,* 494 U.S. 484, 492–93, 110 S. Ct. 1257, 108 L. Ed. 2d 415, reh. denied, 495 U.S. 924, 110 S. Ct. 1960, 109 L. Ed. 2d 322 (1990). Federal precedents have upheld the constitutionality of state statutes that, like our own, permit the imposition of the death penalty: (1) if the sentencer finds the existence of at least one aggravating factor and no mitigating factor, as long as the sentencer could consider a broadly phrased and nonexclusive list of mitigating factors; *Boyde* v. *California,* supra, 373–78; *Blystone* v. *Pennsylvania,* supra, 304–307; and (2) if the sentencer finds that the defendant has not proved the existence of a mitigating factor by a preponderance of the evidence. *Walton* v. *Arizona,* 497 U.S. 639, 649–51, 110 S. Ct. 3047, 111 L. Ed. 2d 511, reh. denied, 497 U.S. 1050, 111 S. Ct. 14, 111 L. Ed. 2d 828 (1990); *Blystone* v. *Pennsylvania,* supra, 306 n.4. The determination of whether death is the appropriate punishment should be based on a "reasoned moral response . . . rather

than an emotional one." (Citation omitted; internal quotation marks omitted.) *Saffle* v. *Parks,* supra, 493; *California* v. *Brown,* supra, 479 U.S. 542–43.

"In sum, [the United States Supreme Court's] decisions [regarding its eighth amendment jurisprudence] since *Furman* [v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972),] have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstances that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey* v. *Kemp,* supra, 481 U.S. 305–306.

2

Bearing these federal constitutional principles in mind, we now turn to an assessment of the facial validity of our death penalty statutes in light of the defendant's claims. The defendant claims that § 53a-46a is unconstitutional on its face because it: (1) fails to provide for an individual decision by a capital sentencer; (2) fails to provide an opportunity for a full individualized consideration of himself as defendant; (3) requires the defendant to prove the existence of a mitigating factor by a preponderance of the evidence; (4) embodies a presumption that death is the appropriate penalty; (5) authorizes an aggravating factor that is

unconstitutionally vague; and (6) requires juror unanimity before a mitigating factor can be given effect. We disagree.

In our assessment of whether the statute passes constitutional muster, we proceed from the well recognized jurisprudential principle that "[t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . We undertake this search for a constitutionally valid construction when confronted with criminal statutes as well as with civil statutes." (Citations omitted.) *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989). The burden of proving unconstitutionality is especially heavy when, as at this juncture, a statute is challenged as being unconstitutional on its face. *State* v. *Floyd,* 217 Conn. 73, 78, 584 A.2d 1157 (1991).

We cannot review the defendant's specific claims of unconstitutionality without placing them into the context of our death penalty statutory provisions as a whole. In General Statutes §§ 53a-46a through 53a-46c,[18] the legislature has established a three-tiered pyramid,[19] in which each tier narrows the class of defendants that may be found eligible for the death pen-

---

[18] As a predicate to triggering the death penalty sentencing statutes, the defendant must be convicted of at least one of eight categories of capital felony homicides that are listed in General Statutes § 53a-54b. The defendant, in this case, had been convicted by a jury of six counts of capital felony. See footnote 2 and accompanying text.

[19] Structurally, our statute resembles the death penalty system that was enacted in Georgia and found constitutional in *Zant* v. *Stephens,* supra, 462 U.S. 870–72.

alty. At the first tier above the base of the pyramid, our statute separates capital felony homicides from other homicides, and authorizes bifurcated death penalty hearings only for those who have been found guilty of or have pleaded guilty to a capital felony. General Statutes § 53a-46a (b). At the second tier, the statute further limits the death penalty by requiring the sentencer to find, beyond a reasonable doubt, the existence of at least one statutorily delineated aggravating factor. General Statutes § 53a-46a (b), (e), (f) and (h)[20]; *State* v. *Daniels,* 207 Conn. 374, 384, 542 A.2d 306 (1988). At the third and final tier, our statute " 'separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed' "; *Zant* v. *Stephens,* supra, 462 U.S. 871; by requiring a sentencer to find, by a preponderance of the evidence, whether a mitigating factor exists. General Statutes § 53a-46a (e). In making this determination, the capital sentencer must consider the existence of each of the mitigating factors listed in the statute at § 53a-46a (g) and of any other "mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime." General Statutes § 53a-46a (b).[21] If the sentencer fails to find the existence of a mitigating factor, after having found the existence of an aggravating factor, the

[20] In proving the existence of an aggravating factor, the statute requires the state to abide by the rules governing admission of evidence in trials of criminal matters. General Statutes § 53a-46a (c). The state is also required to disclose to the defendant or the defendant's counsel all material contained in any presentence report, and cannot use, at the sentencing hearing, any presentence information that has been withheld from the defendant. General Statutes § 53a-46a (c); see also *Gardner* v. *Florida,* supra, 430 U.S. 358–62.

[21] General Statutes § 53a-46a (d) clarifies that the capital sentencer's consideration of the existence of a mitigating factor should include anything that, although "not constitut[ing] a defense or excuse for the capital felony of which the defendant has been convicted . . . in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise con-

court must sentence the defendant to death. General Statutes § 53a-46a (f). Otherwise, the court must impose a sentence of life imprisonment without possibility of release.[22]

In their overall configuration, our death penalty statutes facially satisfy the constitutional requirements of the eighth and fourteenth amendments to the United States constitution. The multitiered pyramid meets the prerequisite of consistency and reliability by guiding the capital sentencer's discretion with clear and objective standards that narrow the class of defendants eligible for the death penalty and by providing a meaningful basis for distinguishing between those cases in which the death penalty is imposed and those in which it is not. The third tier in the pyramid meets the individualization prerequisite by requiring the sentencer to consider any relevant mitigating information so as to enable the sentencer to make the reasoned moral judgment that death is the appropriate punishment in a par-

stitute a basis for a sentence less than death." See *State* v. *Daniels*, supra, 207 Conn. 386 n.10.

The death penalty statute also provides that "[a]ny information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters . . . ." General Statutes § 53a-46a (c). This requirement on the admissibility of all relevant mitigating evidence comports with the United States Supreme Court's pronouncements in *Eddings* v. *Oklahoma*, supra, 455 U.S. 110, and *Lockett* v. *Ohio*, supra, 438 U.S. 604 and n.12.

[22] The death penalty sentencing system adopted by our legislature, like that of Georgia's, is nonweighing. This means that "the [capital sentencer] must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case." *Stringer* v. *Black*, 503 U.S. 222, 229–30, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992). The finding of an aggravating factor only plays a role in narrowing the class of persons who are eligible for the death penalty and does not guide the capital sentencer in exercising its discretion as to whether death is the appropriate punishment in any specific case. *Zant* v. *Stephens*, supra, 462 U.S. 873–75.

ticular case. See *Walton* v. *Arizona,* supra, 497 U.S. 647–49; *Boyde* v. *California,* supra, 494 U.S. 373–78; *Blystone* v. *Pennsylvania,* supra, 494 U.S. 305; *Zant* v. *Stephens,* supra, 462 U.S. 879; *Eddings* v. *Oklahoma,* supra, 455 U.S. 110–12; *Lockett* v. *Ohio,* supra, 438 U.S. 601–605; *Gregg* v. *Georgia,* supra, 428 U.S. 189. Notably, because our statute does not permit the weighing of aggravating and mitigating factors but permits the death sentence to be imposed only if no mitigating circumstances are found; General Statutes § 53a-46a (e) and (f); it is more stringent than the Pennsylvania sentencing statute that was found constitutional in *Blystone* v. *Pennsylvania,* supra, 299. Furthermore, because our statute mandates this court's review of the relevant factual findings and scrutiny of the record to assure that the death penalty was not "the product of passion, prejudice or any other arbitrary factor"; General Statutes § 53a-46b (b) (1); it satisfies the constitutional requirement of meaningful appellate review. *Gregg* v. *Georgia,* supra, 198, 207.[23]

The defendant, however, raises six specific constitutional challenges to the facial validity of our death penalty statutes. The defendant's first two claims are interrelated. He claims both that our death penalty sentencing system fails to provide for an individualized decision that the death penalty is the appropriate sentence *by an appropriate sentencer*, and that our sentencing system imposes a mandatory death sentence on a particular class of defendants without the full, individualized consideration by the sentencer of whether death is the appropriate penalty *for each defendant.* As a facial challenge to the validity of our death penalty sentencing statutes, these claims of a lack of appropriately guided discretion are not tenable under the federal constitution.

---

[23] See also *Jurek* v. *Texas,* supra, 428 U.S. 276; *Proffitt* v. *Florida,* supra, 428 U.S. 258–60.

The United States Supreme Court has stated that the capital sentencer must make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment. *Penry* v. *Lynaugh,* supra, 492 U.S. 319; *Caldwell* v. *Mississippi,* supra, 472 U.S. 330–32; see also *Saffle* v. *Parks,* supra, 494 U.S. 492–93; *California* v. *Brown,* supra, 479 U.S. 541, 543. Our death penalty statutes fulfill this requirement.

Under § 53a-46a (b), the capital sentencer is either a jury or the court. The sentencer determines whether the defendant, who has been convicted of a capital felony, should receive the punishment of death by making findings regarding the existence of any aggravating or mitigating factors. General Statutes § 53a-46a (e). The requirement that the sentencer's determination be made by setting forth its findings regarding aggravating and mitigating factors merely guides the sentencer's discretion to achieve a more focused and rational response. *Boyde* v. *California,* supra, 494 U.S. 377; *Blystone* v. *Pennsylvania,* supra, 494 U.S. 304–305.

The sentencer makes the required moral and individualized ·determination, under our statute, because it must consider a nonexclusive list of mitigating factors as well as a catchall category consisting of any other "mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime." General Statutes § 53a-46a (b); and see § 53a-46a (f). The catchall category of mitigating factors includes those factors "which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes § 53a-46a (d). The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a moral and individualized decision. *Blystone* v. *Pennsylvania,* supra, 494 U.S. 305.

Furthermore, it is evident that the capital sentencer, either a jury or the court, in making its determination regarding the existence of aggravating and mitigating factors during the separate sentencing hearing is aware that its "task [is] the serious one of determining whether a specific human being should die at the hands of the State." *Caldwell* v. *Mississippi,* supra, 472 U.S. 329. Finally, the death sentence is mandatorily imposed only after the capital sentencer has determined unanimously that at least one aggravating factor exists and no mitigating factors exist, and has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for each defendant. *Blystone* v. *Pennsylvania,* supra, 494 U.S. 303–305.

We conclude, therefore, that our capital sentencing statutes, on their face, give the capital sentencer, either a jury or the court, the proper amount of guided discretion to make the appropriate determination regarding the individual defendant with regard to the defendant's specific crime. Because the statutes are not impermissibly mandatory, they comply with the eighth and the fourteenth amendments to the United States constitution.

The defendant's next two claims are that our death penalty statute is facially unconstitutional because, first, as construed in *State* v. *Daniels,* supra, 207 Conn. 385, the statute requires the defendant to prove the existence of a mitigating factor by a preponderance of the evidence and, second, the statute embodies a presumption of death once the state proves the existence of an aggravating factor. Both claims are foreclosed by the United States Supreme Court's recent decision in *Walton* v. *Arizona,* supra, 497 U.S. 649–52.[24]

---

[24] With regard to the burden of proof claim concerning the existence of mitigating factors, the United States Supreme Court in *Walton* v. *Arizona,*

The defendant next claims that the aggravating factor that the state charged, and that the jury found to have been proven in this case, is unconstitutionally vague on its face. The § 53a-46a (h) (4) aggravating factor provides that "[i]f no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds . . . that . . . the defendant committed the offense in an *especially heinous, cruel or depraved manner.*" (Emphasis added.) The United States Supreme Court has held the terms "heinous, atrocious, or cruel" to be unconstitutionally vague; *Maynard* v. *Cartwright,* 486 U.S. 356, 363–65, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988); see also *Godfrey* v. *Georgia,* supra, 446 U.S. 428–33 (holding the terms "outrageously or wantonly vile, horrible or inhuman" as unconstitutionally vague); unless they have been appropriately construed and limited by the state's court. *Maynard* v. *Cartwright,* supra, 359–60; *Godfrey* v. *Georgia,* supra, 428–29; *Proffitt* v. *Florida,* supra, 428 U.S. 255–56. In *State* v. *Breton,* supra, 212 Conn. 270, we adopted a limiting definition of the term "especially cruel" in our construction of the § 53a-46a (h) (4) aggravating factor. Similarly, the terms "heinous" and "depraved" are susceptible of limiting constructions in conjunction with our definition of "especially cruel." See part III A 1. So construed, § 53a-46a (h) (4) is not unconstitutionally vague under the eighth and fourteenth amendments to the federal constitution.

---

supra, 497 U.S. 650, stated: "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances . . . ." With regard to the presumption of death claim, the court determined that there is no unconstitutional presumption of death as long as the requirements of individualized sentencing are satisfied in death penalty cases by allowing the sentencer to consider all relevant mitigating evidence. Id., 651–52. Our statute allows such consideration.

The defendant's final claim is that our death penalty system, as construed in *State* v. *Daniels,* supra, 207 Conn. 374, is facially unconstitutional because it requires the jury to be unanimous in finding the existence of a mitigating factor before an individual juror can give effect to any mitigating factor. The defendant finds support for his position in *McKoy* v. *North Carolina,* 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990), in which North Carolina's death penalty sentencing statute was held to be unconstitutional because the jury, acting as the capital sentencer, could consider only those mitigating circumstances found unanimously when it weighed mitigating circumstances against aggravating circumstances in deciding whether to impose the death penalty. This unanimity requirement was declared to be unconstitutional because it impermissibly prevented each juror from considering and giving effect to all mitigating evidence. Id., 437–38.

Although in *State* v. *Daniels,* supra, 207 Conn. 388–89, we held that the jury had to be unanimous in its finding that the defendant had proven the existence of a mitigating factor by a preponderance of the evidence, that holding arose in the context of a hung jury. In those circumstances, we stated that, in "death penalty cases in which a trier of fact cannot come to a unanimous finding about the existence of mitigating factors. . . . [T]he statute neither authorizes imposition of the death penalty nor requires the imposition of a life sentence. . . . [T]he imposition of the death penalty under § 53a-46a (e) must be premised on two unanimous findings by the trier of fact: that the state has proved beyond a reasonable doubt that an aggravating factor exists and that the defendant has not proved by a preponderance of the evidence that a mitigating factor exists. A unanimous jury verdict that the defendant did not prove that a mitigating factor exists fulfills the statutory requirement that the death penalty

not be imposed unless 'no mitigating factors exist' within the meaning of § 53a-46a (e). . . . Faced with a jury that is unable to agree unanimously on its findings, the trial court may, in the exercise of its discretion, grant a motion for mistrial [pursuant to Practice Book § 889,[25]] by either party [or] enter a judgment 'acquitting' the defendant of the death penalty [pursuant to Practice Book § 883.[26]]" Id., 394–96.

Our holding in *Daniels* did not imply that individual jurors are precluded from considering and giving effect to all mitigating evidence in a death penalty sentencing hearing. The unanimity requirement in our statute requires unanimity only in the sense that each juror must find at least one mitigating factor that was proved by a preponderance of the evidence. The jury need not unanimously find the same mitigating factor to have been proven by a preponderance of the evidence. So construed, our death penalty sentencing statute avoids the unanimity problem identified in *McKoy*, because our unanimity requirement does not interfere with the ability of each individual juror to consider and to give effect to any mitigating factor of which he or she is convinced by a preponderance of the evidence. *McKoy* v. *North Carolina*, supra, 494 U.S. 439–44. With respect to this claim as well, therefore, we conclude that our death penalty statutes are not unconstitutional on their face as a matter of federal constitutional law.

[25] Practice Book § 889 provides: "[PROCEEDINGS AT TRIAL——MISTRIAL]—— ——JURY'S INABILITY TO REACH VERDICT

"The judicial authority shall declare a mistrial in any case in which the jury are unable to reach a verdict."

[26] Practice Book § 883 provides in relevant part: "[PROCEEDINGS AT TRIAL——MOTIONS FOR JUDGMENT OF ACQUITTAL]—— ——IN GENERAL

". . . . After the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon his own motion, the judicial authority shall order the entry of a judgment of acquittal . . . [if] the evidence would not reasonably permit a finding of guilty. . . ."

## B

### STATE CONSTITUTIONAL ISSUES

The defendant contends, in the alternative, that our death penalty statutes facially violate article first, §§ 8[27] and 9[28] of the state constitution. This contention is advanced on two theories. Broadly, the defendant maintains that our state constitution impliedly forbids any punishment that is cruel and unusual and that imposition of the death penalty invariably constitutes cruel and unusual punishment. More narrowly, the defendant maintains that certain specific statutory procedures contained in § 53a-46a violate procedural due process as defined by the state constitution. We are not persuaded that applicable state constitutional analyses or precedents support either claim.

### 1

The defendant broadly claims that our state constitution forbids any imposition of the death penalty because such a penalty, regardless of the circumstances, constitutes cruel and unusual punishment. He maintains that a proper construction of the provisions of our state constitution requires rejection of the contrary holding of the United States Supreme Court in *Gregg* v. *Georgia,* supra, 428 U.S. 153. We disagree.

In order to resolve this claim, we must address two issues. We must first decide whether our state constitution contains any prohibition of cruel and unusual punishment. If that question is decided in the affirma-

---

[27] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[28] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

tive, we must then decide whether imposition of the death penalty invariably violates such a constitutional prohibition.

Unlike the eighth amendment to the federal constitution, no provision in our state constitution specifically proscribes cruel and unusual punishment. Nonetheless, we are free to interpret the due process guarantees contained in our state constitution to prohibit governmental infliction of cruel and unusual punishments. See *State* v. *Kreminski,* 178 Conn. 145, 153 and n.4, 422 A.2d 294 (1979); *State* v. *Kyles,* 169 Conn. 438, 442–44, 363 A.2d 97 (1975).

In determining the scope of our state constitution's due process clauses, we have taken as a point of departure those constitutional or quasi-constitutional rights that were recognized at common law in this state prior to 1818. This is the analysis that we undertook when the question was whether our state constitution protects criminal defendants from double jeopardy. Despite the absence of an express constitutional provision on the subject, we held that our due process clause impliedly includes a right to protection against double jeopardy, because protection against double jeopardy was recognized as a fundamental right in the common law of this state. *State* v. *Rawls,* 198 Conn. 111, 113 n.3, 502 A.2d 374 (1985); *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962); see also E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259 (1989).

Applying the same analysis to this case, we are persuaded that our due process clauses impliedly prohibit punishment that is cruel and unusual. Prior to the adoption of the state constitution in 1818, the common law in Connecticut recognized that the state did not have unlimited authority to inflict punishment for the com-

mission of a crime. See *State* v. *Smith,* 5 Day (Conn.) 175, 178–79 (1811); see also 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) pp. 268–69, 362, 418–19 ("[A]nd though the law invests goalers with all the powers necessary for the interest of the commonwealth, yet they are not to behave with the least degree of wanton cruelty to their prisoners"; rules against execution of the insane and pregnant women). Accordingly, we have routinely assumed that our constitution includes a prohibition against cruel and unusual punishment. *State* v. *Dupree,* 196 Conn. 655, 665, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); *State* v. *Kreminski,* supra, 178 Conn. 153 and n.4 (article first, § 8); *State* v. *Kyles,* supra, 169 Conn. 442–44 (article first, § 9); *State* v. *Levy,* 103 Conn. 138, 148, 130 A. 96 (1925) (unspecified); cf. *Cinque* v. *Boyd,* 99 Conn. 70, 94–95, 121 A. 678 (1923) (article first, § 10, now § 9, pertaining to juvenile detention). The state does not seriously argue to the contrary.

The unresolved question is whether, construed to bar punishment that is cruel and unusual, the due process clauses of our state constitution forbid any enactment of a death penalty for all cases and under all circumstances. Before addressing the merits of that question, we note preliminarily that our state constitutional inquiry may proceed independently from the decisions of the United States Supreme Court upholding the constitutionality of the death penalty. "We may find greater protection of individual rights under our state constitution than that provided by the federal constitution. It is well established that federal constitutional law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Moreover, we have held that in the area of fundamental civil liberties—which includes all protections of the declaration of rights con-

tained in article first of the Connecticut constitution—we sit as a court of last resort. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller,* 227 Conn. 363, 379–80, 630 A.2d 1315 (1993).

The defendant urges us to exercise our independent authority under the state constitution to declare any imposition of the death penalty invalid as cruel and inhuman punishment because it no longer comports with contemporary standards of decency and civilization. He maintains that the death penalty can never be constitutional for three overlapping reasons: the death penalty violates the fundamental value and dignity of life itself; it cannot be carried out without the infliction of inhuman pain; and it serves no valid or compelling state purpose. The state urges us to conclude to the contrary, for two related reasons: the prohibition of cruel and inhuman punishment is grounded solely in article first, § 9; and, as a matter of constitutional history and contrary to *State* v. *Lamme,* 216 Conn. 172, 178–82, 579 A.2d 484 (1990), article first, § 9, confers the authority to determine what constitutes cruel and unusual punishment solely on the Connecticut legislature and not on the courts.

If the state were correct in its construction of our constitutional prohibition of cruel and inhuman punishment, that would end the matter. We are not, however, prepared to overlook article first, § 8, as a constitutional basis for the prohibition. We are likewise unprepared to overrule our holding in *Lamme* that, in contemporary constitutional jurisprudence, article first, § 9, has "independent substantive significance" that may protect constitutional rights not embodied in the form of a statute. *State* v. *Lamme,* supra, 216 Conn. 182; see *State* v. *White,* 229 Conn. 125, 152–55, 640 A.2d 572 (1994). Although we should exercise our authority with great restraint, this court cannot abdicate its nondelegable responsibility for the adjudication of constitutional rights.

We turn therefore to the defendant's contention that we should declare the death penalty to be unconstitutionally unacceptable on its face. In our analysis of issues arising, for the first time, under the state constitution, we have identified six factors to be considered: (1) the text of the constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. *State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

The first five factors do not support the defendant's argument. In article first, § 8, and article first, § 19,[29] our state constitution makes repeated textual references to capital offenses and thus expressly sustains the constitutional validity of such a penalty in appro-

---

[29] Article first, § 19, as amended, of the Connecticut constitution provides in relevant part: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. . . ."

priate circumstances. Connecticut case law has recognized the facial constitutionality of the death penalty under the eighth and fourteenth amendments to the federal constitution. See, e.g., *State* v. *Davis,* 158 Conn. 341, 358, 260 A.2d 587 (1969), vacated and remanded on other grounds, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972). Federal constitutional law does not forbid such a statute outright. *Gregg* v. *Georgia,* supra, 428 U.S. 153. Courts in the overwhelming majority of our sister states have rejected facial challenges to the death penalty under their state constitutions.[30] Finally, Connecticut's history has included a death penalty statute since 1650, when it was incorporated into Ludlow's Code;[31] see 3 N. Osborn, History of Connecticut (1925) pp. 24–25; and such a penalty was considered constitutional at the time of the adoption of the constitution of 1818.[32]

---

[30] See, e.g., *Gilreath* v. *State,* 247 Ga. 814, 279 S.E.2d 650 (1981), cert. denied, 456 U.S. 984, 102 S. Ct. 2258, 72 L. Ed. 2d 862 (1982); *State* v. *Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987); *Commonwealth* v. *Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S. Ct. 2444, 77 L. Ed. 2d 1327 (1983); *State* v. *Campbell,* 103 Wash. 2d 1, 691 P.2d 929 (1984), cert. denied, 471 U.S. 1094, 105 S. Ct. 2169, 85 L. Ed. 2d 526 (1985).

Thirty-seven states have passed death penalty statutes since 1972. See R. Pascucci, E. Strauss & G. Watchman, "Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency," 69 Cornell L. Rev. 1129, 1217 (1984). In the only two states in which the death penalty was held to have been facially unconstitutional as cruel and unusual punishment; *People* v. *Anderson,* 6 Cal. 3d 364, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972), and *District Attorney* v. *Watson,* 381 Mass. 648, 411 N.E.2d 1274 (1980); amendments to the state constitution promptly rejected these decisions. J. Acker & E. Walsh, "Challenging the Death Penalty under State Constitutions," 42 Vand. L. Rev. 1299, 1331 (1989).

[31] Capital punishment existed even prior to the adoption of Ludlow's Code in 1650. The laws of 1642 made idolatry, witchcraft, blasphemy, murder, bestiality, adultery, rape, kidnapping and false witnessing punishable by death. G. Clark, A History of Connecticut (2d Ed. 1914) p. 444.

[32] The constitution of 1818 declared in relevant part: "[N]o person shall be holden to answer for any crime, the punishment of which is death or imprisonment for life, unless on a presentment or indictment of a grand jury." G. Clark, A History of Connecticut (2d Ed. 1914) p. 89.

We must therefore decide whether contemporary understandings of applicable economic and sociological norms compel the conclusion that any death penalty constitutes cruel and unusual punishment. The question is not whether any one of us would vote to enact a death penalty if our role were that of a legislator. It is, rather, whether the defendant is correct in his contention that the death penalty is so inherently cruel and so lacking in moral and sociological justification that it is unconstitutional on its face because it is fundamentally offensive to evolving standards of human decency. Stated so categorically, we are unpersuaded by the defendant's contention. Judicial evaluation of evolving standards of human decency cannot proceed in a vacuum. Community standards of acceptable legislative policy choices are necessarily reflected in the text of our constitutional document, in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts. While we should not blindly follow a beaten path, we agree with the New Jersey Supreme Court's cogent observation: "When, in the course of a decade, thirty-seven states call for the death penalty, the probability that the legislature of each state accurately reflects its community's standards approaches certainty." *State* v. *Ramseur,* 106 N.J. 123, 173, 524 A.2d 188 (1987).

To say that imposition of the death penalty is not cruel and unusual punishment in all circumstances is not to say, however, that the death penalty can be imposed without any constitutional constraints. Community standards of acceptable legislative choices do not go that far. In *State* v. *Lamme,* supra, 216 Conn. 184, we observed that "federal constitutional precedents [may] appropriately illuminate open textured provisions in our own organic document" and that reasoned adoption of such precedents "in no way compromises our obligation independently to construe the

provisions of our state constitution." Accordingly, we hold that the due process clauses of our state constitution incorporate the principles underlying a constitutionally permissible death penalty statute that the United States Supreme Court has articulated in cases such as *California* v. *Brown,* supra, 479 U.S. 541, *Eddings* v. *Oklahoma,* supra, 455 U.S. 110–12, and *Lockett* v. *Ohio,* supra, 438 U.S. 602–605. These principles require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense. Our death penalty statute, § 53a-46a, meets these minimum state constitutional law requirements.

### 2

In addition to his contention that the death penalty violates the constitutional prohibition of cruel and unusual punishment, the defendant also challenges several specific provisions of § 53a-46a as facially unconstitutional as a matter of due process under the state constitution. These claims can be grouped as follows. First, the death penalty statutes violate due process because they fail to provide for an individualized decision maker, or for an individualized decision about the propriety of the death sentence in any particular case. Second, the death penalty statute unconstitutionally requires the defendant to prove the existence of a mitigating factor and thereby embodies a presumption of death. Third, the aggravating factor that the defendant committed the capital felony "in an especially heinous, cruel or depraved manner"; General Statutes § 53a-46a (h) (4); is unconstitutionally vague. Fourth,

the requirement of juror unanimity in finding the existence of a mitigating factor unconstitutionally requires jurors to agree on the weight that each will assign to mitigating evidence. These claims mirror the specific contentions that the defendant raised as a matter of federal constitutional law and that we have found unpersuasive in light of the applicable federal precedents. We find them equally unpersuasive as a matter of state constitutional law.

The defendant's state constitutional claims that § 53a-46a lacks the required individualized decision maker and the required individualized decision to impose the death penalty are misconstructions of the structure of the statute. As we noted in discussing this claim under the federal constitution, our statute identifies the capital sentencer as being either the jury or the court. The statute thereafter provides the capital sentencer with sufficient latitude to make a reasoned moral and individualized determination, based on the defendant's background, character and crime, that death is the appropriate punishment. See part II A. The statute enables a jury, with appropriate instructions, to make this awesome decision in a manner that is appropriately wide-angled and open-textured. So construed, the statute is "entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." *State* v. *Lamme,* supra, 216 Conn. 178; *State* v. *Joyner,* 225 Conn. 450, 470–72, 625 A.2d 791 (1993). Other state courts have come to the same conclusion. *People* v. *Brown,* 40 Cal. 3d 512, 538–44, 726 P.2d 516, 230 Cal. Rptr. 834 (1986), rev'd on other grounds, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987); *State* v. *Bey,* 112 N.J. 123, 162–63, 548 A.2d 887 (1988).[33]

---

[33] State courts have invalidated state death penalty statutes that, unlike General Statutes § 53a-46a, required the imposition of the death penalty if jurors found aggravating and mitigating factors to be in equipoise; *Peo-*

The defendant maintains that § 53a-46a facially violates his right to due process because, as that statute was construed in *State* v. *Daniels,* supra, 207 Conn. 383, he bore the burden of establishing the existence of a mitigating factor by a preponderance of the evidence. Assigning this burden of proof to him, he maintains, is per se unconstitutional and means that the statute in effect embodies a presumption of death whenever the jury finds that an aggravating factor has been established. We rejected a similar argument in *State* v. *Joyner,* supra, 225 Conn. 470–72, in which we found no constitutional impediment to requiring a defendant to bear the burden of proving his insanity. In *Joyner,* we found it significant that a "defendant is much more likely than the state to be able to produce reliable evidence of his own mental status." Id., 471–72. That reasoning applies equally to the defendant's superior access to mitigating information in a death penalty case. The defendant's claim to the contrary has been rejected not only by the United States Supreme Court in *Walton* v. *Arizona,* supra, 497 U.S. 639, but also by a substantial number of state courts. See *State* v. *Richmond,* 136 Ariz. 312, 316, 666 P.2d 57, cert. denied, 464 U.S. 986, 104 S. Ct. 435, 78 L. Ed. 2d 367 (1983); *State* v. *Charboneau,* 116 Idaho 129, 154, 774 P.2d 299 (1989), overruled in part on other grounds, *State* v. *Card,* 121 Idaho 425, 825 P.2d 1081 (1991); *People* v. *Bean,* 137 Ill. 2d 65, 138–40, 560 N.E.2d 258 (1990), cert. denied, 499 U.S. 932, 111 S. Ct. 1338, 113 L. Ed. 2d 270 (1991); *Ake* v. *State,* 663 P.2d 1, 10–11 (Okla. Crim. App. 1983), rev'd on other grounds, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). We concur with their holdings that, once guilt has been established and the state has proved the existence of an aggravating

*ple* v. *Young,* 814 P.2d 834, 844–45 (Colo. 1991); or required the imposition of the death penalty for certain classes of offenders. See *Commonwealth* v. *O'Neal,* 369 Mass. 242, 263, 339 N.E.2d 676 (1975); *State* v. *Green,* 91 Wash. 2d 431, 441–47, 588 P.2d 1370 (1979).

factor, "due process is not offended by requiring the already guilty defendant to carry the burden of showing why he should receive leniency." *State* v. *Watson,* 120 Ariz. 441, 447, 586 P.2d 1253 (1978), cert. denied, 440 U.S. 924, 99 S. Ct. 1254, 59 L. Ed. 2d 478 (1979).

The defendant next claims that the death penalty statute is unconstitutionally vague because of inherent ambiguity in the aggravating factor contained in § 53a-46a (h) (4). We have addressed this claim in *State* v. *Breton,* supra, 212 Conn. 268–71, by requiring death penalty jurors to be given appropriately limiting instructions to correct the unconstitutional infirmity in the phrase "in an especially heinous, cruel or depraved manner." Such limiting instructions have been upheld elsewhere, both as a matter of federal law; *Maynard* v. *Cartwright,* supra, 486 U.S. 359–60; *Godfrey* v. *Georgia,* supra, 446 U.S. 428–29; *Proffitt* v. *Florida,* supra, 428 U.S. 255–56; and as a matter of state law. See, e.g., *State* v. *Greenway,* 170 Ariz. 155, 165–67, 823 P.2d 22 (1991); *State* v. *Dixon,* 283 So. 2d 1, 9 (Fla. 1973), cert. denied sub nom. *Hunter* v. *Florida,* 416 U.S. 943, 94 S. Ct. 1950, 40 L. Ed. 2d 295 (1974); *State* v. *Charboneau,* supra, 116 Idaho 151–53; *State* v. *Sonnier,* 402 So. 2d 650, 658–59 (La. 1981), cert. denied, 463 U.S. 1229, 103 S. Ct. 3571, 77 L. Ed. 2d 1412 (1983); *State* v. *Ryan,* 233 Neb. 74, 140–44, 444 N.W.2d 610 (1989), cert. denied, 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990); *State* v. *Goodman,* 298 N.C. 1, 24–26, 257 S.E.2d 569 (1979); *State* v. *Pritchett,* 621 S.W.2d 127, 137–39 (Tenn. 1981); *State* v. *Wood,* 648 P.2d 71, 85–86 (Utah 1981), cert. denied, 459 U.S. 988, 103 S. Ct. 341, 74 L. Ed. 2d 383 (1982); *Smith* v. *Commonwealth,* 219 Va. 455, 477–78, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 967, 99 S. Ct. 2419, 60 L. Ed. 2d 1074 (1979); but see *People* v. *Superior Court of Santa Clara County,* 31 Cal. 3d 797, 801–802, 647 P.2d 76, 183 Cal. Rptr. 800 (1982). Appropriately limited by

a suitable instruction, § 53a-46a (h) (4) does not violate the defendant's right to due process under the state constitution.

The defendant's final claim is that the unanimity requirement that we construed to be part of our death penalty statute in *State* v. *Daniels,* supra, 207 Conn. 388–89, undermines his right to due process. As we noted in our discussion of the defendant's parallel claim under the federal constitution, we disagree with the premise that underlies this contention. See part II A 2. Nothing in the statute or in our decision in *Daniels* limits the ability of any juror to consider any fact offered in support of mitigation. In order to arrive at a decision that a mitigating factor has been proven, the jurors need not agree on the same mitigating factor. All that unanimity requires is that each juror must be persuaded of the existence of a mitigating factor. Due process requires no less and no more. As a matter of federal law see *McKoy* v. *North Carolina,* supra, 494 U.S. 433; and as a matter of state law see *People* v. *Rodriguez,* 794 P.2d 965, 980–82 (Colo. 1990), cert. denied, 498 U.S. 1055, 111 S. Ct. 770, 112 L. Ed. 2d 789 (1991), and *State* v. *Smith,* 781 S.W.2d 761, 767–68 (Mo. 1989), vacated, 495 U.S. 916, 110 S. Ct. 1944, 109 L. Ed. 2d 306, aff'd on remand, 790 S.W.2d 241 (Mo. 1990).

We therefore conclude that the Connecticut death penalty statutes are not unconstitutional on their face on any of the grounds alleged by the defendant, either under the United States constitution or under the Connecticut constitution. The statutes authorize the death penalty only in defined circumstances that impose a heavy burden on the state to justify the death penalty and that permit the defendant wide latitude to persuade the sentencer to the contrary. The statutes therefore do not violate the prohibition of cruel and unusual punishment and do not infringe upon the defendant's rights to due process.

## III

### VALIDITY OF THE SENTENCING HEARING IN THIS CASE

The defendant challenges the validity of the death sentences imposed upon him on the ground that the sentencing hearing in this case failed to comply with the requirements of § 53a-46a. As a matter of evidentiary sufficiency, he maintains that the trial court improperly: (1) failed to set aside the jury's finding that the state had adduced sufficient evidence to prove an aggravating factor beyond a reasonable doubt; and (2) failed to set aside the jury's finding of insufficient evidence to prove a mitigating factor by a fair preponderance of the evidence. As a matter of evidentiary rulings, he maintains that the trial court improperly: (1) excluded mitigating evidence; and (2) permitted irrelevant or prejudicial evidence to be presented to prove the aggravating factor. As a matter of jury instructions, he maintains that the trial court improperly charged the jury with regard to: (1) the definition of the aggravating factor that the crime had been committed "in an especially heinous, cruel or depraved manner"; (2) the two witness requirement of § 54-83; (3) reasonable doubt; (4) permissible inferences from missing witnesses; and (5) statutory and nonstatutory mitigating factors. Furthermore, the defendant maintains that the trial court improperly: (1) permitted prejudicial commentary by the prosecuting attorney; (2) denied the defendant's motion for mistrial; (3) failed to merge two capital convictions for one victim into one capital felony conviction; (4) failed to sever the sentencing hearing into three separate hearings; (5) denied the defendant's motion for surrebuttal on the issue of mitigation; and (6) rejected the defendant's claim of juror prejudice.

We conclude that an entirely new sentencing hearing must be held. Although there was sufficient evi-

dence to sustain the jury's finding that the state had proved an aggravating factor beyond a reasonable doubt, the jury's finding of "no mitigating factor" cannot stand because of the trial court's evidentiary and instructional rulings that did not comply with the statutory requirements of § 53a-46a.

## A

### SUFFICIENCY OF THE EVIDENCE

In our assessment of the validity of the penalty phase proceedings that were in fact held in this case, the first issue is the sufficiency of the evidence upon which the trial court relied in imposing the death penalty upon the defendant. General Statutes § 53a-46b (b) (2). Under § 53a-46a (f), a court may sentence a person to death only if the trier of fact has found that the state has established the existence of an aggravating factor beyond a reasonable doubt and that the defendant has failed to establish a mitigating factor by a preponderance of the evidence. *State* v. *Daniels,* supra, 207 Conn. 384–85. In these cases, the jury found that the state had met its burden of proof that the defendant, as charged, had committed the offenses "in an especially heinous, cruel or depraved manner." General Statutes § 53a-46a (h) (4). If, as the defendant contends, the state failed to prove this aggravating factor, or he proved a mitigating factor, principles of double jeopardy would require us to remand this case to the trial court with direction to impose life sentences upon the defendant. *State* v. *Daniels,* supra, 397–99.

The defendant urges us to employ a heightened standard of review in our determination, on appeal, of whether the state has presented sufficient evidence to prove the existence of an aggravating factor. He maintains that § 53a-46b (b) (2) confers upon this court discretionary authority comparable to that vested in the sentence review division by General Statutes § 51-195.

See *State* v. *Nardini,* 187 Conn. 109, 118–22, 445 A.2d 304 (1982); *Consiglio* v. *Warden,* 153 Conn. 673, 676–77, 220 A.2d 269 (1966). We disagree. Section 53a-46b (b) (2) requires only a determination of whether "the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a."[34] That language gives no indication that the legislature intended a fundamental alteration in the standard of review that generally governs a criminal defendant's challenge of the sufficiency of the evidence of his guilt at trial. See *State* v. *Francis,* 228 Conn. 118, 127, 635 A.2d 762 (1993); *State* v. *Joyner,* supra, 225 Conn. 455. Nonetheless, because of the seriousness of any death penalty determination, we will subject a finding of an aggravating factor to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina,* 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); or the seizure of a defendant. *State* v. *Greenfield,* 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Northrop,* 213 Conn. 405, 414, 568 A.2d 439 (1990).

1

In support of its allegation that it proved that the defendant had acted "in an especially heinous, cruel or depraved manner"; General Statutes § 53a-46a (h) (4); the state makes two arguments. It contends that the defendant acted in an especially heinous or depraved manner because of the defendant's state of mind when he kidnapped, raped and strangled his victims. Further-

---

[34] This language does not differ substantively from General Statutes (Rev. to 1983) § 53a-46b (b) (2), which provided: "The supreme court shall affirm the sentence of death unless it determines that . . . (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (g) of section 53a-46a . . . ."

more, the state contends that the defendant acted in an especially cruel manner because of the physical and mental pain that he intentionally inflicted on each victim.

Before we review the evidence adduced by the state, we must clarify the standard by which it is to be measured. As we acknowledged in *State* v. *Breton,* supra, 212 Conn. 265, the phrase "in an especially heinous, cruel or depraved manner" contains an arguably subjective standard that runs the risk of being unconstitutionally vague. To avoid constitutional jeopardy for this aggravating factor, we adopted a limiting construction of § 53a-46a (h) (4). Focusing on the meaning of "especially cruel," we concluded that an acceptable core construction of this term "must include the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." Id., 270.

Our decision in *Breton* did not address two further issues concerning the proper construction of § 53a-46a (h) (4). First, does the "extreme pain or torture" that is at the core of "especially cruel" include the infliction of psychological anguish as well as physical pain? Second, does § 53a-46a (h) (4) envisage three separate aggravating factors, so that an independent core meaning must be assigned to "depraved" and "heinous," or are these terms to be read conjointly to describe a single aggravating factor?

The defendant argues in this appeal that "extreme pain or torture" cannot be psychological. We disagree. A defendant cannot intentionally engage in conduct that inflicts extreme psychological trauma and then claim that his victims' mental distress was unintended or unforeseeable. *Breton* did not exclude mental anguish from actionable "extreme pain or torture" and we decline to do so now. See *Walton* v. *Arizona,* supra,

497 U.S. 646–47. No different analysis is required as a matter of state constitutional law.

The state argues that § 53a-46a (h) (4) permits the state to prove an aggravating factor premised on "especially heinous or depraved" that focuses solely on the defendant's state of mind when he kidnapped, raped and strangled his victims. We are not persuaded that we can discern a core meaning for these individual terms solely as a mental state that will shield them from unconstitutional vagueness. More important, however, as a matter of statutory construction, we are not persuaded that § 53a-46a (h) (4) was intended to encompass more than one unitary aggravating factor. In our view, the terms "heinous or depraved" address the defendant's state of mind in intentionally inflicting on his victim extreme pain or torture above and beyond that necessarily accompanying the underlying killing. So construed, § 53a-46 (h) (4) passes constitutional muster under the United States constitution; see *Proffitt* v. *Florida,* supra, 428 U.S. 255–56; and under our state constitution.

A construction of § 53a-46a (h) (4) as a unitary aggravating factor that focuses on the infliction of extreme pain or psychological or physical torture on the victim finds support in the structure of § 53a-46a (h) and in accepted principles of statutory analysis. Structurally, each of the separate clauses of subsection (h) defines a discrete set of aggravating circumstances. Analytically, under the doctrine of noscitur a sociis, "[i]f two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases . . . ." *State* v. *Indrisano,* 228 Conn. 795, 811, 640 A.2d 986 (1994); *Staples* v. *Palten,* 214 Conn. 195, 199–200, 571 A.2d 97 (1990); *State* v. *Roque,* 190 Conn. 143, 152–53, 460 A.2d 26 (1983).

In *Indrisano,* we relied upon the doctrine of noscitur a sociis to find limiting constructions of our disorderly conduct statute; General Statutes § 53a-182 (a); to save that statute from unconstitutional vagueness. We construed the language "[e]ngages in fighting or in violent, tumultuous or threatening behavior" as a prohibition of *physical* fighting and *physically* violent, threatening or tumultuous behavior. *State* v. *Indrisano,* supra, 228 Conn. 812. We held that the statutory phrase " 'by offensive or disorderly conduct' " was to be read as a unitary phrase in which each adjective complements the meaning of the other. Id., 817–18. Our application of this rule of statutory construction was consistent with earlier decisions holding that, in our robbery statute; General Statutes § 53a-133; "the three words 'taking,' 'obtaining,' and 'withholding' are inseparable." *State* v. *Pelletier,* 209 Conn. 564, 576, 552 A.2d 805 (1989); *State* v. *John,* 210 Conn. 652, 688–89, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

In a review of the sufficiency of the evidence to support the jury's finding of an aggravating factor under § 53a-46a (h) (4), we hold, therefore, that the focus must be on whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing. Evidence of the defendant's callousness or indifference to his victims' suffering would substantiate such a finding, but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims. We conclude that the state has met its evidentiary burden in this case.

The jury reasonably could have found, for each of the defendant's four victims in the circumstances of these cases, that their manual strangulation by the defend-

ant was an especially cruel way of inflicting death. In the cases of Wendy B. and Robyn S., the defendant's cruelty was exacerbated when their strangulation was prolonged by the cramping of the defendant's hands, which caused him to stop before resuming the strangulation. For each of these young and emotionally vulnerable victims, moreover, the jury reasonably could have found that the conjoining of the kidnapping with the strangulation would have produced extreme anxiety, fear and uncertainty as to her ultimate fate. See *State* v. *Havican,* 213 Conn. 593, 599–600, 569 A.2d 1089 (1990); *Fairbanks* v. *State,* 143 Conn. 653, 660, 124 A.2d 893 (1956). Except in the case of Leslie S., the jury reasonably could have inferred that the victims' terror would have been increased by the defendant's sexual assaults upon them. For Leslie S., the jury reasonably could have found that she would have been terrified by sitting in the defendant's car, bound hand and foot, and coming to understand that her best friend, April B., was being sexually abused and then killed. Finally, the jury reasonably could have found that the defendant's lack of remorse substantiated a finding that his infliction of suffering upon his victims was intentional. Such findings have probative force even though they are based on inferences rather than on direct evidence; *State* v. *Medina,* supra, 228 Conn. 309; *State* v. *Greenfield,* supra, 228 Conn. 76–77; and even though the jury might have drawn contrary inferences. *State* v. *Francis,* supra, 228 Conn. 127; *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991).

We reject the defendant's contention that the evidence adduced by the state does not prove that his conduct was "especially heinous, cruel or depraved," as a matter of law, because his conduct did not go beyond that which is necessarily encompassed by the capital felonies of which he was convicted. The defendant focuses on the fact that the use or the threat of use

of force is a predicate element of the kidnapping and of the sexual assault aspects of these capital felonies. He maintains, therefore, that in using force on his victims, and in threatening them with the use of force, he was not inflicting "extreme pain or torture above and beyond that necessarily accompanying the underlying killing."

The defendant cannot prevail on this argument because the state presented ample evidence at the penalty hearing to show that, for each capital felony count, there were aggravating circumstances beyond the elements of the crimes charged. With respect to Wendy B. and Robyn S., the jury received evidence about the effect of the kidnapping as an aggravating factor for the capital felony count predicated on a sexual assault, and evidence about the effect of the sexual assault as an aggravating factor for the capital felony count predicated on a continuing kidnapping. On this record, the jury reasonably could have found an aggravating factor for each of these capital felony counts because of the proof of an added element from the other felony count. See *State* v. *Murphy,* 65 Ohio St. 3d 554, 578, 605 N.E.2d 884 (1992). With respect to April B., her sexual assault by the defendant was likewise an aggravating factor above and beyond the kidnapping and the murder that were elements in the capital felony as charged. With respect to Leslie S., an aggravating factor of special cruelty was the exacerbated psychological anguish inflicted upon her by her own bondage and her fear for the fate of her best friend.

Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury. On the

basis of these implied factual findings about the defendant's conduct and its likely impact on the victims in these cases, we conclude that the jury reasonably could have concluded that the cumulative effect of the evidence established beyond a reasonable doubt the existence of an aggravating factor as defined by § 53a-46a (h) (4) for each of the six capital felony counts with which the defendant was charged. See State v. Francis, supra, 228 Conn. 127; State v. Joyner, supra, 225 Conn. 455.

2

The defendant also maintains that he presented sufficient evidence of statutory and nonstatutory mitigating factors to meet his burden of proving mitigation by a preponderance of the evidence. Although the jury found to the contrary, he maintains that an independent review of the evidence of mitigation by this court will establish that the trial court improperly imposed the death penalty upon him. This claim focuses on the testimony of the defendant's three psychiatric experts that the defendant's mental impairment, stemming from his disturbed family background and aberrant sexual development, was a mitigating factor in his crimes.

The state responds that such appellate review is unauthorized as a matter of law and unwarranted in the circumstances of this case. We need not decide today the legal question of whether the specific authority to review a finding of an aggravating factor; General Statutes § 53a-46b (b) (2); necessarily implies a legislative intent to preclude appellate review of a finding that there is no mitigating factor. For this appeal, it suffices to recognize that the defendant's right to present evidence by way of mitigation does not compel a jury to find that evidence credible. Even without countervailing expert evidence of its own, the state can weaken the force of the defendant's presentation by cross-

examination and by pointing to inconsistencies in the evidence. See *State* v. *Medina,* supra, 228 Conn. 309–10; *State* v. *Steiger,* 218 Conn. 349, 381, 590 A.2d 408 (1991); *State* v. *Murphy,* supra, 65 Ohio St. 3d 569–70. The defendant cannot prevail on this issue.

## B

### EVIDENTIARY ISSUES RELATING TO THE PENALTY HEARING

The defendant has raised numerous evidentiary claims relating to the penalty phase of his trial. We conclude that improper evidentiary rulings by the trial court substantially limited the defendant's right to present mitigating evidence and require a new sentencing hearing.

### 1

The defendant first asserts that, in violation of General Statutes § 53a-46a (c),[35] the trial court improperly

[35] General Statutes § 53a-46a (c) provides: "In [a hearing on imposition of the death penalty] the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant."

The defendant also asserts that the restriction of his presentation of relevant mitigating evidence "violates the constitutionally required principle of individualized sentencing." See *Lockett* v. *Ohio,* supra, 438 U.S. 604 (plurality opinion) ("the Eighth and the Fourteenth amendments require that the sentencer . . . not be precluded from considering, as a mitigat-

excluded evidence relevant to mitigation. Although the statute expressly permits the presentation of "[a]ny information relevant to any mitigating factor," the trial court precluded the defendant from submitting to the jury: (a) a letter written by Robert Miller, a court appointed psychiatric expert who had evaluated the defendant for the state, which reflected the fact that he had changed his position about the mitigating role of the defendant's psychopathology; and (b) a report by Miller, which reflected his corroboration of the diagnosis of the defendant contained in the reports of defense psychiatric experts.[36]

On appeal,[37] the state contends that the proffered evidence was properly excluded as not "relevant to any

ing factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); see also *Eddings* v. *Oklahoma,* supra, 455 U.S. 110–15. Because we conclude that the trial court's rulings in violation of § 53a-46a (c) require a new penalty hearing, we do not address this constitutional claim.

[36] Additionally, the defendant contends that the trial court improperly refused to admit: (1) information regarding the defendant's nolo contendere plea and consecutive life sentences in the Windham murders; (2) testimony of the defendant's sisters and others regarding the experiences of the Ross children while they were growing up and certain behavior of the defendant's mother; (3) testimony of the defendant's sister regarding their mother's contact with the prosecution during the case; (4) the defendant's letters to his sister expressing remorse and discussing his mother's abuse of him as a child; (5) the testimony of Fred Berlin, a defense psychiatric expert, that the defendant's ability to control his conduct was significantly impaired; and (6) the testimony of Berlin that the defendant was willing to serve as a research subject regarding causes and possible prevention of "sexual sadism." Because we conclude that the improper exclusion of Miller's letter and report requires a new sentencing hearing, we need not reach these additional evidentiary claims. We assume that our clarification of the standard for admission of mitigating evidence will afford sufficient guidance to the trial court should similar issues recur at a new sentencing hearing.

[37] Before the trial to determine the defendant's guilt, the defendant filed a motion for a "judicial determination of mitigating factor," to which he attached Miller's letter as an exhibit. The state objected to the admissibility of the letter on the grounds that it constituted an opinion on the ultimate fact and that there was no factual basis for the letter. The trial court

mitigating factor'' because it was unauthenticated hearsay and unreliable. Unless the statute impliedly authorizes a trial court to exclude unreliable evidence, the state maintains that the statute would infringe on constitutional principles of separation of powers.

We agree with the defendant that the mandate of § 53a-46a (c) required the trial court to admit the mitigating evidence that he proffered in this case. The statute plainly provides that, in a penalty hearing conducted pursuant to § 53a-46a, *"[a]ny information relevant* to any mitigating factor may be presented by either the state or the defendant, *regardless* of its admissibility under the rules governing admission of evidence in trials of criminal matters . . . .'' (Emphasis added.) On its face, this language authorizes a judge presiding over a penalty hearing to exclude mitigating evidence *only* on the basis of a lack of relevancy.

"It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . *All Brand Importers, Inc.* v. *Department of Liquor Control,* 213 Conn. 184, 194, 567 A.2d 1156 (1989). Where the language of a statute is clear and unambiguous, reference to its history and purpose is unnecessary. *Winslow* v. *Lewis-Shepard, Inc.,* 216 Conn. 533, 538, 582 A.2d 1174 (1990). It is the duty of the court to interpret statutes as they are written . . . and not by construction read into statutes provisions which are not clearly stated.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson,* 227 Conn. 534, 541–42, 630 A.2d 1059 (1993); *Forsyth* v. *Rowe,* 226 Conn. 818, 828, 629 A.2d 379 (1993); *State* v. *Dupree,* 196 Conn. 655, 660, 495 A.2d 691, cert.

denied the defendant's motion. During the penalty phase, when the letter was offered by the defendant as a full exhibit in support of mitigation, the trial court sustained the state's objection to its admission on the ground that Miller was available to testify in person.

denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985). Accordingly, we decline the state's invitation to read into the statute a foundational requirement of reliability for admissibility of mitigating evidence at a capital penalty phase hearing.[38] See also C. Tait & J. La Plante, Connecticut Evidence (2d Ed. 1988) § 3.5.8 (b) (distinguishing relevancy, competency and authenticity of evidence).

We disagree with the state's contention that a literal reading of § 53a-46a (c) puts the statute at constitutional risk of violating applicable principles of separation of powers. See *Moscone* v. *Manson,* 185 Conn. 124, 128, 440 A.2d 848 (1981). "A statute violates the constitutional mandate for a separate judicial magistracy only if it represents an effort by the legislature to exercise a power which lies exclusively under the control of the courts. . . . *Bartholomew* v. *Schweizer,* [217 Conn. 671, 676, 587 A.2d 1014 (1991)]." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell,* 224 Conn. 168, 177, 617 A.2d 889 (1992), cert. denied, U.S. , 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993). "[T]he rules of evidence . . . have never in this state been regarded as exclusively within the judicial domain." *State* v. *James,* 211 Conn. 555, 560, 560 A.2d 426 (1989).

---

[38] We decline to follow the decision of the Illinois Supreme Court construing its statutes on the admissibility of evidence relevant to mitigation to require a showing of reliability. See, e.g., *People* v. *Edwards,* 144 Ill. 2d 108, 174–75, 579 N.E.2d 336 (1991) (citing Ill. Rev. Stat. c. 38, ¶ 9-1 [e] [1987]), cert. denied, U.S. , 112 S. Ct. 2278, 119 L. Ed. 2d 204 (1992). The other cases relied upon by the state to support its position are inapposite. *Underwood* v. *State,* 535 N.E.2d 507, 521 (Ind.) (applying pure relevancy standard of limited scope), cert. denied, 493 U.S. 900, 110 S. Ct. 257, 107 L. Ed. 2d 206 (1989); *State* v. *Long,* 119 N.J. 439, 502, 575 A.2d 435 (1990) (applying rule derived from state statute governing scope of cross-examination of defense character witness); *State* v. *Pitts,* 116 N.J. 580, 633, 562 A.2d 1320 (1989) (applying statute; N.J.S.A. 2C:11-3 [c] [2] [b]; that specifically requires "reliability" of evidence relevant to mitigating factors).

The state nonetheless argues that a construction of § 53a-46a (c) that limits the trial court's role, with respect to mitigating evidence, to an assessment of relevance "defies logic [and] impairs the essential function of the judiciary." We disagree. Although we have "held unconstitutional statutes modifying the rules of evidence in such manner as to defy logic," we have not done so in reliance "upon any grant of exclusive authority to the courts under article second to promulgate rules of evidence but upon other constitutional principles, such as due process and equal protection." *State* v. *James,* supra, 211 Conn. 561–62. The exclusion of considerations of reliability does not per se undermine a trial court's authority to preserve the integrity of the proceeding.

The broad sweep of § 53a-46a (c) reflects a balance struck by the legislature between a defendant's eighth amendment right to receive individualized consideration when faced with the death penalty; see *Lockett* v. *Ohio,* supra, 438 U.S. 606; and a trial court's need to exercise appropriate control over courtroom proceedings. The state's rhetoric does not specify in what particular manner this balance "significantly interferes with the orderly functioning of the Superior Court's judicial role." *State* v. *Campbell,* supra, 224 Conn. 178. We are persuaded that a relevance standard retains sufficient discretion for the court to enable it to exercise proper control over the admissibility of evidence. *State* v. *Pollitt,* 205 Conn. 61, 91, 530 A.2d 155 (1987).

The state argues, in the alternative, that, read as a whole, § 53a-46a (c) must be construed to allow only "relevant evidence whose reliability can be tested before the jury." This argument is premised on additional language in § 53a-46a (c) permitting the "[t]he state . . . to rebut any information received at the hearing and [giving the state] fair opportunity to present argument as to the adequacy of the informa-

tion to establish . . . any mitigating . . . factor." Acceptance of the state's position would make the test for the defendant's right to present mitigating evidence turn on the state's right to undertake an effective rebuttal by way of cross-examination or otherwise. As the defendant correctly observes, such a limitation on the admissibility of mitigating information in capital penalty hearings would be more restrictive than that generally governing rules of evidence. We therefore reject the state's construction. The language quoted by the state creates a temporal opportunity for the state to rebut mitigating evidence and permits argument on the weight of such evidence. It does not, however, limit the scope of the mitigating information that the defendant may present to the trier at the penalty phase hearing.

Turning now to the specific claims of error, we conclude that the trial court improperly excluded both the letter and report of Miller, because both were relevant to mitigation. General Statutes § 53a-46a (c). The concept of relevancy is well established in our criminal jurisprudence. "[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *State* v. *McClendon,* 199 Conn. 5, 8–9, 505 A.2d 685 (1986). Evidence is irrelevant if there is 'such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in proof of the latter.' *State* v. *Kelly,* 77 Conn. 266, 269, 58 A. 705 (1904)." *State* v. *Jeffrey,* 220 Conn. 698, 704, 601 A.2d 993 (1991), cert. denied,    U.S.    , 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992).

The letter and report in question were produced by a psychiatrist appointed by the court to evaluate the defendant for the *state.* The letter reflects not only Miller's change of position in favor of "psychopathology playing a sufficient role in [the] defendant's

behavior to mitigate the type of penalty," but also Miller's extreme reluctance to make himself available to testify.[39] Miller's report corroborated the defense psychiatric experts' opinions that the defendant suffered from sexual sadism.[40] Not only did this evidence bear directly on the question of whether, at the time of the offense, the defendant's "mental capacity was significantly impaired" so as to warrant mitigation; General Statutes § 53a-46a (g) (2); but it could have appeared more objective and worthy of belief than evidence adduced by the defendant from his own expert witnesses. See *Brennan* v. *State,* 766 P.2d 1385, 1386–87 (Okla. Crim. App. 1988) (harmful error to exclude letter from state's psychiatric expert).[41] The fact that it was the defendant's burden to prove miti-

---

[39] The letter, dated February 15, 1987, reads in its entirety:

"Dear Bob, Because of the long time since I have heard from you concerning one of the cases I saw for you, I have had a great deal of time to go over in my mind how feasible the stand we had anticipated I would take might be.

The result of all this rumination is this personal letter which I write without any copies. As you assume, it is a demurral and a reverse of my earlier intemperate stand, which was based more on emotion than reason.

After deliberation I [can't] see how I could testify against psychopathology playing a sufficient role in defendant's behavior to mitigate the type of penalty. If it had been only one or two incidents I could have held up, but the repetitive nature of the acts as well as past history of assaultive behavior make my (our) position untenable. Accordingly I must back out of the case, even if it is such a late date.

If it is of any assistance to you, I have had to see an ENT specialist several times recently, and will have to seek him in a month again at which time I may have to enter a hospital for further tests, so you could tell the Court I have to be excused for reasons of health.

Regards to Tommy.

Bob Miller."

[40] The report stated, "Were a specific diagnosis to be attached to [his] condition at the time of his offenses, it would be, in DSM III, 302.84, Sexual Sadism."

[41] In making this determination we do not assume that psychiatric professionals will act as hired guns on behalf of their respective "employers." See *State* v. *Schneider,* 402 N.W.2d 779, 788 (Minn. 1987) ("Experts are not the paid harlots of either side in a criminal case and should not be por-

gation by a preponderance of the evidence persuades us that the improper exclusion of this unique evidence was more likely than not to have affected the result of the sentencing hearing. *State* v. *Tatum,* 219 Conn. 721, 738, 595 A.2d 322 (1991); *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988). Accordingly, we conclude that exclusion of the report and letter violated § 53a-46a (c) and was harmful. A new penalty hearing is therefore required.

### 2

The defendant also claims that the trial court improperly allowed the state to introduce irrelevant or prejudicial evidence to prove aggravation and to rebut mitigation. Specifically, the defendant contends that it was harmful error to permit the state to introduce: (a) testimony by a state's expert about rape trauma syndrome; (b) testimony of Warden Richard Orszak regarding good time credits, minimum security institutions, and the possibility of pardon, and testimony of Fred Berlin, a psychiatrist, regarding the defendant's potential dangerousness if ever released; and (c) evidence about the victims including testimony on their physical characteristics and personalities and photographs of their appearance both before and after their murders. We address these claims only to the extent that they are likely to arise again at a new sentencing hearing.

The admissibility of evidence in a capital sentencing hearing is governed by § 53a-46a (c).[42] In the absence of applicable statutory mandates, evidentiary rulings are within the sound discretion of the trial court and are reversible only "if there is an abuse of discretion

---

trayed in such a light."). Nevertheless, it is reasonable to assume that a jury would give special weight to an opinion favoring the defense that was rendered by an expert appointed for the state to undertake an independent evaluation of the defendant.

[42] See footnote 35.

and a showing of substantial prejudice or injustice to the defendant. *State* v. *Alvarez,* 216 Conn. 301, 306, 579 A.2d 515 (1990)." *State* v. *Colton,* 227 Conn. 231, 260, 630 A.2d 577 (1993). Because a new hearing is required, however, we need not engage in harmless error analysis with respect to these claims.

The defendant's first challenge to the evidence that was admitted over his objection is to the state's presentation of expert testimony regarding rape trauma syndrome. The state's expert testified that every victim of sexual assault, to some degree, experiences "feelings of helplessness, powerlessness, fear, panic, horror; feelings of personal intrusion, violation; feelings of being entrapped . . . a sense of not being able to be rescued, a feeling of isolation, abandonment," and that these emotions exist from just before the assault until shortly thereafter. The defendant asserts that this evidence was not relevant to aggravation, because it described the feelings experienced by every rape victim, and did not serve to distinguish these particular rapes as "heinous, cruel or depraved." General Statutes § 53a-46a (h) (4).[43]

The state does not dispute the generic nature of the expert testimony but argues that the testimony was relevant to show aggravation for the capital felony counts that were based on kidnapping and murder.[44] We agree with the state. A sexual assault that occurs during the course of a kidnapping that results in murder is relevant evidence for the jury to consider in deter-

---

[43] The defendant also argues that permitting general characteristics of the form of any capital felony to prove aggravation fails to distinguish meaningfully those who receive the death penalty from those who do not. *State* v. *Breton,* supra, 212 Conn. 263. The substance of this argument was rejected in our discussion on the sufficiency of evidence claims. See part III A.

[44] The state argues, specifically, that a kidnap/murder that includes a brutal sexual assault is "especially cruel." General Statutes § 53a-46a (h) (4).

mining whether the state has proven aggravation of that kidnap/murder. The additional fact of a sexual assault is relevant irrespective of whether the sexual assault, in and of itself, was especially cruel. The trial court properly admitted this testimony over the defendant's objection on grounds of relevance.

The defendant's second claim is that the court improperly permitted the state to cross-examine two of the defendant's witnesses to rebut his evidence on mitigation. In the defendant's presentation to prove mitigation, Orszak testified for the purpose of showing "an inmate's ability to do useful and productive work while incarcerated." Over the defendant's objections, the state cross-examined Orszak regarding good time credits, minimum security institutions, and the possibility of pardon. Later, again over the defendant's objections, the state cross-examined Berlin, a defense psychiatric expert, on whether the defendant would be dangerous if released in ten years. The defendant asserts that, because such cross-examination related to future dangerousness, it was not relevant to rebut the defendant's case for mitigation.[45] The state argues to the contrary that this evidence rebutted an assumption underlying the defendant's claim that he would be a good prisoner by contending that the defendant would not actually remain a prisoner. To the extent that these issues may arise at the sentencing rehearing, the court should be guided by the general rule limiting the scope of cross-examination to the matters elicited on direct examination. *State* v. *McCarthy,* 197 Conn. 247, 260, 496 A.2d 513 (1985); see *People* v. *Garcia,* 97 Ill. 2d 58, 87–88, 454 N.E.2d 274 (1983), cert.

---

[45] We note additionally that the defendant was prohibited from asking Orszak, on redirect, whether someone serving two consecutive life sentences could ever earn enough good time credits to be released. The state concedes that this ruling was improper.

denied, 467 U.S. 1260, 104 S. Ct. 3555, 82 L. Ed. 2d 856 (1984).[46]

The defendant finally asserts that the trial court improperly admitted, as evidence of aggravation, testimony and exhibits concerning the physical characteristics and personalities of the victims, all of which the defendant claims to have been irrelevant and highly prejudicial. The evidence at issue consisted of testimony describing the victims, studio-type photographic portraits of how they looked before the murders, and postmortem photographs showing their bodies after the murders. The state proffered this evidence to enable it to meet its burden of proving the aggravating factor that the defendant's crimes were "especially cruel" under § 53a-46a (h) (4). To meet this burden, the state must show "the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." *State* v. *Breton,* supra, 212 Conn. 270. On appeal, we must determine whether the trial court abused its discretion in admitting this evidence as more probative than prejudicial. *State* v. *Woodson,* 227 Conn. 1, 17, 629 A.2d 386 (1993).

The state introduced testimony briefly describing each of the victims as a petite young teenager who was a caring, sensitive and trusting person. In addition, the state introduced exhibits consisting of photographs of the victims before and after abduction, including those of the severely decomposed bodies of Leslie S. and April B. The trial court admitted all this evidence, impliedly finding that it was more probative than prejudicial. The evidence at issue demonstrated a gross dis-

---

[46] Furthermore, we caution the court on remand to consider the possible applicability of the United States Supreme Court's recent opinion in *Simmons* v. *South Carolina,* U.S. , 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), concerning a defendant's constitutional right to have a jury at a capital sentencing hearing be informed of his ineligibility for parole when future dangerousness is at issue.

parity in size between the defendant and the victims, and corroborated evidence relating to the manner in which the crimes had occurred. The testimony regarding the age and emotional makeup of these girls reflected a level of maturity that could elevate the degree of terror a jury might believe they would have experienced during the assaults.

The defendant does not take issue with the standard of appellate review that governs discretionary evidentiary rulings of the trial court. He nonetheless maintains that, in capital sentencing proceedings, there should be heightened concern for potential prejudice, especially from inflammatory photographs, citing *State v. Pitts,* 116 N.J. 580, 638–39, 562 A.2d 1320 (1989) (cautioning courts to exercise discretion in admitting photographs of crime victims with careful consideration of state's burden of proof, other evidence adduced by state, and rules of evidence). We urge such careful consideration upon the trial court at the sentencing rehearing. See *State v. Haskins,* 188 Conn. 432, 453, 450 A.2d 828 (1982). We note, however, that even gruesome photographs are admissible if they would prove or disprove a material fact in issue, or illuminate a material inquiry. Id., 452.

## C

### INSTRUCTIONAL ISSUES RELATING TO THE PENALTY HEARING

Because we have already decided that a new sentencing hearing must be held to determine whether the death penalty should be imposed on the defendant, we will address the defendant's numerous challenges to the trial court's penalty phase jury instructions only with the view to giving guidance for the conduct of the new sentencing hearing. With regard to aggravation, the defendant maintains that the trial court improperly charged the jury on: (1) the definition of the aggra-

vating factor contained in § 53a-46a (h) (4) requiring a showing that the crime was committed "in an especially heinous, cruel or depraved manner"; (2) the two witness requirement of § 54-83; and (3) reasonable doubt. With regard to mitigation, the defendant maintains that the trial court improperly charged the jury on: (1) permissible inferences from missing witnesses; and (2) statutory and nonstatutory mitigating factors.

1

None of the issues raised by the defendant with regard to the trial court's instructions on aggravation warrants extended consideration in the present posture of this case. Some have already been dealt with previously in this opinion.

We have described a constitutionally appropriate narrowing of the definition of "especially heinous, cruel or depraved" in the discussion of the state's proof of the aggravating factor in part III A. That discussion should suffice to guide the trial court in the future.

We have discussed the scope of the instructions required by the two witness rule of § 54-83 in part I dealing with the defendant's guilt. We agree, however, with the state that § 54-83 applies only to the guilt phase and not to the penalty phase of a capital felony trial. Section 54-83 provides: "No person may be *convicted* of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." (Emphasis added.) Unless the context indicates the contrary, the word "conviction" means "a finding of the party guilty by verdict or plea of guilty, and not to a sentence in addition." *Quintard* v. *Knoedler,* 53 Conn. 485, 488, 2 A. 752 (1885). In the prefatory language of § 53a-46a (b), our death penalty statute expressly incorporates the traditional distinction between the processes of convicting and sentencing. The statute reads: "For the purpose of determining

the *sentence to be imposed* when a defendant is *convicted of* or pleads guilty to a capital felony . . . ."[47] (Emphasis added.) We assume that the legislature knew and intended to adopt the longstanding judicial construction of the word "conviction" when it revised the death penalty statutes in 1973, and revised § 54-83 in 1980. *State* v. *Dabkowski,* 199 Conn. 193, 201, 506 A.2d 118 (1986). Construing the statute as it is written; *State* v. *Johnson,* 227 Conn. 534, 541–42, 630 A.2d 1059 (1993); *Forsyth* v. *Rowe,* 226 Conn. 818, 828, 629 A.2d 379 (1993); *State* v. *Dupree,* 196 Conn. 655, 660, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); we conclude that § 54-83 has no application to a capital sentencing hearing.

The defendant also challenges the trial court's penalty phase instruction on reasonable doubt. This instruction was identical to that given during the guilt phase. We have concluded that its wording did not amount to constitutional error. See part I C 3 of this opinion. Because the defendant did not preserve this claim at trial, it warrants no further discussion.

2

With regard to mitigation, the defendant contends that the trial court improperly charged the jury on: (a) the permissible inferences to be drawn from the defendant's failure to call his parents to testify; and (b) nonstatutory and statutory mitigating factors.[48]

[47] The defendant misconstrues *State* v. *Schutte,* supra, 97 Conn. 467, as standing for the proposition that General Statutes § 54-83 applies during a capital sentencing hearing because its purpose is "to prevent a person [from] being put to death by the unsupported testimony of one witness." *Schutte* discusses the two witness rule as an evidentiary requirement imposed on the state only in proving the defendant *guilty* of a capital crime. Id., 468–70 ("All that the statute requires . . . is that the proof of all the essential *elements of the capital crime charged* . . . shall not depend upon the testimony of one witness." [Emphasis added.] Id., 468.).

[48] The defendant also claims that the trial court improperly instructed the jury not to consider statements made by the defendant to psychiatric

Some of these contentions warrant serious considera-
tion at the new sentencing hearing.

The defendant first asserts that the trial court improp-
erly gave a *Secondino* charge instructing the jury that
it might draw inferences unfavorable to the defendant
because he failed to call his parents at the penalty phase
hearing.[49] The defendant argues that he presented evi-
dence of his parents' mistreatment of him as a child
as a contributing cause of his psychological problems
and that, consequently, his parents were hostile wit-
nesses and not ones the defendant would naturally call.
See *State* v. *Grant*, 221 Conn. 93, 104–107, 602 A.2d
581 (1992); *D'Amico* v. *Manson*, 193 Conn. 144, 153,
476 A.2d 543 (1984); *State* v. *De Paola*, 5 N.J. 1, 19–20,
73 A.2d 564 (1950). The defendant also argues that his
parents were cooperating with the state during the
trial,[50] and were equally available to the state, mak-
ing a *Secondino* inference improper in these circum-
stances. In light of these uncontroverted facts, the trial
court at the penalty phase rehearing should reconsider
the propriety of a *Secondino* instruction.

The defendant also challenges the manner in which
the trial court instructed the jury on the definition of
nonstatutory mitigating factors. The defendant main-
tains that the trial court improperly charged the jury

experts " 'in regard to a proof of mitigating . . . factors directly.' " The
state responds that this issue was waived because the defendant did not
object to the court's corrective instruction that such statements could be
used to support the psychiatric opinions offered by the defense. We assume,
in light of our clarification of the standard of admissibility regarding evi-
dence of mitigation, that this issue will not arise again at a new sentencing
hearing.

[49] See footnote 8 for requirements of *Secondino* v. *New Haven Gas Co.*,
supra, 147 Conn. 672.

[50] The defendant's parents were included on the state's list of witnesses.
Also, Detective Malchik testified that he had been in contact with the defend-
ant's mother, who had answered his questions and provided him with evi-
dence.

on § 53a-46a (d) and inadequately charged the jury on other aspects of the evidence relating to mitigation. Finally, the defendant argues that the trial court improperly explained the requirement for unanimity in their findings. Bearing in mind that we review instructions to the jury in their entirety, we will address only those claims that raise issues that are likely to recur at a rehearing.

Although the crimes were committed in 1983 and 1984, the court utilized the language of Public Acts 1985, No. 85-366, § 1 (d), now codified at General Statutes § 53a-46a (d) (subsection [d]).[51] The defendant contends: (i) that subsection (d) cannot be applied in his case to nonstatutory mitigating factors without violating Connecticut law and the prohibition against ex post facto laws contained in article one, § 10, of the United States constitution; and (ii) that subsection (d) cannot constitutionally be applied in any case because it calls for an internal balancing of mitigants against aggravants that is unreviewable, or standardless and arbitrary. We disagree with both of these contentions.

"The rules of law that underlie the defendant's [first] claim under the United States constitution are well established. The prohibition of ex post facto laws forbids the enactment of 'any law "which imposes a pun-

---

[51] Public Acts 1985, No. 85-366, § 1 (d), now codified at General Statutes § 53a-46a (d), provides: "In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death."

ishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Cummings* v. *Missouri,* [71 U.S. (4 Wall.)] 277, 325–26, 18 L. Ed. 356 (1867).' *Weaver* v. *Graham,* 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); see also W. LaFave & A. Scott, Criminal Law (1972) § 12; 2 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law: Substance and Procedure (1986) § 15.9 (b); L. Tribe, American Constitutional Law (1978) §§ 10-2, 10-3. Under the applicable federal cases, 'two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.' (Emphasis in original.) *Weaver* v. *Graham,* supra, 29." *State* v. *Rollinson,* 203 Conn. 641, 646, 526 A.2d 1283 (1987).

The law in Connecticut is also well established. "A statute 'affecting *substantial changes in the law'* is not to be given a retrospective effect unless it clearly and unequivocally appears that such was the legislative intent." (Emphasis added.) *State* v. *Paradise,* 189 Conn. 346, 351, 456 A.2d 305 (1983). A procedural statute, however, will be applied retroactively without a legislative imperative to the contrary unless "considerations of good sense and justice dictate that it not be so applied." Id.

Accordingly, both under federal precedents and under the law of Connecticut, a statute may have retroactive effect if the legislature so intends and if the statute does not enact a substantive change in the law. The defendant does not challenge this general principle. He maintains, however, that subsection (d) adds "some sort of weighing or balancing process to our statutory scheme and [that this] places substantive limitations on the definition of a nonstatutory mitigating factor" and that the

subsection therefore may not be applied retroactively.[52] We disagree. Subsection (d) merely codifies the definition for mitigating factors utilized in capital cases prior to the enactment of Public Acts 1985, No. 85-366, § 1. See *State* v. *Wood,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 48729 (sentencing hearing of July 24, 1984, utilizing jury instructions on mitigating factors indistinguishable from subsection [d]); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1985 Sess., pp. 1537–38 (testimony of Joseph Shortall, chief public defender); see also *State* v. *Daniels,* supra, 207 Conn. 386 n.10.

Even if it is assumed, arguendo, that subsection (d) represents a change in the law, the change is at most procedural in nature. See *State* v. *Almeda,* 211 Conn. 441, 454, 560 A.2d 389 (1989). "[C]hanges in procedural law do not ordinarily give rise to violations of the prohibition against ex post facto laws in article one, § 10 of the United States constitution. '[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance.' *Beazell* v. *Ohio,* 269 U.S. 167, 171, 46 S. Ct. 68, 70 L. Ed. 216 (1925); see also *Collins* v. *Youngblood,* 497 U.S. 37, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990)." *Payne* v. *Fairfield Hills Hospital,* 215 Conn. 675, 683, 578 A.2d 1025 (1990). Utilization of subsection (d) for the definition of a mitigating factor is therefore not improper.

We are equally unpersuaded by the defendant's argument that the jury should not have been charged on

---

[52] The defendant specifically maintains that the phrase, "considering all the facts and circumstances of the case," contained in subsection (d) sets up a dichotomy between mitigants and aggravants. The legislative history cited by the defendant does not support this proposition. See 28 H.R. Proc., Pt. 17, 1985 Sess., pp. 6111–17; 28 S. Proc., Pt. 10, 1985 Sess., pp. 3470–75.

subsection (d) because that subsection unconstitutionally impairs the jury's opportunity to consider all the mitigating circumstances in his individual case. Under subsection (d), a fact is mitigating if "in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." In our view, this statutory language codifies the defendant's constitutional right to consideration of " '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.' " *Caldwell* v. *Mississippi,* supra, 472 U.S. 330; *Eddings* v. *Oklahoma,* supra, 455 U.S. 104; *Lockett* v. *Ohio,* supra, 438 U.S. 586. Furthermore, the trial court did not infringe upon the defendant's constitutional rights by instructing the jury to apply subsection (d) "considering all the facts and circumstances of the case." A jury that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum. The instructions as given did not preclude the jury from giving mitigating force to any fact, taken alone or taken in conjunction with any other facts presented.[53]

[53] At the jury's request for a reinstruction on mitigating factors, the court charged that the jury should determine whether the established "facts considered *alone or in combination with other facts* rise to the level of becoming a factor, that in light of all the circumstances surrounding the commission of the crimes . . . should reduce the severity of the punishment that the defendant is to receive." (Emphasis added.) These instructions permitted the jury to give cumulative force to any facts it had found to have been established by a preponderance of the evidence. On remand, we caution the trial court to convey more carefully to the jury, in the first instance, that it may give cumulative effect to any or all of the facts presented and proven by the defendant in favor of mitigation.

Furthermore, this instruction, viewed in conjunction with the catchall instruction given by the trial court, would not preclude a jury from exercising the discretion to give mitigating force to a finding that the defendant was mentally impaired, but not sufficiently so as to constitute a statutory mitigant. General Statutes § 53a-46a (g) (2). The catchall instruction charged

The defendant makes an additional claim that the trial court's instruction on jury unanimity with respect to the existence of a mitigating factor was misleading. He argues that the trial court improperly failed to charge that unanimity was also required for a finding that no mitigating factor exists. Thus, the defendant argues, a jury hung on the existence of a mitigating factor may have believed that a verdict of "no mitigating factor" would be appropriate. We agree with the defendant that, at the rehearing, the jury should be given instructions that affirmatively and effectively convey this statutory requirement. Our holding in *State v. Daniels,* supra, 207 Conn. 374, which was decided subsequent to this sentencing hearing, is dispositive of this issue. A jury must be unanimous in its verdict that the defendant has not met his burden of proof on mitigation in order to satisfy the requirement of § 53a-46a (f) that "no mitigating factor exists." Id., 392, 394.

## D

### OTHER ISSUES RELATING TO THE PENALTY HEARING

Although we recognize that the defendant has raised numerous other issues concerning the conduct of his sentencing hearing, we are persuaded that they need not be addressed at this time. Furthermore, we need not undertake a review of the proportionality of the defendant's death sentences until there has been a proper determination by a sentencing jury that death sentences are warranted on any or all of the six capital felony counts of which the defendant stands convicted.

---

the jury to consider "any other mitigating factors concerning [the defendant's] character, background, and history suggested by the evidence. You will note by the last that you can consider any evidence that you determine in your own wisdom rises to the level of a mitigating factor which may not be incorporated or urged upon you in any one of the preceding claims in that list of mitigating factors."

## IV

### SUMMARY

In summary, the defendant's convictions are affirmed in their entirety. The defendant kidnapped and killed four young girls, and sexually assaulted three of them, in a manner that was especially cruel, heinous or depraved. Imposition of the death penalty, however, requires more. Even a defendant who has offered no persuasive legal excuse for his felonious conduct is entitled to have a sentencing jury consider extenuating circumstances that may explain his behavior and mitigate his moral culpability and may therefore counsel against the ultimate sanction of death. Because evidentiary rulings by the trial court impaired the defendant's ability to prove the existence of such mitigating factors, a new sentencing hearing must be held.[54]

The defendant's convictions are affirmed with respect to his guilt of six counts of capital felony. The judgments are, however, reversed with respect to the imposition of the death penalty, and the cases are remanded to the trial court for an entirely new sentencing hearing pursuant to § 53a-46a.

In this opinion CALLAHAN, DUPONT and E. O'CONNELL, Js., concurred.

BERDON, J., dissenting in part.[1] I believe that Connecticut's death penalty statute is facially unconstitu-

---

[54] This court has the authority to remand a case for resentencing without setting aside the underlying convictions. *State* v. *Somerville,* 214 Conn. 378, 393, 572 A.2d 944 (1990); *State* v. *Hanson,* 210 Conn. 519, 531, 556 A.2d 1007 (1989); *State* v. *Williams,* 199 Conn. 30, 47, 505 A.2d 699 (1986); *State* v. *Jenkins,* 198 Conn. 671, 680, 504 A.2d 1053 (1986); *State* v. *Lewis,* 176 Conn. 270, 274, 407 A.2d 955 (1978).

[1] I agree with the conclusion reached in part I A of the majority opinion that the state had jurisdiction to try the defendant for the murders of

tional and may not be applied to the defendant or anyone else. I also believe that the trial court committed harmful error by instructing the jurors, during the guilt phase of the defendant's trial, that they could draw an adverse inference from the defendant's failure to call as witnesses a psychiatrist and a psychologist with whom he had consulted concerning his insanity defense.[2] I therefore would remand this case for a new, noncapital trial.

Our post-*Furman*[3] death penalty statutes, from which General Statutes § 53a-46a derives, were enacted by the legislature in 1973. See Public Acts 1973, No. 73-137, § 4. Section 53a-46a sets forth the procedures as well as the substantive law governing the imposition of the death penalty. Section § 53a-46a "permits a person convicted of a capital felony to be sentenced to death if the state proves the existence of an aggravating factor beyond a reasonable doubt and the defendant fails to prove the existence of a mitigating factor by a preponderance of the evidence." *State* v. *Breton,* 212 Conn. 258, 260–62, 562 A.2d 1060 (1989).

The defendant challenges not only the validity of his capital felony convictions, but also whether § 53a-46a passes muster under both the state and the federal constitutions. The two specific constitutional issues that I address are the following: (1) whether § 53a-46a violates the state constitution because the death penalty constitutes cruel and unusual punishment; and (2) whether § 53a-46a violates the state and federal constitutions because it does not provide for a capital sentencer.

April B. and Leslie S. that occurred in Rhode Island. I do not reach any additional issues that are not discussed in this dissent.

[2] This issue is discussed in part III of this dissent.

[3] In *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the United States Supreme Court "effectually invalidated our previous death penalty statutes as violative of the federal constitution." *State* v. *McGann,* 199 Conn. 163, 174, 506 A.2d 109 (1986).

# I

## STATE CONSTITUTION:
## CRUEL AND UNUSUAL PUNISHMENT

### A

#### THE STATE CONSTITUTIONAL PROVISION

Although our post-*Furman* death penalty statute has previously been considered by this court,[4] the state constitutional issues raised in this appeal have been left open. As this court stated in *State* v. *Breton,* supra, 212 Conn. 271, "we have not decided whether the death penalty, per se or as applied, violates any provision of our state constitution . . . [and] have not determined what standard of review will govern any future appeal of the defendant's conviction or death sentence . . . ." In this case, the defendant squarely raises the issue of whether the punishment of death provided for in § 53a-46a constitutes cruel and unusual punishment under the state constitution.

When reviewing the contours of our state constitution, we are clearly not limited by the interpretation given to the cognate provisions of the federal constitution by the United States Supreme Court. "It is beyond dispute that we are not bound by federal precedents in interpreting our own state constitutional provisions. '[F]ederal decisional law is not a lid on the protections guaranteed under our state constitution.' *Doe* v. *Maher,* 40 Conn. Sup. 394, 419, 515 A.2d 134 (1986). As we stated in *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992), 'federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit

---

[4] See *State* v. *Breton,* supra, 212 Conn. 258; *State* v. *Daniels,* 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989); *State* v. *Daniels,* 207 Conn. 374, 542 A.2d 306 (1988).

state governments from affording higher levels of protection . . . .' (Internal quotation marks omitted.)" *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey,* 229 Conn. 312, 316–17, 640 A.2d 101 (1994); see also *State* v. *Joyce,* 229 Conn. 10, 15–16, 639 A.2d 1007 (1994).

Our state constitution, which was first formally adopted in 1818,[5] does not explicitly prohibit the imposition of cruel and unusual punishment. Nevertheless, there are constitutional rights that are so fundamental they need not be set forth explicitly in order to be protected by our state charter of liberty. See, e.g., *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962) (the right to protection against double jeopardy is implicit in the due process clause of our state constitution); *Doe* v. *Maher,* supra, 40 Conn. Sup. 394 (implicit in our state due process clause is the fundamental right to privacy, which includes the right of a poor woman to require that the state's medical assistance program for the poor pay for therapeutic abortions). These fundamental rights "are recognized in the preamble of the constitution and that of the declaration of rights; and all are guaranteed by the due process clause. These clauses, first incorporated in the constitution of 1818, were carried forward in their original language through several revisions to the present constitution of 1965. The preamble of the constitution makes clear that it reserves to the people 'the liberties, rights and privileges which they have derived from their ancestors'; and the preface clause to the declaration of rights, arti-

---

[5] Prior to the adoption of our first formal constitution in 1818, Connecticut had an informal constitution, consisting of "the Charter of 1662, certain locally derived common law principles and practices, some locally applicable English common law, various significant statutes, and most importantly, the Fundamental Orders of 1639." C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 89–90 (1982).

cle first, broadly incorporates the concept of ordered liberty by stating '[t]hat the great and essential principles of liberty and free government may be recognized and established . . .' which clause is followed by a declaration of specific rights." *Doe* v. *Maher,* supra, 422.

Article first, § 8,[6] of our state constitution, which prohibits the deprivation of life without due process of law, and article first, § 9,[7] which provides that no person may be punished unless "clearly warranted by law," provide a textual basis for the prohibition of cruel and unusual punishment. Inextricably interwoven into the fabric of these two clauses is the right of every person in Connecticut to be free from such punishment no matter what crime that person has committed. The prohibition against cruel and unusual punishment has always been understood to be a fundamental right in any civilized nation. Even the majority concedes that Connecticut's constitution also prohibits such punishment.

The historical antecedents of our formal state constitution confirm the existence of this fundamental right. As early as 1673, the laws of the Connecticut colony explicitly prohibited the infliction of bodily punishments "that are Inhumane, Barbarous or Cruel." Laws of Connecticut (1673) p. 58 (section entitled "Punishment"). In addition, Chief Justice Swift wrote that "though the law invests goalers with all the powers necessary for the interest of the commonwealth, yet they are not to behave with the least degree of wanton cruelty to their prisoners." 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 268–69

---

[6] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law."

[7] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

(hereinafter Swift's Digest). He also wrote that if a person commits a crime without sufficient mental capacity, such that "he does not comprehend the consequence of what he is doing, cannot distinguish between right and wrong, and is rather actuated by a blind impulse," then that person is not criminally liable, because "it would be cruel to punish him for his acts." Id., p. 362.

Justice Swift's writings are particularly significant to our state constitutional jurisprudence. "He was instrumental in encouraging the public and the legislature to convene the constitutional convention of 1818. Although he pursued a written constitution in order to achieve separation of powers, his participation as a leader is significant. J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873) pp. 40–41. Second, since Justice Swift was the chief judge and the state's leading judicial scholar at the time of the convention, his views on the law take on great significance in determining what the framers had in mind when adopting the language of the constitution. See W. Horton, 'Connecticut Constitutional History 1776–1988,' 64 Conn. B.J. 355, 356–58 (1990)." *State* v. *Joyner,* 225 Conn. 450, 490, 625 A.2d 791 (1993) (*Berdon, J.,* dissenting).

Furthermore, our case law has long recognized a state constitutional right to be free from cruel and unusual punishment. See *State* v. *Smith,* 5 Day (Conn.) 175, 178–79 (1811) (the court may not impose a sentence that is cruel or inhuman); *State* v. *Torkomian,* 113 Conn. 785, 787, 156 A. 860 (1931) (the court may not impose a punishment so "unusual" or "excessive" as to "shock the conscience"); *State* v. *Kyles,* 169 Conn. 438, 442–44, 363 A.2d 97 (1975) (considering a "cruel and unusual punishment" claim under both the state and federal constitutions); *State* v. *Kreminski,* 178 Conn. 145, 153 and n.4, 422 A.2d 294 (1979) (recog-

nizing that article first, § 8, prohibits " 'cruel and unusual punishments' "); *State* v. *Dupree,* 196 Conn. 655, 665, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985) (considering a "cruel and unusual punishment" claim under both the state and federal constitutions). The fact that *State* v. *Smith,* supra, 175, predates our first formal constitution is significant because "[t]he common law provided the foundation for our unwritten constitution prior to 1818." *State* v. *Joyner,* supra, 225 Conn. 488 (*Berdon, J.,* dissenting); see also W. Horton, The Connecticut State Constitution (1993) pp. 60–61 (suggesting that an excessive punishment would violate article first, § 8, of the Connecticut constitution).

### B

#### CONTEMPORARY STANDARDS OF DECENCY

It is clear, as the majority concedes, that the right to be free from cruel and unusual punishment is protected by our state constitution. It is also clear that when our formal constitution was first adopted in 1818, the death penalty was the designated punishment for certain crimes. Nevertheless, we have never held that our constitution must be interpreted today to mirror the standards of decency that prevailed in 1818. Indeed, in *State* v. *Lamme,* 216 Conn. 172, 183, 579 A.2d 484 (1990), we recently concluded that it is appropriate to seek a contemporary interpretation of the constitution: " 'The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens.' *State* v. *Dukes,* 209 Conn. 98, 115, 547 A.2d 10 (1988)."

The history of this state on the issue of death as an acceptable punishment clearly demonstrates that, constitutionally, we must look at the penalty through the

lens of contemporary standards. This court certainly would reject, as cruel and unusual, other forms of punishment that were at one time as acceptable in Connecticut as the death penalty. For example, contemporary standards of decency would certainly forbid the punishment imposed by a judge of the Connecticut Superior Court in 1773 for burglary: "[T]hat [the defendant] go from hence to the Goal from whence he Came and from thence to the place of Execution and then and there be branded on his forehead with the Capital Litter B on a hot Iron and have one of his Ears Nailed to a post and Cut off and also Whipt on his Naked body fifteen Stripes." 4 American Legal Records, The Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942) pp. 91–92.

Chief Justice Swift recognized these evolving standards of decency when he pointed out, in his 1796 treatise on Connecticut law, that while England imposed the death penalty for 241 crimes, Connecticut had narrowed the number to only seven.[8] 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 293 (hereinafter Swift's System). Moreover, notwithstanding this limitation of the death penalty, Swift advocated that it should be further circumscribed as follows: "I shall only remark, that the *dreadful punishment of death* ought only to be inflicted on treason and murder: that confinement to hard labour ought to be inflicted on those crimes, to which there is a strong

---

[8] According to Swift, by 1796, only seven crimes—treason, murder, rape, bestiality, sodomy, aggravated mayhem, and arson that endangers life—were punishable by death in Connecticut. 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 296. Furthermore, this list was diminished in subsequent years. By 1818, when the state constitution was adopted, bestiality and sodomy were no longer punishable by death. 2 Swift's Digest, supra, pp. 264, 292–94, 304. In 1830, the legislature removed rape and aggravated mayhem from the list of capital offenses, and reduced arson to a noncapital offense except in cases where death resulted. General Statutes (1835 Rev.) tit. 21, c.1, §§ 1–13, 156, pp. 119–21, 158.

temptation, which indicate great moral depravity, which are infamous, and are highly injurious to society; that this ought to be varied according to the aggravations of the offence: and that for all inferior crimes, corporal pains and pecuniary penalties may be proportioned in such a manner as to subserve the interest of society: that corporal punishment is proper for those crimes which are infamous and bad in their own nature; and pecuniary penalties are adapted to actions which are deemed crimes in a political point of view, and bad because they are prohibited." (Emphasis added.) Id., p. 297.[9]

Accordingly, we must consider the death penalty and our state constitution's prohibition against cruel and unusual punishment in the context of contemporary standards of decency and morality. The prohibition against cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958). If our death penalty is unacceptable under contemporary standards of decency and morality, then

---

[9] It is ironic that while the majority upholds the death penalty, it would surely strike down the alternative punishment available at the time our constitution was adopted that Swift believed was less severe than the "dreadful punishment of death"—hard labor—as cruel and unusual punishment. The hard labor that Justice Swift referred to was confinement in Old New-Gate Prison. 2 Swift's System, supra, p. 296. New-Gate, which became the state prison of Connecticut in 1790, was "improvised . . . out of certain copper mines at Simsbury." L. Friedman, Crime and Punishment in American History (1993) p. 78. New-Gate "was, by all accounts, a horrendous dungeon, a dark cave of horrid gloom. The dripping water trickling like tears from its sides; the unearthly echoes, all conspired to strike an observer aghast with amazement and horror. The prisoners were heavily ironed and secured by fetters; they ate pickled pork for dinner, while working at forges; a piece for each [was] thrown on the floor and left to be washed and boiled in the water used for cooling the iron wrought at the forges." (Internal quotation marks omitted.) Id. This punishment would not be acceptable or even constitutional, in modern times, in any state of our nation.

we, as the state's highest appellate court, are obligated to declare it unconstitutional. *District Attorney for Suffolk District* v. *Watson,* 381 Mass. 648, 661–62, 411 N.E.2d 1274 (1980).

The majority concedes that our state constitution's prohibition against cruel and unusual punishment must be interpreted in light of contemporary standards. Nevertheless, it bases its conclusion of what this standard requires on a cursory analysis of the issues. First, the majority attempts to insulate itself from the moral degradation of the death penalty by stating that "[t]he question is not whether any one of us would vote to enact a death penalty if our role were that of a legislator." Second, the majority relies on the judgments of the legislatures of this state and the other states that have enacted death penalty statutes. While this simplistic approach may provide an easy way for the majority to decide the important issue before us, it fails to fulfill our obligation as a constitutional court of last resort because it evades the substance of the issue.

The fact that many state legislatures have enacted death penalty statutes clearly does not control the issue of whether contemporary standards prohibit that punishment. Public opinion polls also are not controlling. "The right to be free of cruel and unusual punishments, like the other guarantees of the Bill of Rights, 'may not be submitted to vote; [it] depend[s] on the outcome of no elections.' 'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.' *Board of Education* v. *Barnette,* [319 U.S. 624, 638, 63 S. Ct. 1178, 87 L. Ed. 1628] (1943)." *Furman* v. *Georgia,* 408 U.S. 238, 268–69, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Brennan, J., concurring). Justice Arthur J. Goldberg and Professor Alan M. Dershowitz explained it this way

in discussing the federal constitution's cruel and unusual punishment clause: "Were wide acceptance—measured by statutory authorization or public opinion polls—enough to authorize a punishment, the clause would indeed be drained of any independent integrity as a governing normative principle. Like no other constitutional provision, its only function would be to legitimize advances already made by the other departments and opinions already the conventional wisdom. It would forbid only extremely aberrant penalties. The framers cannot have intended so narrow a role for this basic guaranty of human rights." (Internal quotation marks omitted.) A. Goldberg & A. Dershowitz, "Declaring the Death Penalty Unconstitutional," 83 Harv. L. Rev. 1773, 1782 (1970).

This is not to say, of course, that the views of the public are irrelevant in determining whether contemporary standards of decency prohibit the death penalty. Although public opinion is relevant, it cannot appropriately be measured by abstract polls that elicit generalized, emotional responses from participants. Nor should public opinion be gauged by the actions of activists who are blindly and vindictively guided by a desire for retribution.[10] Instead, as I discuss later in

---

[10] For example, the following account appeared in the Washington Post newspaper one decade ago: "A minute after 11 last night, a chorus of long, anguished wails erupted from the hundreds of prisoners inside the walls of the Virginia State Penitentiary. Outside the aging prison, a jeering mob set off fireworks in celebration. Across the street, a somber group of death penalty opponents began a silent candlelight vigil.

"They needed no announcement. All knew it was over: Linwood E. Briley, who had killed seven people, had been electrocuted.

"Deborah Wyatt, Briley's 35-year-old Charlottesville attorney, left the prison glassy-eyed and trembling after witnessing the execution of the man she spent more than a year trying to save. She strode into the taunting crowd, past the Confederate flag, past the yells of 'Burn, baby, burn' and slipped into her car.

"For her, it was the bitter end to a prolonged legal battle capped by panicked, desperate appeals to Gov. Charles S. Robb in the 24 hours leading

this opinion, public opinion must be gleaned from a society's actual record in carrying out the death penalty. See *District Attorney for Suffolk District* v. *Watson,* supra, 381 Mass. 662 ("what our society does in actuality is a much more compelling indicator of the acceptability of the death penalty than the responses citizens may give upon questioning"). While it is easy for the public to respond to the conviction of a vicious murderer or a serial killer by advocating the ultimate penalty of death, it is far more difficult for society to carry out that penalty by taking the life of that person. This is simply because we, as a civilized society with high moral values, believe "that even the vilest criminal remains a human being possessed of common human dignity." *Furman* v. *Georgia,* supra, 408 U.S. 273 (Brennan, J., concurring).

In determining whether the death penalty is cruel and unusual under contemporary standards of decency, several factors should be considered. These factors are: (1) whether the punishment is degrading to the dignity of the human being; (2) whether the punishment is acceptable to the public; (3) whether the punishment has, in the past, been administered in an arbitrary and capricious manner; (4) whether the punishment has been imposed in a discriminatory fashion; (5) whether the punishment serves any legitimate purpose; and (6) whether the punishment is so final and complete that error cannot be corrected. Although each of these factors may be considered separately as a standard for determining whether a punishment is cruel and unusual, they are interrelated and should be considered

---

up to the execution. For others, the final hours passed less frantically, but in the last moments there were outbursts of emotions.

"There were the vengeful voices of the men screaming 'Fry 'im. Fry Briley.' There was pain reflected in the eyes of those like Marie Deans, who has dedicated her life to a crusade against capital punishment." M. Moore & S. Sugawara, "Sorrowful, Satisfied Crowds Greet Briley Execution in Va.," Wash. Post, October 14, 1984, p. A1.

collectively in determining whether contemporary standards of human decency and morality prohibit the state from imposing this "dreadful punishment." These factors simply provide means by which a court can determine whether a challenged punishment is cruel and unusual under the civilized standards of 1994.

1

Degrading to the Dignity of the Human Being

The punishment of death is inherently degrading to the dignity of a human being for at least two reasons. First, the physical and psychological pain associated with it are barbaric. See, e.g., Amnesty International, United States of America, The Death Penalty (1987) pp. 108–19; K. Haas & J. Inciardi, "Lingering Doubts About A Popular Punishment," in 24 Criminal Justice System Annuals, Challenging Capital Punishment: Legal and Social Science Approaches (K. Haas & J. Inciardi eds., 1988) pp. 13, 23–24. Such pain exists whether the death penalty is carried out by electrocution, hanging or lethal injection,[11] and is especially bar-

---

[11] The following is a description of death by electrocution: "Electrocution produces visibly destructive effects as the body's internal organs are burned; the condemned prisoner often leaps forward against the restraining straps when the switch is thrown; the body changes colour; the flesh swells and may even catch fire; the prisoner may defecate, urinate or vomit blood. Eye-witnesses always report that there is a smell of burned flesh." Amnesty International, supra, p. 114.

Ellen Goodman, a syndicated columnist, has described death by lethal injection as follows: "The descriptions of his death were graphic enough. James David Autry, murderer, was strapped in a gurney in a Texas death chamber. From behind a wall lethal chemicals were injected into tubes that led to his body. As the drugs took effect, Autry began twitching, his knees jerked up. He grunted a bit and sighed. His stomach began to expand. He winced. His eyes looked cloudy. Then he was dead." E. Goodman, "Tuning Out TV Executions," Boston Globe, March 20, 1984. An edited version of this article also appeared in the Hartford Courant. E. Goodman, "Executions: Are They to Become the Next Televised Spectacular?" Hartford Courant, March 20, 1984, p. B9.

baric when an attempted execution is bungled.[12] "Since the discontinuance of flogging as a constitutionally permissible punishment . . . death remains as the only punishment that may involve the conscious infliction of physical pain." (Citation omitted.) *Furman* v. *Georgia,* supra, 408 U.S. 287–88 (Brennan, J., concurring).

Furthermore, "[t]he cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture." *People* v. *Anderson,* 6 Cal. 3d 628, 649, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972).[13] The death

[12] In *Francis* v. *Resweber,* 329 U.S. 459, 67 S. Ct. 374, 91 L. Ed. 422 (1947), the United States Supreme Court held that Louisiana could constitutionally execute Willie Francis, even though the first attempt to electrocute him had been bungled. Justice Burton's dissent includes several eyewitness descriptions of Francis during the bungled attempt. Id., 480 n.2 (Burton, J., dissenting).

[13] In his concurring opinion in *District Attorney For Suffolk District* v. *Watson,* supra, 381 Mass. 677–78, Justice Liacos furnished a vivid example of the psychological trauma suffered by a condemned prisoner whose death sentence was commuted at the last minute: "For over two years, Henry Arsenault lived on death row feeling as if the Court's sentence were slowly being carried out. Arsenault could not stop thinking about death. Despite several stays, he never believed he could escape execution. There was a day to day choking, tremulous fear that quickly became suffocating. If he slept at all, fear of death snapped him awake sweating. His throat was clenched so tight he often could not eat. His belly cramped, and he could not move his bowels. He urinated uncontrollably. He could not keep still. And all the while a guard watched him, so he would not commit suicide. The guard was there when he had his nightmares and there when he wet his pants. Arsenault retained neither privacy nor dignity. Apart from the guards he was alone much of the time as the day of his execution neared.

"And on the day of the execution, after three sleepless weeks and five days' inability to eat, after a night's pacing the cell, he heard the warden

penalty is inherently cruel, regardless of the method that is used to carry it out.[14]

Second, as Justice Brennan points out, punishment by death is a denial of a person's basic humanity. "Death is truly an awesome punishment. The calculated

explain the policy of the Commonwealth—no visitors, no special last meal, and no medication. Arsenault asked the warden to let him walk to the execution on his own. The time came. He walked to the death chamber and turned toward the chair. Stopping him, the warden explained that the execution would not be for over an hour. Arsenault sat on the other side of the room as the witnesses filed in behind a one-way mirror. When the executioner tested the chair, the lights dimmed. Arsenault heard other prisoners scream. After the chaplain gave him last rites, Arsenault heard the door slam shut and the noise echoing, the clock ticking. He wet his pants. Less than half an hour before the execution, the Lieutenant Governor commuted his sentence. Arsenault's legs would not hold him up. Guards carried him back to his cell. He was trembling uncontrollably. A doctor sedated him. And he was moved off death row." (Internal quotation marks omitted.)

Justice Liacos summarized it as follows: "The raw terror and unabating stress that Henry Arsenault experienced was torture; torture in the guise of civilized business in an advanced and humane polity. This torture was not unique, but merely one degrading instance in a legacy of degradation. The ordeals of the condemned are inherent and inevitable in any system that informs the condemned person of his sentence and provides for a gap between sentence and execution. Whatever one believes about the cruelty of the death penalty itself, this violence done the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." Id., 678–79.

[14] "A century-old passage from Dostoevsky's The Idiot gives a towering yet touching indication of the cruelty of capital punishment: 'But the chief and worst pain may not be in the bodily suffering but in one's knowing for certain that in an hour and then in ten minutes, and then in half a minute, and then now, at the very moment, the soul will leave the body and that one will cease to be a man and that that's bound to happen; the worst part of it is that it's certain. . . . To kill for murder is a punishment incomparably worse than the crime itself. Murder by legal sentence is immeasurably more terrible than murder by brigands. Anyone murdered by brigands, whose throat is cut at night in a wood, or something of that sort, must surely hope to escape till the very last minute. . . . But in the other case (execution) all that last hope, which makes dying ten times as easy, is taken away for certain. There is the sentence, and the whole awful torture lies in the fact that there is certainly no escape, and there is no torture in the world more terrible. . . .' " G. Gottlieb, "Testing the Death Penalty," 34 S. Cal. L. Rev. 268, 272 n.15 (1961).

killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose the right to have rights. A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a person for purposes of due process of law and the equal protection of the laws." (Internal quotation marks omitted.) *Furman* v. *Georgia,* supra, 408 U.S. 290 (Brennan, J., concurring). The destruction of a human being does not become any more humane simply because the state is the executioner. To burn human flesh to death by electrocution, or snuff out life through lethal injection, is not less inhumane because it is done in the name of justice.[15]

### 2

### Public Acceptance

The second factor we should consider is public acceptance of the death penalty. Public acceptance, as I pointed out previously, should not be measured in the abstract by opinion polls, or by the outraged response of the public to a particularly vicious murder. Instead, public opinion should be measured objectively in terms of society's actual record in imposing the death penalty.[16]

---

[15] To the contrary, it is less humane, because capital punishment " 'is . . . the most premeditated of murders, to which no criminal's deed, however calculated . . . can be compared . . . . For there to be an equivalency, the death penalty would have to punish a criminal who had warned his victim of the date on which he would inflict a horrible death on him and who, from that moment onward, had confined him at his mercy for months. Such a monster is not encountered in private life.' " A. Amsterdam, "Capital Punishment," The Stanford Magazine, Fall/Winter 1977, pp. 42–47, reprinted in The Death Penalty in America (H. Bedau ed., 3d Ed. 1982) p. 348, quoting A. Camus.

[16] Even public opinion polls demonstrate public reluctance and concern over the imposition of the death penalty. While a majority of the public

Over the last 100 years, there have been only seventy-three executions in Connecticut, and no one has been put to death since 1960. W. Bowers, Legal Homicide: Death as Punishment in America 1864–1982 (1984) pp. 419–20. Indeed, our whole state history demonstrates a reluctance to impose the death penalty. For example, from colonial days to the present, Connecticut has required that a capital conviction must be supported by the testimony of at least two witnesses. Laws of Connecticut (1673) p. 69 (section entitled "Witnesses"); see General Statutes § 54-83. This requirement is "unique in Anglo-Saxon jurisprudence" and reflect's Connecticut's " 'high regard for life.' " *State* v. *Schutte,* 97 Conn. 462, 465, 467, 117 A. 508 (1922). Moreover,

may support the death penalty in the abstract, public support for the penalty drops to below 50 percent when alternative sentences are considered. Given the choice, more people would support life imprisonment without parole plus restitution to the victim's family over the death penalty. In addition, many people have significant doubts about various aspects of the death penalty. Fifty-eight percent of those surveyed in an April, 1993 poll were concerned about the danger of executing innocent people. Forty-eight percent were concerned about racism in the application of the penalty, and another 42 percent had doubts about the ability of the death penalty to deter crime. Death Penalty Information Center, Facts About The Death Penalty (November 12, 1993) p. 4, citing a Greenberg/Lake and Torrance Group National Poll of April, 1993.

Indeed, polling data indicate that the public's opinion on the imposition of the death penalty would be significantly influenced if they were informed of the alternative sentence that can be imposed. A poll referred to in a recent United States Supreme Court case indicated the following: "More than 75 percent of those surveyed indicated that if they were called upon to make a capital-sentencing decision as jurors, the amount of time the convicted murderer actually would have to spend in prison would be an 'extremely important' or a 'very important' factor in choosing between life and death." *Simmons* v. *South Carolina,* U.S. , 114 S. Ct. 2187, 2191, 129 L. Ed. 2d 133 (1994) (citing a statewide public opinion survey conducted by the University of South Carolina's Institute for Public Affairs). If the penalty of death were declared unconstitutional, the alternative sentence in Connecticut that would be in place for the conviction of a capital felony under General Statutes § 53a-54b would be "a sentence of life imprisonment *without the possibility of release."* (Emphasis added.) This simply means life imprisonment without the possibility of parole or pardon.

in 1846, the Connecticut legislature created a distinction between first degree murder and second degree murder in order to limit the application of the death penalty. *State* v. *Dowd,* 19 Conn. 388, 391–92 (1849). This court held that the statute gave the jury discretion in all cases to find second degree murder, and therefore avoid the death penalty. Id., 393. In 1951, the legislature enacted a statute that allowed the jury to recommend life imprisonment rather than death for individuals convicted of first degree murder, making it even easier for the jury to avoid imposing the death penalty. See Public Acts 1951, No. 369.

It is also significant that around the time of the adoption of our first formal state constitution in 1818, England imposed the death penalty for at least 200 crimes;[17] 2 Swift's Digest, supra, p. 259; whereas Connecticut had narrowed the number to only five. See footnote 8. Many historians have recognized Connecticut's reluctance to impose the death penalty. "There have been, it is believed, within the last two hundred and twenty years, fewer executions in Connecticut for crime, than in any other state of equal size in the world. The records of our courts have scarcely the stain of blood upon them . . . ." 2 G. Hollister, The History of Connecticut (1855) p. 526. According to The Judicial and Civil History of Connecticut, our early capital laws "were seldom enforced, and, indeed, the cases in which capital punishment has been inflicted have been exceedingly rare, some counties hardly having known an execution." The Judicial and Civil History of Connecticut (D. Loomis & J. Calhoun eds., 1895) p. 63. "[T]he forefathers of Connecticut can only be admired for a clearer appreciation of human rights, human

---

[17] Apparently, perhaps due to evolving standards of decency, by 1818 even England was reducing its number of capital offenses. As noted previously, Swift had estimated the number at 241 when he wrote his System of the Laws of the State of Connecticut in 1796.

suffering and human justice, than the average of civilized nations." Id., p. 71.

Furthermore, the death penalty has been repudiated consistently in the northeastern part of our country and in many parts of the world.[18] New York, Maine, Massachusetts, Vermont and Rhode Island do not provide for capital punishment. It is difficult to understand why Connecticut, the birth place of the world's first constitution,[19] would continue to sanction the execution of human beings. Although we do not decide cases according to which side has the greatest number of supporters, it is significant that sixteen religious, social and other concerned groups have filed amicus briefs opposing the imposition of the death penalty in this case.[20]

### 3

### Arbitrariness and Capriciousness of the Death Penalty

The third factor that must be considered in determining whether the death penalty comports with contemporary standards of decency and morality is the arbitrary manner in which it is imposed. When the legis-

---

[18] See Amnesty International, supra, p. 228 (listing nations that have abolished the death penalty).

[19] See W. Maltbie, "The Unconstitutional Period of Connecticut History," 14 Conn. B.J. 22, 24 (1940) (Connecticut's Fundamental Orders of 1638 were the first written constitution known to history).

[20] These groups are American Friends Service Committee of the Religious Society of Friends (Quakers) in America, Amnesty International, Capitol Region Conference of Churches, Caucus of Connecticut Democrats, Connecticut Association for Human Services, Connecticut Chapter of the National Association of Social Workers, Connecticut Citizens for Humanizing Criminal Justice, Connecticut Civil Liberties Union Foundation, Connecticut Conference of the United Church of Christ, Connecticut Network to Abolish the Death Penalty, Episcopal Diocese of Connecticut, Hartford Monthly Meeting of the Religious Society of Friends, Inside-Out: Citizens United for Prison Reform, National Association for the Advancement of Colored People, Office of Urban Affairs of the Archdiocese of Hartford, and the Peace and Justice Committee of the Presbyterian Church of Southern New England.

lature debated our post-*Furman* death penalty statute, some legislators expressed great concern about the likelihood that the statute would be arbitrarily applied. For example, Senator Joseph Fauliso stated: "The Bill before us fails to remedy the arbitrary application of the law which was the critical element in [*Furman*]. Dean [Pollak], the distinguished scholar and the former dean of Yale Law School made a study of this Bill. He concluded by saying, I quote, 'The conclusion that this Bill is unconstitutional is not a criticism of the drafters, it is rather a recognition that they were undertaking a constitutional impossibility. Maintaining the idea of a death sentence while insuring that it would in practice almost never be imposed, the result necessarily is not merely [that death sentences] would be rarities but that those rarities would occur wantonly and freakishly and hence, unconstitutionally.' " 16 S. Proc., Pt. 4, 1973 Sess., p. 1892.

Similarly, Senator Joseph Lieberman objected that the bill established "a process which is so filled with opportunities to condemn one human being to death and find favorably for another in the same circumstances that it cannot withstand the . . . test of the *Furman* case. The situation is made increasingly fallible by the vagueness of some of the aggravating and mitigating factors . . . . I fully respect the apparent intention of the Judiciary Committee in writing in these factors which I assume was to protect all but the worst, most dangerous criminal from the ultimate sanction of death, but I feel in their attempt to take a terrible penalty and make it, one might use the word humane, they have built a crazy 'house of cards' which cannot stand." Id., p. 1906.

Justice Brennan expressed this same concern in *Furman:* "When a country of over 200 million people inflicts an unusually severe punishment no more than 50 times a year, the inference is strong that the pun-

ishment is not being regularly and fairly applied. . . .
When the rate of infliction is at this low level, it is highly
implausible that only the worst criminals or the crimi-
nals who commit the worst crimes are selected for this
punishment. No one has yet suggested a rational basis
that could differentiate in those terms the few who die
from the many who go to prison.'' *Furman* v. *Geor-
gia,* supra, 408 U.S. 293–94 (Brennan, J., concurring);
see generally C. Black, Capital Punishment: The
Inevitability of Caprice and Mistake (2d Ed. 1981).

Indeed, this case demonstrates the inherent arbitrar-
iness of our death penalty. After the defendant had
confessed to the murders of six young women in Con-
necticut, he was charged with capital felony in the judi-
cial district of Windham for two of the murders. The
state's attorney in that case, with full knowledge of all
of the murders that had been committed by the defend-
ant, allowed him to plead nolo contendre to two counts
of first degree murder and to be sentenced to two con-
secutive terms of life imprisonment (120 years).[21] When
the defendant was subsequently prosecuted in the judi-
cial district of New London for the other four murders,
a different state's attorney decided to proceed to trial
on the capital felony charges and seek the death pen-
alty. As a result, the defendant was convicted and sen-
tenced to death. This life-and-death difference between
the sentences received by the defendant for identical
crimes proves that an unacceptable level of arbitrari-
ness exists due to prosecutorial discretion, even if the
jury is adequately guided by the statute.

The available statistics also compel the conclusion
that prosecutorial discretion has resulted in the arbi-
trary imposition of the death penalty. Since 1973, there
have been at least fifteen cases in Connecticut in which

---

[21] General Statutes § 53a-35b provides that ''[a] sentence of imprison-
ment for life shall mean a definite sentence of sixty years . . . .''

the defendant was initially charged with capital felony, but was allowed to plead guilty to a lesser crime and avoid the death penalty. This number does not include cases in which the defendant could have been charged with capital felony originally but was not. Four of the fifteen cases were factually similar to the one before us, involving murders committed in the course of a sexual assault or kidnapping.

Justice Brennan described the effects of this arbitrariness as follows: "[D]iscrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (Internal quotation marks omitted.) *DeGarmo v. Texas,* 474 U.S. 973, 975, 106 S. Ct. 337, 88 L. Ed. 2d 322 (1985) (Brennan, J., dissenting). There is no better example of such arbitrariness than this case, in which, faced with identical crimes, one prosecutor pursued and obtained the death sentence, while another was satisfied with life imprisonment. See C. Black, supra, pp. 46–53, 51 (discussing the arbitrariness inherent in the prosecutor's decision to charge a capital offense; concluding that "within any foreseeable future, one of the absolutely crucial decisions for life or death—the decision whether to offer the defendant a chance to plead guilty to a noncapital offense—will be made administratively, on the basis of administrative discretion, without clear standards in law").

Arbitrariness also inheres in this court's decision to resolve this appeal before a majority of the justices of this court have had an opportunity to review the con-

stitutionality of the death penalty. Of the seven justices of the Connecticut Supreme Court, only three are qualified to sit on this case because of disqualifications by the remaining four. Of these three, only two are voting to uphold our death penalty statute. The other two judges who constitute the majority are sitting by designation of the chief justice.[22]

Clearly, these designated judges are as competent and capable of deciding important issues of law as the justices of the Supreme Court. The fact remains, however, that Michael Ross will be forced to undergo another death penalty sentencing hearing, and perhaps will even be executed, before a majority of the members of this court have considered the constitutionality of the death penalty. Because there are four other death penalty appeals pending before this court,[23] and because a greater number of justices probably would be qualified to sit on each of these appeals, it is possible that the death penalty will eventually be ruled unconstitutional by this court[24] sometime in the future.

---

[22] Pursuant to General Statutes § 51-207 (b), the chief justice of the Supreme Court may appoint one or more judges to sit on a case if less than five Supreme Court justices are available. This statute provides in relevant part: "If any judge is absent and [the right to a five member court] is claimed or if any judge is disqualified and the absence or disqualification is not waived or if the business before the court requires it, the chief justice . . . may summon the sixth or seventh member, or both, of the supreme court or one or more of the judges of the superior court to constitute a full court, who shall attend and act as judges of the supreme court for the time being."

[23] I note that the following death row defendants have had appeals pending in this court since the dates indicated: Robert Breton, Sr., November 20, 1989; Sedrick Cobb, October 11, 1991; Daniel Webb, November 8, 1991; and Terry Johnson, June 30, 1993.

[24] General Statutes § 51-199 provides in relevant part: "(a) The supreme court shall have final and conclusive jurisdiction of all matters brought before it according to law, and may carry into execution all its judgments and decrees and institute rules of practice and procedure as to matters before it.

"(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender

To me, upholding the death penalty for a particular defendant and allowing his case to move forward when a majority of the full court has not considered the constitutional issue is arbitrary and capricious. It is conceivable that Michael Ross will die, whereas the other death row inmates will be spared, because his appeal was heard first. I find this possibility unacceptable.[25]

Like Justice Glass, I am unwilling to tolerate "a certain amount of capriciousness in the application of the death penalty." *State* v. *Breton,* supra, 212 Conn. 281

status, for which the maximum sentence which may be imposed exceeds twenty years; (4) review of a sentence of death pursuant to section 53a-46b . . . ."

In addition, General Statutes § 53a-46b provides: "REVIEW OF DEATH SENTENCE. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

[25] I also find this possibility unnecessary. Barring objection by the defendant or good cause shown by the state, there is no reason that this appeal could not have been delayed until one of the other appeals, on which a greater number of the justices of this court would be qualified to sit, became ready for argument. Accordingly, this court should have given Michael Ross an opportunity to be heard, at an open hearing before the court and with all parties present, as to whether he had any objection to such a delay. Indeed, it seems to me that it would be cruel and unusual punishment to affirm his convictions, uphold the death penalty, and put him through the ordeal of another death penalty sentencing trial when a majority of the justices of this court have yet to vote on the constitutionality of the death penalty.

(*Glass, J.*, dissenting). Even if a conscious effort were made to eliminate arbitrariness in the imposition of the death penalty, it simply could not be achieved. "[T]he effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether." *Godfrey* v. *Georgia,* 446 U.S. 420, 442, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (Marshall, J., concurring). Although I recognize that there is a degree of arbitrariness in the imposition of almost any punishment, such capriciousness cannot be tolerated when the punishment is the final and awesome one of death. In view of the arbitrariness and capriciousness that inheres in our system, we cannot reasonably rely on it to decide who should live and who should die.

### 4

### Discrimination

A fourth factor that needs to be considered is the fact that the death penalty is imposed in a discriminatory fashion. Simply put, defendants who are convicted of murdering whites are much more likely to be sentenced to death than those convicted of murdering African-Americans. See *McCleskey* v. *Kemp,* 481 U.S. 279, 320, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (Brennan, J., dissenting) ("murder defendants in Georgia with white victims are more than four times as likely to receive the death sentence as are defendants with black victims"). A 1990 report by the United States General Accounting Office found that " '[i]n 82 [percent] of the studies [reviewed], race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., those who murdered whites were found more likely to be sentenced to death than those who murdered blacks.' " U.S. General Accounting Office, Death Penalty Sentencing (February 1990), quoted in Death Penalty

Information Center, Facts About the Death Penalty (November 12, 1993) p. 2. Furthermore, although 50 percent of the murder victims in this country are African-American, 84 percent of the victims in death penalty cases are white. Death Penalty Information Center, supra.

In addition, African-American defendants are more likely to receive the death penalty than white defendants, especially where the victim is white, and poor defendants are more likely to receive the death penalty than defendants generally. K. Haas & J. Inciardi, supra, p. 18; see C. Black, supra, pp. 94–102. "The poor and the black have been the chief victims of the death penalty. . . . It is the poor, the sick, the ignorant, the powerless and the hated who are executed." A Fortas, "The Case Against Capital Punishment," New York Times Magazine (January 23, 1977), reprinted in The Death Penalty (I. Isenberg ed., 1977) p. 122. A report issued by "the President's Commission on Law Enforcement and Administration of Justice concluded that 'there is evidence that the imposition of the death sentence and the exercise of dispensing power by the courts and the executive follow discriminatory patterns. The death sentence is disproportionately imposed and carried out on the poor, the Negro, and the members of unpopular groups.' The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice 143 (1967)." *District Attorney for Suffolk District* v. *Watson,* supra, 381 Mass. 668–69.

Fortunately, not enough people have been sentenced to death in Connecticut in recent years to allow this court to undertake meaningful statistical analysis. Nevertheless, the familiar patterns of discrimination are reflected in the current administration of the death penalty in Connecticut. All of the victims of the five

defendants now on death row in Connecticut are white, and two of the five defendants are African-American.[26]

## 5

## The Death Penalty Serves No Legitimate Purpose

The fifth factor to be considered is that there is simply no reason to justify the imposition of the death penalty. "Death is not only an unusually severe punishment, unusual in its pain, in its finality, and in its enormity, but it serves no penal purpose more effectively than a less severe punishment; therefore, the principle inherent in the [constitutional provision] that prohibits pointless infliction of excessive punishment when less severe punishment can adequately achieve the same purposes invalidates the punishment." *Gregg* v. *Georgia,* 428 U.S. 153, 230, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (Brennan, J., dissenting).

The death penalty does not deter crime. As Justice Marshall concluded, after reviewing the available research, there is simply no reliable evidence that capital punishment deters crime. See *Gregg* v. *Georgia,* supra, 428 U.S. 233–36 (Marshall, J., dissenting). Indeed, "[a] recent review of all post-1972 empirical studies on capital punishment identified no criminologist in the United States in the last fifteen years who

[26] It is important to note that the threat of discriminatory application of the death penalty is not limited to conscious discrimination. "[W]here standardless 'discretion' plays a part, or where close decisions of fact must be made on disputed evidence, or where vague and ambiguous concepts . . . must be applied to concrete facts, we are one and all susceptible to the tendency to see things in a better or worse light depending on our general sympathies; we fight against this, but in the end only the self-deluding think they can wholly avoid it. If this idea is right, then there is the ever-present danger that anyone against whom, for any reason, conscious or unconscious prejudice exists will come off worse than a person against whom such feeling does not exist. And of course the *unconscious* prejudice, the prejudice one thinks one has wholly overcome, is the more dangerous." (Emphasis in original.) C. Black, supra, pp. 100–101.

has claimed to find data showing that the death penalty has a long-term deterrent effect greater than that exerted by lengthy imprisonment." G. Pierce & M. Radelet, "The Role and Consequences of the Death Penalty in American Politics," 18 N.Y.U. Rev. L. & Soc. Change 711, 715–16 (1990–91). Furthermore, "common sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted." *Furman* v. *Georgia,* supra, 408 U.S. 312 (White, J., concurring).

William J. Bowers points out that "[w]e appear to be less concerned with the deliberation and premeditation of offenders than with the brutal, cruel, mindless, even irrational or spontaneous character of their crimes—suggesting that we are more serious about retribution or vengeance than about deterrence as the rationale for capital punishment." W. Bowers, "The Effect of Executions is Brutalization, Not Deterrence," in 24 Criminal Justice System Annuals, supra, p. 51. Retribution is not, however, a valid justification. I agree with Justice Marshall's statement in *Gregg* v. *Georgia,* supra, 428 U.S. 240–41 (Marshall, J., dissenting), that to be constitutional, "the death penalty must 'comport with the basic concept of human dignity at the core of the [prohibition against cruel and unusual punishment]' . . . the objective in imposing it must be '[consistent] with our respect for the dignity of [other] men.' . . . Under these standards, the taking of life 'because the wrongdoer deserves it' surely must fall, for such a punishment has as its very basis the total denial of the wrongdoer's dignity and worth."[27] (Citations omitted.)

[27] The financial aspects of a punishment have little meaning to me when life is at stake. Nevertheless, I suppose that there are some supporters of the death penalty who argue that their tax dollars should not be spent to

## 6

## Finality of Death

The last factor that should be considered in determining whether the death sentence is cruel and unusual punishment is the "irreversible finality of the execution of a criminal defendant . . . ." *Commonwealth v. O'Neal,* 369 Mass. 242, 276 n.1, 339 N.E.2d 676 (1975) (Wilkins, J., concurring). Mistakes cannot be corrected after a person is executed. A recent report documents that in the last twenty years, at least forty-eight people have been released from death row after their convictions were overturned because of significant evidence of their innocence. "Innocence and the Death Penalty: Assessing the Danger of Mistaken Executions," Staff Report, Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103d Cong., 1st Sess. p. 2 (1993). The report concludes that "[i]t is an inescapable fact of our criminal justice system that innocent people are too often convicted of crimes. Sometimes only many years later, in the course

keep convicted murderers alive. Of course, the real answer to this argument is that even a convicted murderer is a living human being. In terms of the financial aspects, the most comprehensive study in the country found that the death penalty costs $2 million *more* per execution than a nondeath penalty murder case with a sentence of life imprisonment. Death Penalty Information Center, supra, p. 4 (citing a May, 1993 study by Duke University); see also B. Nakell, "The Cost of the Death Penalty," Criminal Law Bulletin, January/February 1978, pp. 68–80, reprinted in The Death Penalty in America (H. Bedau ed., 3d Ed. 1982) p. 241 (a criminal justice system that includes capital punishment "is considerably more expensive than a criminal justice system without capital punishment"); Amnesty International, supra, p. 170 (death penalty cases "cost far more than ordinary criminal proceedings in terms both of time and money"). It costs the state of Connecticut approximately $20,000 per year to keep a person incarcerated. See *Johnson v. Meehan,* 225 Conn. 528, 556 n.8, 626 A.2d 244 (1993) (*Berdon, J.,* dissenting). The interest earned on the extra $2 million in costs identified by the Duke study would more than pay for a defendant's costs of incarceration, and indeed would probably fund the annual cost of confining five people.

of a defendant's appeals, or as a result of extra-legal developments, new evidence will emerge which clearly demonstrates that the wrong person was prosecuted and convicted of a crime. . . . Americans are justifiably concerned about the possibility that an innocent person may be executed. Capital punishment in the United States today provides no reliable safeguards against this danger. Errors can and have been made repeatedly in the trial of death penalty cases because of poor representation, racial prejudice, prosecutorial misconduct, or simply the presentation of erroneous evidence. Once convicted, a death row inmate faces serious obstacles in convincing any tribunal that he is innocent." Id., p. 19.

I recognize that the defendant, Michael Ross, has confessed his guilt, and does not claim that he is "innocent." This does not make the finality of the death penalty less of a concern, however. The defendant has steadfastly maintained that he was insane at the time he committed the murders, and therefore was not culpable for them. Both legally and morally, executing a person who was insane at the time he or she committed the crime would be just as wrong as executing a person who is innocent of the crime. See State v. Joyner, supra, 225 Conn. 490, 496–98 (Berdon, J., dissenting). Furthermore, even if a person who is condemned to die claims neither innocence nor insanity, there may have been errors in the penalty phase of the trial such that the death sentence should not have been imposed. Indeed, as the majority concedes, such errors occurred in this very case.

The biographer of Associate Justice Lewis F. Powell, Jr., recently disclosed that Powell confessed the decision he most regretted was his decisive vote to uphold the imposition of the death penalty on Warren McCleskey, whose appeal attacked the racial bias inher-

ent in the administration of the death penalty.[28] According to his biographer, four years after his retirement from the United States Supreme Court Justice Powell said, "I have come to think that capital punishment should be abolished." J. Jeffries, "A Change of Mind that Came too Late," The New York Times (June 23, 1994) p. A23, col. 1. Justice Harry Blackmun also recently changed his mind about the constitutionality of the death penalty. *Callins* v. *Collins,* U.S. , 114 S. Ct. 1127, 1134, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting). While Powell's change of heart came too late for Warren McCleskey, who died in Georgia's electric chair on September 25, 1991; J. Jeffries, supra, p. A23, col. 1; the transformation of the thinking of these two justices demonstrates the great difficulty that jurists of even the United States Supreme Court can experience in evaluating the constitutionality of the death penalty. This great difficulty, and the awesome finality that marks the execution of a defendant, are even more of a concern in this case than in most because a majority of the justices of this court are unable to participate in the decision of whether our death penalty is constitutional.[29] As it currently stands, two justices of this court believe the death penalty is constitutional, one does not, and four are silent. It is entirely possible, with four other death penalty appeals pending,[30] that a majority of this court will overturn the death penalty sometime in the future, but that the decision may come too late for Michael Ross.

The finality of the death penalty must be viewed in the context of what this court has done, over my dissent, to the writ of habeas corpus, which is the Great Writ of liberty. In the recent case of *Summerville* v. *Warden,* 229 Conn. 397, 431, 641 A.2d 1356 (1994), the

[28] *McCleskey* v. *Kemp,* supra, 481 U.S. 279.
[29] See part I B 3.
[30] See footnote 23.

majority held that a habeas petitioner who demonstrates that he or she is probably innocent is not entitled to a new trial. Although the majority refused to articulate a standard regarding the burden of proof a habeas petitioner claiming actual innocence must meet in order to obtain a new trial, all of the standards referred to in the opinion approximate the United States Supreme Court's requirement of "a truly persuasive demonstration of actual innocence," as articulated by a majority of that court in *Herrera* v. *Collins,*   U.S.   , 113 S. Ct. 853, 869, 122 L. Ed. 2d 203 (1993). See *Summerville* v. *Warden,* supra, 434.

As I demonstrated in my *Summerville* dissent, this standard "is simply absurd." Id., 442. What this standard will mean is that once the three year window for bringing a petition for a new trial has closed,[31] a defendant who has been convicted of a capital felony in Connecticut and sentenced to death will be able to obtain a new trial (assuming he or she is still alive) only if the defendant is able to prove that he or she is actually innocent. Therefore, our law, according to the *Summerville* majority and prior decisions of this court, will allow a criminal defendant to be executed even though there is a probability of his or her innocence. I do not believe that this result is acceptable to the people of Connecticut, who have always demonstrated the highest regard for the dignity of the human being, and insisted that justice be done.

The finality of the death penalty must also be considered in light of this court's unfortunate decisions,

---

[31] General Statutes § 54-95 (a) provides in relevant part: "Any defendant in a criminal prosecution, aggrieved by any decision of the superior court, upon the trial thereof, or by any error apparent upon the record of such prosecution, may be relieved by appeal, petition for a new trial or writ of error . . . ."

General Statutes § 52-582 provides that "[n]o petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of."

over the dissents of myself and Justice Katz, in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and *Carpenter* v. *Meachum*, 229 Conn. 193, 640 A.2d 591 (1994). The majority opinions in those cases held that if the habeas court denies a petition and denies the petitioner certification to appeal,[32] the petitioner may not bring a writ of error to obtain appellate review of the denial of the habeas petition. As a result, habeas petitioners no longer have an unqualified right to appeal from decisions of the habeas court. See *Carpenter* v. *Meachum*, supra, 203 (*Berdon, J.*, dissenting). The Great Writ is supposed to be a "bulwark against convictions that violate fundamental fairness," a line of defense against any injustice that remains after direct appeals have been exhausted. (Internal quotation marks omitted.) Id., 208. By severely restricting the opportunity for appellate review of habeas corpus proceedings, the majorities in *Simms* and *Carpenter* have made it far more likely that injustices at every stage of the criminal proceedings—including in the habeas proceeding itself—will go uncorrected. I pointed out in my dissent that "the best way to expedite the business of putting people to death is to limit severely the right to appeal in habeas corpus proceedings." Id., 206. The combination of the creation of an effective barrier to claims of actual innocence, and the elimination of the right to appeal from all claims brought in habeas corpus, will certainly result in some injustice going uncorrected.

Finally, the death penalty is too high a price to pay as retribution, especially in light of this court's recent decisions that have all but dismantled habeas corpus.

---

[32] General Statutes § 52-470 (b) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought in order to obtain his release by or in behalf of one who has been convicted of crime may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the supreme court or appellate court to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

See id., 206–207 (*Berdon, J.,* dissenting) (detailing the court's restrictive interpretations of the Writ over the past three years). Even if only one innocent life is extinguished in the process of putting people to death, that one life makes the cost of the death penalty unacceptable.

## C

### CONCLUSION

I can only conclude, on the basis of all the factors I have considered, that the imposition of the death penalty does not comport with contemporary standards of decency and morality. The California Supreme Court and the Supreme Judicial Court of Massachusetts have reached the same conclusion; *People* v. *Anderson,* supra, 6 Cal. 3d 628; *District Attorney for Suffolk District* v. *Watson,* supra, 381 Mass. 665; and so have justices of two other high courts. *State* v. *Kills On Top,* 787 P.2d 336, 356 (Mont. 1990) (Sheehy, J., dissenting); *State* v. *Dicks,* 615 S.W.2d 126, 134 (Tenn.) (Brock, J., dissenting), cert. denied, 454 U.S. 933, 102 S. Ct. 431, 70 L. Ed. 2d 240 (1981). Accordingly, I would hold that the death penalty is invalid under our state constitution.

## II

### CAPITAL SENTENCER: WHO SHOULD LIVE AND WHO SHOULD DIE

Even if I believed that our death penalty does not constitute cruel and unusual punishment, I would still agree with the defendant that our statutory scheme does not pass state or federal constitutional muster because, under it, neither the jury nor the judge is the capital sentencer. Specifically, the jury does not make the painful moral decision by explicitly setting forth in its verdict that the defendant should die, and the

judge exercises no discretion but merely imposes the sentence according to the jury's findings regarding the aggravating and mitigating factors.

The United States Supreme Court has held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell* v. *Mississippi,* 472 U.S. 320, 328–29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). The reason for this requirement is that the capital sentencer is thereby required to view its "task as the serious one of determining whether a specific human being should die at the hands of the State." Id., 329. Requiring that, if capital punishment is to be imposed, the sentencer must specifically state that the defendant should be put to death forces the sentencer, be it jury or judge, to confront " 'the truly awesome responsibility of decreeing death for a fellow human [so that the sentencer] will act with due regard for the consequence of [the] decision . . . .' " Id., 329–30.

Put simply, the jury—if the jury is the capital sentencer—must realize that it is making "an individualized determination that death is the appropriate sentence for a particular defendant." *Blystone* v. *Pennsylvania,* 494 U.S. 299, 309, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990) (Brennan, J., dissenting). The sentencer must consciously make the "judgment that death is 'the fitting and appropriate punishment' " for a particular defendant. *State* v. *Bey,* 112 N.J. 123, 162, 548 A.2d 887 (1988). Toward this end, the sentencer "must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." (Internal quotation marks omitted.) *Blystone* v. *Pennsylvania,* supra, 304–305. The requirement that the

sentencer must consider any relevant mitigating evidence "that would warrant a sentence less than death is meaningless unless the sentencer has the discretion and authority to dispense mercy based on that evidence." *Callins* v. *Collins,* supra, 114 S. Ct. 1134 (Blackmun, J., dissenting).

Under our death penalty statute, neither the judge nor the jury is an appropriate sentencer. The trial judge is obligated to impose the death sentence; General Statutes § 53a-46a (h); or not impose the death sentence; General Statutes § 53a-46a (g); on the basis of the jury's findings concerning aggravating and mitigating factors. The jury decides whether aggravating or mitigating factors exist, but never makes the specific moral judgment of whether the defendant should die.[33] Because neither the judge nor the jury confronts "the truly awesome responsibility of decreeing death for a fellow human" under our statutory scheme, the constitutional requirement that the capital sentencer act with due regard for the consequence of its decision is not met. See *Simmons* v. *South Carolina,*      U.S.      ,

---

[33] The end product of the jury's deliberations in this case on one of the counts, in accordance with the statute, was the following special verdict form, the format of which was identical to that used for the other counts:

"SPECIAL VERDICT: EXISTENCE OF AGGRAVATING FACTOR

QUESTION: Has the State of Connecticut proved beyond a reasonable doubt that the Defendant, Michael Bruce Ross, in the commission of the crime of 'Murder in the course of kidnapping' in connection with the death of Wendy B., committed the offense in an especially heinous, cruel, or depraved manner?

ANSWER: ____X____ YES

_____ NO

SPECIAL VERDICT: EXISTENCE OF MITIGATING FACTOR

QUESTION: In connection with the death of Wendy B., has the Defendant, Michael Bruce Ross, proved by a fair preponderance of the evidence, a mitigating factor?

ANSWER: _____ YES

____X____ NO"

114 S. Ct. 2187, 2198–99, 129 L. Ed. 2d 133 (1994) (Souter, J., concurring).

In this case, the trial judge did instruct the jury that the death penalty would be imposed if it found an aggravating factor and no mitigating factor.[34] While such an instruction is very beneficial, it is not a substitute for requiring the decision makers to look upon the accused—if they can[35]—and render a verdict that society requires that he or she be put to death. It is not enough to instruct the jury that based on its factual determinations the judge will or will not impose the death penalty, because this procedure could lead the jury to believe that there is another level of decision-making authority that will make the ultimate determination. If the ultimate punishment of death is to be inflicted, the decision makers must be fully aware that they have made the decision to inflict it, and this can be assured only if the decision makers are required to pronounce expressly a judgment of death. Indeed, in this case, the trial court underscored this deficiency in the statutory scheme by limiting counsel in their summations from explaining to the jurors the consequences of their decision on the aggravating and mitigating factors.[36]

---

[34] The trial judge instructed the jury as follows: "[I]f the jury finds that one or more of the aggravating factors exists and that no mitigating factor exists, the Court shall sentence the defendant to death.

"If the jury finds that none of the aggravating factors set forth exist or that one or more of the mitigating factors exist, the Court shall impose a sentence of life imprisonment."

[35] Anthony Amsterdam reports, on the basis of his own experience representing people charged with capital crimes: "The jury hears evidence and votes; and you can always tell when a jury has voted for death because they come back into court and they will not look the defendant or defense counsel in the eyes." A. Amsterdam, "Capital Punishment," The Stanford Magazine, Fall/Winter 1977, reprinted in The Death Penalty in America (H. Bedau ed., 3d Ed. 1982) p. 347.

[36] In regard to final argument, the trial court repeatedly cautioned counsel for the defendant to avoid emotional arguments concerning the ultimate

The majority holds that our statutory scheme meets eighth amendment requirements in reliance on *Blystone* v. *Pennsylvania,* supra, 494 U.S. 299. In *Blystone,* the court upheld a death penalty statute that, like our own, required the jury to sentence the defendant to death if it found an aggravating factor and no mitigating factor. Nevertheless, the jury in that case was specifically required to sentence the defendant to *death.* Id., 302; see also *Commonwealth* v. *Peterkin,* 511 Pa. 299, 306, 513 A.2d 373 (1986), cert. denied, 479 U.S. 1070, 107 S. Ct. 962, 93 L. Ed. 2d 1010 (1987) (jury determines whether defendant should be sentenced to death); *Commonwealth* v. *Blystone,* 519 Pa. 450, 475, 549 A.2d 81 (1988), aff'd, *Blystone* v. *Pennsylvania,* supra, 494 U.S. 299. Indeed, Pennsylvania requires the jury in a capital case to answer a special interrogatory that reads: "We the jury unanimously sentence the defendant to: _____ death _____ life imprisonment." See *Zettlemoyer* v. *Fulcomer,* 923 F.2d 284, 308 (3d Cir.), cert. denied, 502 U.S. 902, 112 S. Ct. 280, 116 L. Ed. 2d. 232 (1991). Because the Pennsylvania statutory scheme reviewed in *Blystone* v. *Pennsylvania,* supra, 494 U.S. 299, did not end the jury's function with a finding concerning aggravating and mitigating factors, but instead also required the jury to make the specific judgment of whether the defendant should live or die, *Blystone* does not control our decision.

---

effect of the jury's decision, and stated that "[i]f you get into that area, I will intrude." "I don't want emotional pleas to the jury about the irreversible step of their decision and threatening them as citizens of this state. That shouldn't be done. If it's a calm, cool approach to the function they have, the law I will give them. I don't bar you from mentioning it, but to continually bring this to their minds in an attempt to be emotional about it . . . it isn't going to happen." "I am just warning you not to do it. It's a sensitive area, and I think the legislature developed this statute for the very reason that the jury isn't to get involved. It was to remove from the jury the question of the ultimate penalty. They were to decide facts, mitigating and aggravating; and so be it in regard to how they decide it."

## III

### GUILT PHASE: ADVERSE INFERENCE FROM FAILURE TO CALL WITNESSES

In regard to the guilt phase of the defendant's trial, I believe the trial court committed harmful error by instructing the jury that it could draw an adverse inference from the defendant's failure to call as witnesses Howard Zonana, a psychiatrist, and Bruce Freedman, a psychologist, both of whom the defendant had consulted regarding his insanity defense (missing witness instruction). Although this court authorized missing witness instructions generally in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), I believe that the giving of such an instruction under the circumstances of this case constituted reversible error.

The trial court instructed the jury, in part, concerning these missing witnesses as follows: "[I]f a party has failed to call to the stand a witness who is within his power to produce and who would naturally have been produced by him, you may infer that the testimony of the witness would have been unfavorable to the party failing to call him and consider that fact in arriving at your decision. There are two requirements: One, the witness must be demonstrated by the evidence to be available; two, the witness must be a witness whom the party would naturally produce."[37] At trial, ample evi-

---

[37] The trial court elaborated on the missing witness instruction as follows: "So you have to determine those two threshold factors. Availability, naturally produced by whom. Now in that regard, you have to consider all the evidence in the case bearing on what is the probability, the naturalness of producing that witness.

"Whether the witness was available is a question of fact for you to determine before you draw an adverse inference from the absence of such a witness. Availability may be shown or determined not only from mere physical presence or accessibility for service, but also from the relationship, the usefulness or nature of the expected testimony, and this means only that the

dence was introduced to support a jury finding that both requirements had been met with regard to the mental health professionals who did not testify, including evidence introduced by the state specifically for this purpose.

As the majority acknowledges, in *State* v. *Toste,* 178 Conn. 626, 628, 424 A.2d 293 (1979), we held that where a psychiatrist or psychologist "is retained by a criminal defendant or by his counsel for the sole purpose of aiding the accused and his counsel in the preparation of his defense, the attorney-client privilege bars the state from calling the expert as a witness. The fact that the psychiatric expert was appointed by the court

witness [is] in such a relationship with a party, state or the accused, that [it] is likely that his presence would be procured.

"A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues or both, could reasonably be expected to have a peculiar or superior information material to the case which if favorable the party would have produced.

"As with the question of availability, it is for you to determine from the evidence presented whether the absent witness's testimony would be material or substantial to the case before you may draw an adverse inference.

"He has to be available. One, must be a witness whom the party would naturally produce; and your view of the entire evidence as it relates to that witness's name is whether you have a basis to conclude that the evidence they would have had would be peculiar or superior, substantial or material to the case.

"So unless you have the threshold questions decided that there is availability and there is a naturalness to one or another party producing him, you should not draw the inference that what they would have said would have been favorable to the party that you would have expected to call them.

"The failure of a party to call a witness who is available to both parties and does not stand in such a relationship to the party or issues so that the party would naturally be expected to produce him if his testimony was favorable, afford[s] no basis for an unfavorable inference.

"Converse. The failure of a party to call—the failure of a party to call a witness who is available to both sides and who does not stand in your judgment in such a relationship to the party in question or to the issues so that the party would naturally be expected to produce him, if his testimony was favorable, afford[s] no basis for an unfavorable inference. That's so even though availability is established and equally available to both sides."

rather than employed by the defense is irrelevant; the law affords no lesser protection for a defendant who is indigent than for one with means to retain his own psychiatrist to prepare a defense. This rule is consistent with a majority of jurisdictions who have resolved this issue."

The majority suggests, without deciding the issue, that the state may destroy the privilege through the back door by obtaining a missing witness instruction. In other words, although communications between a defendant and the psychiatrist are privileged, the state may obtain, as it did in this case, an instruction permitting the jury to draw an adverse inference if the defendant does not call the psychiatrist as a witness.

I am troubled by the fact that the majority does not decide whether the giving of the missing witness instruction was error, although it suggests that the instruction may have been appropriate. I believe that this issue should be reached. It was appropriately raised by the defendant and fully briefed by the parties. Furthermore, this issue: (1) goes to the heart of the only defense asserted by the defendant in the guilt phase of his trial; and (2) is crucial to our jurisprudence, not only in regard to the privilege for communications between a defendant and his psychiatrist, but in regard to other privileges as well.

I believe that interpreting a privilege to allow such a missing witness instruction effectively annuls the privilege. "Where [a] privilege has been exercised, the established principle which permits an inference that the excluded testimony would be unfavorable to the party who suppressed it ought to yield, as being inconsistent with the full exercise of the privilege." *Bisno v. United States*, 299 F.2d 711, 723 (9th Cir. 1961) (Hamley, J., concurring), cert. denied, 370 U.S. 952, 82 S. Ct. 1602, 8 L. Ed. 2d 818 (1962); see also *State*

v. *Holsinger,* 124 Ariz. 18, 601 P.2d 1054 (1979); *Daniels* v. *Beeson,* 312 So. 2d 441 (Miss. 1975); *George* v. *State,* 98 Nev. 196, 644 P.2d 510 (1982).

The majority claims that this court "[has] in fact applied the *Secondino* [missing witness] rule in a number of contexts despite the possible existence of a privilege restricting the applicability of the rule." This statement is misleading because the cases cited by the majority do not support the giving of a missing witness instruction over a claim of privilege. In *Secondino* v. *New Haven Gas Co.,* supra, 147 Conn. 676, this court did hold that a missing witness instruction was appropriate where the plaintiff in a personal injury case failed to call her treating physician as a witness. The majority neglects to mention, however, that Connecticut did not recognize a privilege for physician-patient communications until 1990, thirty years after *Secondino* was decided. See General Statutes § 52-146o; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 12.8.1, p. 455, and (1993 Sup.) § 12.8.1, p. 168. Therefore, there was no privilege at issue in that case. The same is true of *State* v. *McLaughlin,* 126 Conn. 257, 10 A.2d 758 (1939), in which this court rejected the defendant's claim that the trial court had improperly allowed the state to comment on the failure of the defendant's wife to testify. The defendant never asserted the privilege for marital communications. To the contrary, the defendant's claim was predicated on the trial court's refusal to grant a one day continuance so that his wife would be available to testify. Id., 260–61. Finally, in *D'Amico* v. *Manson,* 193 Conn. 144, 153, 476 A.2d 543 (1984), a habeas corpus case, the plaintiff claimed before the trial court that his guilty pleas should be vacated because he had been given an "erroneous impression" concerning the maximum sentence he could be given if convicted. The trial court rejected this claim, relying, in part, on the plaintiff's failure to call his trial

attorney as a witness. Id. The attorney-client privilege is not even mentioned in the opinion. Moreover, because the competence of the plaintiff's attorney was "implicitly under attack"; id.; *D'Amico* resembles a case in which the client and his or her attorney are involved in a lawsuit and the privilege does not apply. See C. Tait & J. LaPlante, supra, (2d. Ed 1988) § 12.5.7, p. 448. Finally, any suggestion in *D'Amico* that the inference may be drawn is pure dicta because the *D'Amico* court held that the two prerequisites for a missing witness instruction had not been met.[38] Indeed, the majority concedes that not one of these cases explicitly considers the relationship between a missing witness instruction and the attorney-client privilege.

Furthermore, allowing a missing witness instruction under the circumstances of this case flies in the face of reason. In order to avoid the adverse inference raised by the missing witness instruction, the defendant must call the psychiatrist as a witness. This places the defendant in a "Catch-22" position: he is damned if he calls the witness because he loses the privilege as a result of the psychiatrist's testimony, and damned if he does not call the witness because he loses the privilege when the jury is instructed that it may draw an adverse inference.

The amicus brief filed by five forensic psychiatrists[39] who practice and teach in Connecticut cogently points

---

[38] The court held: "We have serious reservations as to whether such an inference can be justified, because an attorney, whose competence is implicitly under attack in a habeas corpus proceeding, as in this case, is hardly a witness whom a disgruntled client would 'naturally' have produced. . . . In any event, the principle is inapplicable for the reason that there is nothing in the record to indicate the availability of the 'missing' witness, an essential prerequisite." (Citations omitted.) *D'Amico* v. *Manson,* supra, 193 Conn. 153.

[39] The amicus brief was filed by the following psychiatrists: Ezra E.H. Griffith, M.D.; Harold I. Schwartz, M.D.; Peter M. Zeman, M.D.; Kenneth M. Selig, M.D., J.D.; and John H. Felber, M.D., J.D.

out the importance of this issue to the truth-seeking function of a psychiatric examination.[40] This issue is also critical to the truth-seeking function of a trial: "[A] prosecutor should [not] be allowed to cast aspersions on a defendant's insanity defense simply by pointing out that a particular psychiatrist . . . was not called. To do so would encourage defense attorneys to seek out psychiatric witnesses who have come to be associated with the defense in such proceedings and not risk having their clients examined by persons who have either not testified in previous cases or who have testified on different occasions for the prosecution and defense. . . . [T]his would detrimentally affect the truth-finding function of a trial by virtually eliminating from the process those expert witnesses most likely to be impartial." *People* v. *Pate,* 108 Mich. App. 802, 808, 310 N.W.2d 883 (1981).

The majority's suggestion that a missing witness instruction may be needed in order to afford the state a fair opportunity to respond to an insanity defense ignores the arsenal of weapons that already are available to the state for this purpose. See, e.g., Practice Book § 758 (requiring the defendant to notify the state that he or she intends to rely on the defense of mental disease or defect); Practice Book § 759 (requiring the defendant to notify the state that he or she intends to introduce expert testimony concerning a mental dis-

---

[40] The brief states in part: "In order to be of assistance to the defense in evaluating the basis for a psychiatric defense, an accurate and detailed diagnosis of a defendant's mental condition must be performed. Such a diagnosis requires the development of a relationship of trust between the consulting psychiatrist and the defendant, in which the defendant feels free to provide full and open disclosure of his history and thought processes. If the outcome of a psychiatric examination sought by the defense may be used against a defendant at trial—whether through direct testimony or through an adverse inference drawn from the defendant's failure to call the expert—the truth seeking function of the examination is likely to be inhibited."

ease or defect, and to disclose any reports of mental examinations); Practice Book § 760 (requiring the defendant to submit to a psychiatric examination); Practice Book § 761 (authorizing the court to exclude expert testimony if the defendant fails to comply with §§ 759 and 760); see also *State* v. *Manfredi,* 213 Conn. 500, 517, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990) (trial court may order a defendant to submit to a psychiatric examination even before the defendant asserts an insanity defense). Most important, the state is not required to prove that the defendant was sane when he or she committed the crime. Instead, under General Statutes §§ 53a-12 and 53a-13, the defendant must prove lack of capacity by a preponderance of the evidence.

In any case, the majority concludes that the defendant was not harmed by the missing witness instruction because: (1) the jury learned that the defendant had been evaluated by Zonana and Freedman through the cross-examinations of Walter Borden and John Cegalis, the two psychiatrists who were called by the defendant; and (2) the testimony of Borden and Cegalis that the defendant suffered from a mental disease was weakened by the state's vigorous cross-examination. Neither of these reasons makes sense.

First, any weakening of the testimony of Borden and Cegalis is irrelevant to the question of harm unless the testimony was rendered insufficient as a matter of law to support the defendant's insanity defense. Barring insufficiency, which has not and could not be claimed in this case, it was the jury's function as fact finder to evaluate this testimony and determine whether the defendant had proven his defense. During this process of evaluation, the adverse inference from the missing witness instruction necessarily weighed against the defendant, who had the burden of proof. Indeed, the fact that the defendant's case had been weakened by

cross-examination necessarily magnified the importance of the inference in this weighing process, making it more—not less—harmful.

Second, the fact that the jury already knew that the defendant had been evaluated by Zonana and Freedman does not render the instruction harmless. In *Shelnitz* v. *Greenberg,* 200 Conn. 58, 75–76, 509 A.2d 1023 (1986), this court recognized, in the context of a missing witness instruction, that "[w]hat the jury may infer, given no help from the court is one thing. What it may infer when the court solemnizes the silence . . . into evidence . . . is quite another." (Internal quotation marks omitted.)[41] The requirements for a missing witness instruction must be strictly complied with because of "the potentially critical effect of such an inference" on the jury. *Fontaine* v. *Coyle,* 174 Conn. 204, 212, 384 A.2d 616 (1978). Improperly instructing the jury that it may draw an adverse inference is harmful error. *Bell* v. *Bihary,* 168 Conn. 269, 273, 362 A.2d 963 (1975).

Furthermore, as the majority points out, all that the jury could glean from the cross-examinations of Borden and Cegalis are: (1) that Zonana had examined the defendant; (2) that Freedman disagreed with Borden's diagnosis of sexual sadism because Freedman believed that the defendant suffered from "intermittent explosive disorder"; and (3) that Freedman found that the defendant did not suffer from psychotic think-

---

[41] This precise point was underscored by the Supreme Court of the United States in *Boyde* v. *California,* 494 U.S. 370, 384, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). In comparing the relative impact that argument of counsel and the instructions of the trial court have on the jury, the court stated: "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence . . . and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (Citation omitted.) Id.; *Simmons* v. *South Carolina,* supra, 114 S. Ct. 2198–99 (Souter, J., concurring).

ing and knew what he was doing when he killed the victims. This evidence falls short of establishing the adverse inference that was permitted by the instruction, that is, "that the testimony of [both witnesses] would have been unfavorable to the [defendant]" on the ultimate issue of insanity. Most important, the majority completely ignores the fact that there was nothing in the evidence before the jury to suggest that Zonana's testimony would have been unfavorable to the defendant.

Moreover, immediately before he gave this instruction, the trial judge emphasized its importance. After directing the jury's attention to Zonana and Freedman by name, he stated: *"Listen carefully to this.* It's not a very usual or an easy concept." (Emphasis added.) Furthermore, the trial judge permitted the state to highlight the absence of these two witnesses and the inference to be drawn therefrom during closing arguments, an opportunity that the state exploited very well.[42]

---

[42] The state argued the following: "Two other persons I want to mention. Dr. [Zonana]. My recollection is the information before you is that he ordered either the EEG or the CAT scan on February 22, 1985. Dr. Borden told you that Dr. Howard [Zonana] is a psychiatrist in New Haven, he's a forensic psychiatrist. I think he also said he's board certified, but I'm not certain of that. Where is Dr. Howard [Zonana]?

"Dr. Freedman, Dr. Bruce Freedman—incidentally, I submit the State can establish that Dr. [Zonana] was available, through the inspector, the officer from New Haven. Where is Dr. Bruce Freedman, the psychologist who first saw the defendant Michael Ross? Why isn't he here to testify to this jury to let you know what his findings are? My recollection is that Dr. Borden acknowledged on cross-examination that Dr. Freedman's diagnosis was somewhat different from theirs. I'm not sure of that, but I think that was elicited.

"Be that as it may, if Dr. [Zonana] could help the defendant, he would be here to testify. I submit to you, if Dr. Freedman by reason of his examinations could help the defendant, he also would be here to testify.

"Their failure to be here may be taken into account by you in your deliberations; although frankly, I don't really think it's necessary because I do think that the testimony of Dr[s]. Borden and Cegalis is sufficient for you

The instruction must be viewed as even more harmful in light of the facts that: (1) in the guilt phase of the trial, insanity was the defendant's only defense, he having admitted to sexually assaulting and killing the victims; and (2) the state did not itself present any evidence concerning the defendant's mental capacity to commit the crimes charged. The majority claims that it does "not dismiss lightly the defendant's claim" with regard to the missing witness instruction. Nevertheless, the adverse inference may very well have been the determining factor in the jury's rejection of the defendant's insanity defense. Therefore, while the majority may not dismiss the defendant's claim lightly, it has allowed the trial court effectively to deprive the defendant of an insanity defense by giving the missing witness instruction.

Giving the state the benefit of a missing witness instruction must also be viewed in the context of this court's ruling, over my dissent, that a defendant bears the burden of proof on the issue of insanity. See *State* v. *Joyner,* supra, 225 Conn. 450. Placing the burden of proof on the defendant concerning the insanity evidence he presents, while permitting an adverse inference against the defendant for the evidence he does not present, will have a devastating effect on the administration of justice. It will greatly increase the chances that a person who commits a crime as a result of men-

---

to conclude that this defendant suffers from no legal insanity as it will be defined to you by Judge Ford.

\*   \*   \*

"The excuse given for not calling Dr. Freedman. I don't remember Dr. Borden saying that I asked Dr. Freedman to do one thing for me and/or two things and he only did one thing. I don't remember him saying I called him back and said aren't you going to do these other tests or anything of that nature. My recollection was that apparently Dr. Freedman came up with a diagnosis—I think he testified to it—I think I asked him intermittent explosive disorder. The diagnosis is different from Dr. Borden. And that's why they went to Dr. Cegalis, because Dr. Freedman was not going to support the theory that Dr. Borden wanted to present to this jury."

tal illness will be incarcerated, or even executed, even though the person lacked the requisite culpability. This is not very far removed from the execution of minors; see *Stanford* v. *Kentucky,* 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989); or the mentally retarded. See *Penry* v. *Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). Although executing people with diminished mental capacity may pass federal constitutional muster, it "fails measurably to serve the goals of capital punishment" and therefore "is 'nothing more than the purposeless and needless imposition of pain and suffering.'" *Stanford* v. *Kentucky,* supra, 405 (Brennan, J., dissenting).

## IV

### SUMMARY

After fully exploring the subject of the death penalty, I can come to only one conclusion—that the death penalty fails to comport with contemporary standards of decency and morality. Not only does the death penalty degrade the individuals who are sentenced to die, but it also degrades and dehumanizes a society that permits it to be imposed, calling into question the morality of every one of us.

"There is little doubt that life is a fundamental right explicitly or implicitly guaranteed by the Constitution. *San Antonio Independent Sch. Dist.* v. *Rodriguez,* 411 U.S. 1, 33–34 [93 S. Ct. 1278, 36 L. Ed. 2d 16] (1973) . . . ." (Internal quotation marks omitted.) *District Attorney for Suffolk District* v. *Watson,* supra, 381 Mass. 663. No other right is more precious; indeed, it is the one right that brings everyone, rich and poor, down to a common denominator. Even if the state imposes the death penalty on only the most wicked among us, all of our lives are cheapened when a human being is executed.

I would hold that the death penalty statute is unconstitutional, and that the trial court committed harmful error in instructing the jury, during the guilt phase of the defendant's trial, that it may draw an unfavorable inference from the defendant's failure to call as witnesses a psychiatrist and a psychologist with whom he consulted concerning his insanity defense.

Accordingly, I respectfully dissent.